Volume 8

Pages 1456 - 1713

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )          NO. CR 11-00573 JSW
                                   )
WALTER LIEW; ROBERT MAEGERLE;      )
and USA PERFORMANCE TECHNOLOGY,    )
INC.,                              )
                                   )
          Defendants.              )
_____)
                                   San Francisco, California
                                   Wednesday, January 22, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                         MELINDA HAAG
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
                    BY:  **PETE AXELROD**
                         **JOHN H. HEMANN**
                         **ASSISTANT UNITED STATES ATTORNEYS**

                         U.S. DEPARTMENT OF JUSTICE
                         600 E Street NW
                         Washington, D.C.  20044
                    BY:  **RICHARD S. SCOTT**
                         **ASSISTANT U.S. ATTORNEY**

           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
             Official Reporters

1    **APPEARANCES**:   **(CONTINUED)**

2    For Defendant Walter Liew and USA Performance Technology, Inc.:
                          KEKER & VAN NEST LLP
3                         633 Battery Street
                          San Francisco, California  94111
4                   BY:   **STUART L. GASNER**
                          **SIMONA A. AGNOLUCCI**
5                         **KATHERINE M. LOVETT**
                          **CHRISTINA BLAIS**
6                         **ATTORNEYS AT LAW**

7    For Defendant Robert J. Maegerle:
                          MCKENNEY & FROELICH
8                         1349 West Peachtree Street
                          Two Midtown Plaza - Suite 1250
9                         Atlanta, Georgia  30309
                    BY:   **JEROME J. FROELICH, JR.**
10                        **ATTORNEY AT LAW**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## I N D E X

Wednesday, January 22, 2014

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **WHITE, CHRISTOPHER (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1481 | 8 |
| Cross-Examination resumed by Mr. Gasner | 1482 | 8 |
| Cross-Examination by Mr. Froelich | 1514 | 8 |
| Redirect Examination by Mr. Axelrod | 1521 | 8 |
| Recross-Examination by Mr. Froelich | 1528 | 8 |
| | | |
| **DAYTON, DANIEL** | | |
| (SWORN) | 1532 | 8 |
| Direct Examination by Mr. Axelrod | 1532 | 8 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 161 | | 1576 | 8 |
| 787 | | 1523 | 8 |
| 847 | | 1567 | 8 |
| 848 | | 1571 | 8 |
| 849 | | 1565 | 8 |
| 894 | | 1574 | 8 |
| 895 | | 1558 | 8 |
| 918 | | 1675 | 8 |
| 1726 | | 1501 | 8 |
| 3488 | | 1498 | 8 |

```
 1   Wednesday - January 22, 2014                    7:49 a.m.

 2                    P R O C E E D I N G S

 3                        ---o0o---

 4       (Proceedings were heard out of the presence of the jury:)

 5           THE COURT:  Good morning, everybody.  Please be

 6   seated.

 7       Call the case, Ms. Ottolini.

 8           THE CLERK:  Calling Case Number CR-11-573,

 9   United States versus Walter Liew, United States versus Robert

10   Maegerle, and United States versus USAPTI.

11       Counsel, please state your appearances.

12       MR. AXELROD:  Good morning, Your Honor.  Pete Axelrod,

13   John Hemann, and Richard Scott for the United States.

14           THE COURT:  Good morning.

15       MR. GASNER:  Good morning, Your Honor.  Stuart Gasner,

16   Simona Agnolucci, Katie Lovett for USAPTI and Walter Liew who

17   is present.

18           THE COURT:  Good morning.

19       MR. FROELICH:  Good morning, Your Honor.  Jerry

20   Froelich for Mr. Maegerle who's present.

21           THE COURT:  Good morning, everybody.

22       Okay.  So in no particular order, the first issue that I

23   want to deal with is the note that we got from the juror that

24   says as follows:  (reading)

25               "Your Honor, my wife's sister-in-law" -- this is from
```

**PROCEEDINGS**

1    Antonio Xavier, Juror Number 7 -- "My wife's sister-in-law

2    has been diagnosed with breast cancer recently and will

3    start the chemotherapy and radiation treatment starting

4    next Monday, 1/27/2014.  My wife will be one of her

5    support persons, and," I can't read, "and thereafter she

6    will be with her on Monday morning.  Being that said, I

7    need to take care of our eight-month-old baby girl in the

8    morning before dropping her to the daycare.  So I need to

9    be excused on Monday, 1/27/2014.  Sincerely."

10    So my proposal would be to release this juror.  We have

11    four alternates.  We're a number of weeks into the trial.  The

12    Government says it's going to rest by Thursday, and I'll take

13    it.  That's what Mr. Hemann said yesterday, so I take him at

14    his word, and I don't need to hear comment on that; but the

15    point is we're moving along.

16    I worry about the emotional stress on this juror, and we

17    have enough alternates.  And it is not in the cards to take off

18    Monday.  We are not going to take off an extra day.  So that's

19    not going to happen.

20    So what's the Government's position?

21    **MR. HEMANN:**  Your Honor, just I do want to clarify.

22    It was Thursday in three weeks.  Three weeks -- two weeks from

23    this Thursday.

24    **THE COURT:**  Oh, all right.  Okay.

25    **MR. HEMANN:**  Sorry.

1        **THE COURT:**  I thought you said, "We're on schedule."

2        **MR. HEMANN:**  We're on schedule for the seven weeks

3 that we predicted at the beginning.

4        **THE COURT:**  For the whole trial?

5        **MR. HEMANN:**  Correct.  Correct.

6        **THE COURT:**  All right.  So what's the Government's

7 position with respect to this note?

8        **MR. HEMANN:**  The thought we had had, Your Honor, was

9 to inquire as to how late he might be.  It does suggest he's

10 going to daycare and that there's a daycare drop-off.  I mean,

11 if it's 9:00 o'clock, I think our position would be that's

12 probably fine to start at 9:00 rather than 8:00 to spare the

13 juror.  If it is 10:30, then I guess we would probably be

14 inclined to agree with the Court, or the whole day, whatever.

15        **THE COURT:**  All right.  What's your position,

16 Mr. Gasner?

17        **MR. GASNER:**  Your Honor, we'd prefer to keep this

18 juror.  I mean, it is his wife's sister-in-law.  It's a

19 one-time support thing for the treatment, which we're certainly

20 sympathetic to; but it does seem as though, as Mr. Hemann says,

21 if it's just a small accommodation, that would be ideal.

22    And if it's a matter of discharging the juror because of

23 this, I think relative -- I don't think this is going to have a

24 big emotional impact on the juror himself given that it's a

25 sister-in-law and it's just a one-day thing; but, of course,

**PROCEEDINGS**

 1   I'm not familiar with his personal situation.

 2       But we prefer to keep the juror than --

 3           **THE COURT:**  All right.  Well --

 4       **MR. HEMANN:**  Your Honor --

 5           **THE COURT:**  -- as I said, I'm not inclined to take

 6   Monday off, so that's not going to happen.  So I guess -- and

 7   I'll hear from Mr. Froelich as well, but it seems to the Court

 8   that what Mr. Hemann says is valid.  We can start an hour later

 9   and go an hour later so we can -- we won't lose any time, but

10   I'd want to query the juror about whether he feels that

11   emotionally he can continue with the case.  He hasn't said

12   anything, and he's a trooper about it, but I think I can firm

13   that question up and see what he has to say, and then we can

14   discuss it afterwards.

15       **MR. HEMANN:**  Your Honor, one other possible area of

16   inquiry might be as to whether he anticipates this to recur.

17   Mr. Gasner -- I mean, it does indicate this is a one-time

18   thing, and based on the note it appears that way; but if this

19   is going to be a recurrent issue, that's probably something

20   that might be worth inquiring about.

21       **MR. GASNER:**  What I worry about, Your Honor, is what

22   message this sends to the rest of the jurors.  If this is

23   adequate to be excused from the jury, I wonder whether we might

24   run out of alternates.

25           **THE COURT:**  Well, you know, we have to take each one

 1   as we find it.  This one appears to be very legitimate and

 2   appropriate, at least so that we should make an inquiry.

 3        But, you know, I don't want to have a juror that is

 4   distracted; and I think, as the Government has pointed out, if

 5   there are other treatments, because it sounds like the

 6   chemotherapy is going to start this Monday, and if the

 7   chemotherapy is going to continue such that there's going to be

 8   another day that needs to be taken off, then I think we might

 9   as well call the question now.

10        So let's get the facts, and then we can talk about it

11   after.

12        Mr. Froelich, do you have anything to say about that?

13        MR. FROELICH:  No, Your Honor.  I'd like to hear what

14   the juror has to say.

15        THE COURT:  Okay.  Great.  So let's put that one on

16   the back burner.

17        Yes, Mr. Gasner?

18        MR. GASNER:  Just some other inquiries that the Court

19   may wish to employ.  One is, when the diagnosis was, whether

20   this really is something new that is upsetting or something

21   that he's lived with for a while.  That's the only other

22   thought that comes to mind in terms of getting the full

23   picture.

24        THE COURT:  Well, I don't know that it matters that

25   much.  I suspect -- you could take it either way.  If it was

1    just -- let's say it was diagnosed a few weeks ago, and the

2    juror did not ask for a hardship because the juror felt that he

3    would be able to handle this; and now the chemotherapy is here,

4    it's a reality.  Does it really matter when it was diagnosed?

5    I mean, I don't think this is pretextual in any way.

6         **MR. GASNER:**  No.  I just think it has to do with

7    gauging whether this is really going to affect the juror

8    emotionally, if this is something that they've been living with

9    and there's this one appointment.  I think it's all part of the

10   factual context, and I'm sure the Court will make an

11   appropriate inquiry.

12        **THE COURT:**  Okay.  Well, I'll do that at the

13   appropriate time.

14        All right.  The other issue the Court wanted to get to was

15   the issue of the exhibits that were identified, and the Court

16   conditionally sustained an objection over it or reserved, which

17   had to do with the Exhibit 787, which was a set of -- which are

18   three confidentiality agreements, each of which was executed,

19   allegedly, by Mr. Maegerle; and then Exhibit 105, which is a

20   letter or an email with some documents attached.

21        So I looked at the Government's offer of proof and

22   Mr. Maegerle's response; and the question I have for you,

23   Mr. Axelrod, is as follows:

24        To the extent -- the Government has represented or made an

25   offer of proof that somehow this transmittal and these

1    documents show Mr. Maegerle violated his confidentiality

2    agreement with his former contracting partner and employer

3    Gaylord.  What evidence does the Government have to that

4    effect?

5         MR. AXELROD:  Sure.  It's the face of the agreement

6    itself, Your Honor.  If you look at the confidential disclosure

7    agreement, the first one, it defines confidential information,

8    and it specifically identifies how that information will be

9    treated.

10        So if you look at 787, page 2, in paragraph 3 there's a

11   discussion of the treatment of confidential information.

12        THE COURT:  No, I understand that, that it does

13   prohibit that; but how do we know that the information -- what

14   proof does the Government have that the information that was

15   transmitted to Mr. Liew was, indeed, subject to the agreement?

16   Is there going to be a Gaylord witness or somebody else?

17        MR. AXELROD:  No, but let me explain.

18        THE COURT:  Yes.

19        MR. AXELROD:  The document, the confidential

20   disclosure agreement, specifically states that:  (reading)

21        "Confidential information as used herein shall mean

22        all information, documentation, and devices disclosed or

23        made available to Maegerle in connection with, but not

24        limited to, information related to mechanical design."

25        That's a document from Gaylord that says "Control Copy."

 1    That is more than sufficient to -- that's Gaylord information.

 2    It's covered by these agreements.  That's the basis.

 3          THE COURT:  Is the legal theory that somehow this is a

 4    prior similar act of theft of trade secrets?

 5          MR. AXELROD:  No.  It's inextricably intertwined.  It

 6    shows his, first of all, his knowledge.  He signed these

 7    agreements.  He knows the terms of the agreements.  He agrees

 8    to handle information in a particular way, and then he

 9    disregards that agreement and in furtherance of this particular

10    conspiracy, which is to assist Mr. Liew in working out on this

11    TiO2 project and getting it developed and having a set of pipe

12    specifications.  Obviously it's helpful because he's passing it

13    on to use it.

14        So that's the theory.  I mean, it's --

15          THE COURT:  All right.  Mr. Froelich?

16          MR. FROELICH:  There's nothing on that document that

17    says it's confidential, Your Honor.  And you're going to ask

18    the jury to speculate and draw legal conclusions, which I don't

19    think -- they have no evidence that says it's a confidential

20    document.  There's no one coming in here from Gaylord.

21        And, in addition, I have an explanation but it doesn't

22    matter now, because the point of it is, there's nothing on that

23    document that says confidential.  We're throwing something

24    before a jury, and it's 404(b) because he's not charged with

25    revealing Gaylord information.  They haven't given notice of

**PROCEEDINGS**

 1   it.

 2        And I think it's pure speculation.  They've admitted

 3   they're not calling anybody from Gaylord, so they're going to

 4   make an argument.  That's what it is.  It's to base an

 5   argument, not on facts, not on someone from Gaylord saying,

 6   "This is confidential."  They're bringing people in from DuPont

 7   to say things are confidential.  They're not doing that with

 8   Gaylord.

 9             **THE COURT:**  Mr. Gasner, did you want to add anything?

10             **MR. GASNER:**  No, Your Honor.  We defer to Mr. Froelich

11   on this issue.

12             **THE COURT:**  All right.  Well, here's the ruling of the

13   Court:

14        First of all, I'm going to admit Exhibit 787 because I

15   think that there is some probative value with respect to the

16   issue of Mr. Maegerle's knowledge of confidentiality

17   agreements, his experience with them, and the like.

18        And to the extent there's any prejudicial effect, it is

19   not clearly prejudicial in the sense that the case is about

20   confidentiality agreements.  There's really not a whole lot of

21   dispute that the Court has heard that there were not in

22   existence these confidentiality agreements with DuPont; and,

23   so, any prejudice with respect to these documents that are

24   further evidence of Mr. Maegerle's experience with

25   confidentiality agreements is minimal.

```
 1          With respect to Exhibit 105, I'm excluding it.  I think

 2   that there's a -- I think the Government's best argument shows

 3   that the documents may be probative, but I think the probative

 4   value is clearly outweighed by the prejudicial effect of

 5   throwing -- of the allegation that Mr. Maegerle is somehow a

 6   serial thief of, if you will -- I don't know what the verb

 7   is -- thief, stealer of confidential information or trade

 8   secrets.

 9          And without regard -- and this case, a substantial amount

10   of this case, is being taken up and to be taken up with the

11   issue of whether the materials that the defendants were

12   utilizing and obtained from DuPont were trade secrets, as that

13   term is defined in the statute; and that based upon the

14   competing offers of proof, I don't think the Government's going

15   to be able to prove -- lay out such probative value as to

16   overcome the prejudicial effect.

17          So that document is excluded, and that's the Court's final

18   ruling.

19          All right.  With respect to the juror, let's bring out

20   Juror Number 7, Mr. Alexander [sic].

21              THE CLERK:  Anthony Xavier.

22              THE COURT:  Ms. Alexander, Antonio.  Is it a female?

23              THE CLERK:  Xavier is his last name.

24              THE COURT:  Oh, Xavier.  It's a male?

25              THE CLERK:  It is a male.
```

 1              THE COURT:  Okay.

 2              MR. GASNER:  Your Honor, I had a couple other issues.

 3              THE COURT:  All right.  Just a moment.

 4              MR. GASNER:  I don't know if the Court wants to bring

 5     them up after the juror --

 6              THE COURT:  Well, let's -- no.  Why don't we bring it

 7     up after because we're going to be discussing it anyway, we're

 8     going to be discussing what the juror says.

 9              MR. GASNER:  Very well, Your Honor.  Thank you.

10              THE COURT:  All right.

11              THE CLERK:  So you want the juror in?

12              THE COURT:  Yes.

13                   (Juror Number 7 entering courtroom.)

14              THE CLERK:  If you would just take your seat in the

15     box, please.

16          Your Honor, we're still missing one juror.

17              THE COURT:  All right.  You may be seated.  Thank you.

18          Good morning, Mr. Xavier.  How are you?

19              JUROR NO. 7:  Fine.  Thank you.  How are you?

20              THE COURT:  Fine.  Thank you very much.

21          So we received your note, and I had a couple of questions

22     to follow up on the note.  And we appreciate your being candid

23     with the Court and advising us of your status.

24          And the first question I want to ask you is:  You said in

25     your note that your wife's sister-in-law has been diagnosed

1   with breast cancer recently.  Would you mind telling us when

2   she was diagnosed with breast cancer?

3            **JUROR NO. 7:**  Before Christmas, Your Honor.

4            **THE COURT:**  Okay.  And, so, what is new about this is

5   that the radiation treatment has been scheduled?

6            **JUROR NO. 7:**  It was scheduled last week.

7            **THE COURT:**  It was just scheduled last week?

8            **JUROR NO. 7:**  Yes, Your Honor.

9            **THE COURT:**  For next Monday?

10           **JUROR NO. 7:**  Yes, Your Honor.

11           **THE COURT:**  All right.  And, so, the issue for Monday

12   is that you have to drop your 8-year-old [sic] off at daycare?

13           **JUROR NO. 7:**  Yes, Your Honor.

14           **THE COURT:**  All right.  What time -- if we were to

15   delay the start of the trial -- what time do you have to drop

16   your child off and what time -- if you had to come after that,

17   come to court, when could you arrive here?

18           **JUROR NO. 7:**  The daycare starts at 8:30 at South

19   San Francisco, and it depends on traffic.  I could be here,

20   like, half an hour, 45 minutes.

21           **THE COURT:**  All right.  So 9:30 would be pretty safe?

22           **JUROR NO. 7:**  Yes, Your Honor.

23           **THE COURT:**  All right.  Would that be acceptable to

24   you?

25           **JUROR NO. 7:**  Okay.

```
 1              THE COURT:  Okay.  You seemed a little reluctant.  Do
 2   you have some concern about that?
 3              JUROR NO. 7:  I don't know what the situation will be.
 4   I mean, it just depends on the traffic.
 5              THE COURT:  Okay.  Let me ask you this -- obviously,
 6   that's always the case in this area.  We all have to live with
 7   that.
 8        Do you anticipate that the situation with respect -- that
 9   you're going to face on Monday will recur throughout this
10   trial?  Meaning, do you anticipate there will be additional
11   radiation treatments which will require you potentially to come
12   in later than the appointed hour of 8:00 a.m.?
13              JUROR NO. 7:  You mean that day only or future on
14   because I don't --
15              THE COURT:  In the future.
16              JUROR NO. 7:  Future.  I will not know when her
17   scheduled appointments will be because after Monday, I might
18   have to let you know ahead of time like today.
19              THE COURT:  All right.  So, in other words, today,
20   sometime today, you will know when the remainder -- when the --
21              JUROR NO. 7:  Sorry.  I would have to let you know by
22   Monday when will -- her next appointment will be.
23              THE COURT:  Okay.  So you have no idea today how long
24   it will be before the next appointment will be?
25              JUROR NO. 7:  Yes, Your Honor.
```

1      **THE COURT:**  And when the next appointment occurs, do

2  you anticipate that we'll have the same situation, meaning

3  you'll have to drop your child off and perhaps start late?

4      **JUROR NO. 7:**  Yes, Your Honor.

5      **THE COURT:**  Okay.  Do you have any idea of how many

6  treatments she's going to have within the next, let's say, six

7  weeks?

8      **JUROR NO. 7:**  I do not know, but all I know is this is

9  her second stage, and I don't know how many treatments there

10  will be.

11      **THE COURT:**  But you say you'll know that tomorrow?

12      **JUROR NO. 7:**  I mean, next Monday.

13      **THE COURT:**  Next Monday you'll know that.  Okay.

14      **JUROR NO. 7:**  Yes.

15      **THE COURT:**  All right.  So if we decided to start next

16  Monday, the 27th, let's say at 9:30, understanding you might be

17  a few minutes late, that would be acceptable to you?

18      **JUROR NO. 7:**  Yes, Your Honor.

19      **THE COURT:**  All right.  Let me ask you this question:

20  Of course, I don't know the relationship with your wife's

21  sister-in-law.  Will the ongoing treatments be distracting to

22  you such that it will be difficult for you to continue to

23  serve?

24      **JUROR NO. 7:**  I do not know.

25      **THE COURT:**  Could you explain what you mean by that?

1          **JUROR NO. 7:**  Because it's emotional, and she and

2    her -- I mean, my wife and her sister-in-laws are pretty close;

3    and her brother, which is my brother-in-law, is all the time in

4    China and just she and her and her son.

5          **THE COURT:**  All right.  So this is something that's on

6    your mind?

7          **JUROR NO. 7:**  Well, it's -- she's on my mind.

8          **THE COURT:**  All right.  So going back to my question,

9    sir, do you feel that you may be distracted by this situation

10   in such a way that it may make it difficult for you to focus on

11   what's going on?

12         **JUROR NO. 7:**  A little bit.

13         **THE COURT:**  All right.  Are there any questions that

14   counsel want the Court to ask?  You can address them through

15   the Court.

16         **MR. GASNER:**  No, Your Honor.

17         **MR. AXELROD:**  No, Your Honor.

18         **THE COURT:**  All right.  Mr. Froelich?

19         **MR. FROELICH:**  No, Your Honor.  I'm sorry.

20         **THE COURT:**  All right.  Thank you, sir.  We really

21   appreciate your candor; and we're going to talk about it, and

22   then we'll decide and we'll let you know, and we'll do it in a

23   way that is comfortable for you.  Okay?

24         **JUROR NO. 7:**  Thank you, Your Honor.

25         **THE COURT:**  Thank you very much.

1    Do not -- please, the instruction that I give you every

2    day about not discussing the case, that's definitely included

3    in what we're talking about here.  So please don't discuss with

4    any other -- have you already talked to any jurors about your

5    note?

6         **JUROR NO. 7:**  No, Your Honor.

7         **THE COURT:**  No one knows about the situation?

8         **JUROR NO. 7:**  No.

9         **THE COURT:**  Okay.  Don't discuss it with anybody.

10   Okay?  That's the Court's direction.  Understand?

11        **JUROR NO. 7:**  Yes, Your Honor.

12        **THE COURT:**  All right.  Thank you.  You can go back to

13   the jury room.  I appreciate it.

14             (Juror Number 7 exiting courtroom.)

15        **THE COURT:**  All right.  The juror has left.

16   My view is we ought to excuse this juror.  He was

17   hesitant.  He seemed distraught.  He was being very respectful

18   and I think conservative, and did not strike the Court as

19   somebody who was raring to get off the case.  He didn't ask to

20   be taken off the case.

21   But given his view about connection with China and he did

22   seem to the Court to be somewhat emotional, I think that it's

23   too risky to leave him on the jury at this point with the hope

24   that this will all dissipate even if he comes back and says,

25   "You know, well, there's only two more treatments," or

1    whatever.  So that would be my inclination.

2        What's the Government's position?

3        **MR. AXELROD:**  The Government would have no objection

4    to that, Your Honor.  He did -- I mean, he said he was

5    emotional.  He took some time in reacting.  He said his sister

6    is on his mind, so the Government has no objection to that.

7        **THE COURT:**  All right.  Mr. Gasner?

8        **MR. GASNER:**  Your Honor, we respectfully object.  He

9    did seem a little tentative.  It's a relatively remote

10   situation.  He is concerned about his wife, but it's a

11   sister-in-law who's got the illness.  It's got a derivative

12   effect on his wife and then a derivative effect on the juror.

13   So our preference would be to wait and see what the schedule

14   for further radiation and chemo looks like.

15       **THE COURT:**  Well, here's what I would suggest, and I

16   don't think there's any prejudice to anybody at this point

17   because the jury is not deliberating or doing anything other

18   than sitting here and listening, is to continue today.  We have

19   today, today is Wednesday and tomorrow is Thursday, and then

20   maybe query him at the end over the day and ask him how he's

21   doing.

22       He will have had two days under his belt since the

23   appointments were made.  Maybe he's come to grips with it.

24   Maybe arrangements were made.  We're not going to know any more

25   about future appointments, but we will know -- if he comes back

1    and says, "You know, I'm still upset.  It's been hard to listen

2    to this, to the testimony.  You know, I've been distracted,"

3    you know, then we could excuse him; but I don't know that

4    there's any need to do that now since -- if they were in

5    deliberation, that might be one thing because he might not be

6    fully -- you know, his mind might not be all there.

7        So let's just continue.  He hasn't asked to be off today

8    or tomorrow, and we'll come to grips with it tomorrow and see

9    how he's doing.

10       If he says, "I'm fine.  I've been able to listen," and all

11   that, then I think that the prudent thing would be to start

12   late on Monday, and just mention to the jury that an issue came

13   up that requires us to start late, see if we can make up the

14   time.  And then on Monday ask him when the future appointments

15   are.  So we'll do it sort of incrementally and see how things

16   progress.

17       Is that acceptable to the Government?

18           **MR. AXELROD:**  That is, Your Honor.

19           **THE COURT:**  And, Mr. Gasner?

20           **MR. GASNER:**  Yes, Your Honor.

21           **THE COURT:**  All right.  I think that's the prudent way

22   to go.

23       All right.  So you had other issues you wanted to raise?

24           **MR. GASNER:**  Yes, Your Honor.

25       Mr. Dayton from DuPont is going to be testifying later

1    today, and I just wanted to remind the Court of the Court's

2    earlier motion in limine ruling where our big concern is that

3    Mr. Dayton is going to get into expert opinion.

4        The Court said that his 302 wasn't enough to really be an

5    expert opinion because it doesn't reveal the methodology that

6    he used, it didn't allow for a *Daubert* challenge.

7        And within that concern, my biggest concern are

8    off-the-cuff statements as to the value of the technology,

9    which I think Mr. Dayton has admitted in his 302s are

10   speculative.  That's the subject of expert testimony.

11       So I just want to alert the Court that when those

12   questions come up, we will object and may need a sidebar.

13           **THE COURT:**  All right.  Well, I'm not going to -- you

14   don't need to respond now, Mr. Axelrod.  My ruling was quite

15   clear on his status; and I know expert testimony when I see it

16   and opinions, and I also know speculation when I hear it, so

17   I'll rule on each question or each issue as it comes up.

18           **MR. GASNER:**  Thank you, Your Honor.

19       The other issue is our recurring saga with the

20   San Francisco County Jail.  My understanding from Mr. Hemann is

21   that the United States Attorney, Melinda Haag, called over.  So

22   both the U.S. Attorney's Office and the Marshals have gone all

23   out to try to rectify the situation, and they've just hit a

24   brick wall.

25       The County Jail, still no legal documents in terms of

1    access to the hard copy; and Mr. Liew wasn't able to shave or

2    shower today.  I think with just one day he's relatively

3    presentable, but I am concerned -- especially how far he is

4    away from the jury.

5         But apparently just the rules at the jail for the

6    Medical Unit, there's only two showers a week.  One of them is

7    7:00 to 8:00 a.m. on Tuesday, which conflicts with getting

8    Mr. Liew here.  He has to leave the jail at 5:00 a.m., so he

9    misses his Tuesday shower.  He's only going to get one shower a

10   week under their usual procedures.

11        And the person in charge I believe is Matthew Freeman,

12   who's the Head of Custody at the San Francisco County Jail.

13   We've gone through the lawyers for the Sheriff's Department,

14   and it just seem like they, too, hit a brick wall when it comes

15   to dealing with the actual jailers.

16        **THE COURT:**  All right.  Mr. Hemann, what's the

17   Government's position here?

18        **MR. HEMANN:**  Your Honor, I think that Mr. Gasner

19   raises valid issues with regard to the computer access.  I have

20   a -- I don't believe that the showering and shaving rise to the

21   level of interfering with trial preparation or participation in

22   trial, but the computer access is an issue.

23        **THE COURT:**  And the document access as well.

24        **MR. HEMANN:**  That, too.  And I mean that sort of

25   together and, yes, Your Honor.

 1              **THE COURT:**  All right.

 2              **MR. HEMANN:**   The United States Attorney contacted the

 3     Marshal because the Marshal is the responsible party.   The

 4     Marshal has done, we believe, what it is able to do.

 5         The San Francisco County Jail has, as we understand it,

 6     rules and procedures that it follows, and it has indicated that

 7     it intends to adhere to those rules and procedures.

 8         There's a contractual relationship.   In this case it's a

 9     case-by-case.   We do not have a Marshals long-term, as I

10     understand it, contract with the San Francisco Jail.   It's a

11     courtesy hold, if you will.

12         And that's what I know, Your Honor.

13              **THE COURT:**   All right.   Well, here is what I'm going

14     to do:

15         Ms. Ottolini, I want you to call a Pretrial Services

16     officer because I'm thinking of releasing Mr. Liew to house

17     arrest or halfway house or some other secure modality.   There

18     comes a time in a trial, and it's an evolving thing, where due

19     process takes precedence over any risk of flight.

20         I don't believe, observing Mr. Liew and his compliance and

21     learning the facts of this case as I now know a lot more, that

22     the risk of flight that may have existed before, based upon the

23     showing of the Government, is as strong.   I don't believe

24     Mr. Liew is going to flee at this point.

25         So I want to get a proposal from the Pretrial Services of

1   a way of releasing Mr. Liew with the most extreme measures of

2   security that we can deal with -- that we can impose while out

3   of custody, meaning signing appearance bonds, whatever else.

4          And I'll look to you, Mr. Gasner and Ms. Agnolucci, to

5   come up with a proposal to work with Pretrial Services because

6   if that can't be done in a way that satisfies Pretrial

7   Services, then I'll revisit this.

8          But I think at this point the Court's at the end of its

9   rope, not with the Marshal Service, but with the Jail and the

10   Marshal needs to reexamine its relationship with the Jail

11   because it's not adequate to deal with this kind of a case.

12          And, so, I am finding and holding that the due process

13   rights of the defendant take precedence over any interest the

14   Government may have with respect to the Bail Reform Act.

15          So I understand we'll be in trial, but in the afternoon

16   I'm going to want you folks to work with Pretrial Services and

17   whoever the duty magistrate judge is to come up with some

18   conditions so that Mr. Liew will have not freedom but

19   unfettered access to his attorneys, as well as all of the

20   evidence here.

21          And it's not debatable; and if the Government doesn't like

22   it, take it up to the Ninth Circuit because that's going to be

23   my order.  He's going to be released.  All right?

24          **MR. GASNER:**  Thank you, Your Honor.

25          **THE COURT:**  All right.

 1              MS. AGNOLUCCI:  Thank you, Your Honor.

 2          THE COURT:  All right.  Let's get the jury.

 3          THE CLERK:  Your Honor, one juror was still late so

 4  I'm not sure.  He was stuck in traffic.

 5          THE COURT:  All right.  If the juror is not here, then

 6  I'll recess until the juror comes.

 7          THE CLERK:  Okay.

 8                  (Pause in proceedings.)

 9          THE COURT:  Is the witness available?

10          MR. HEMANN:  Special Agent White is here.

11          THE COURT:  All right.  Are they here?

12          THE CLERK:  He's here.  He's just in the restroom.

13          THE COURT:  Okay.  Would you come up, Agent White,

14  please?  Thank you.

15                  CHRISTOPHER WHITE,

16  called as a witness for the Government, having been previously

17  duly sworn, testified further as follows:

18                  (Pause in proceedings.)

19      (Proceedings were heard in the presence of the jury:)

20          THE COURT:  Please be seated.

21      Good morning, everybody.  Welcome back.  Just to remind

22  you, we are in cross-examination of FBI Special Agent White.

23      You may continue.

24          MR. GASNER:  Thank you, Your Honor.

25

1    <u>**CROSS-EXAMINATION**</u>    (resumed)

2    **BY MR. GASNER:**

3    **Q.**   Good morning, Agent White.

4    **A.**   Good morning, sir.

5    **Q.**   We left off yesterday, we were talking about the series of

6    emails that you looked at that had mentions of Kuan Yin.  Do

7    you recall those questions?

8    **A.**   Yes.

9    **Q.**   I want to pick up where we left off.

10       If I understood you correctly, your assignment was to go

11   through a large collection of emails and to find references to

12   Kuan Yin; is that --

13   **A.**   Well, I did go through the emails, but I narrowed my

14   search by looking just from emails from Walter Liew or from Bob

15   Maegerle, or to them as well, just to sort of help narrow the

16   search.

17   **Q.**   And that was still a pretty large collection?

18   **A.**   I don't recall the number, but it was -- it was

19   manageable.

20   **Q.**   I want to focus on just one of the emails.

21       As I understand it, you really didn't look at the

22   information in those emails to determine whether that

23   information had been publicly disclosed.  Is that an accurate

24   assessment of your assignment?

25   **A.**   Yeah, that's true; but to my knowledge, none of it is

 1  publicly available.

 2  **Q.**   But your assignment, as far as it went, was to just find

 3  the references to Kuan Yin and leave it to others to determine

 4  whether or not things were publicly disclosed; fair?

 5  **A.**   Yeah.

 6  **Q.**   Let me show you -- if I might approach, Your Honor --

 7  Exhibit 79?

 8          **THE COURT:**  Yes, you may.

 9          **THE CLERK:**  Is it admitted?

10          **MR. GASNER:**  It is admitted.  It's been previously

11  admitted.

12          **THE CLERK:**  Thank you.

13      Will you be publishing it?

14          **MR. GASNER:**  And permission to publish the previously

15  admitted Exhibit 79, Your Honor.

16          **THE COURT:**  Yes.

17          **MR. GASNER:**  Mr. Guevara, are you able to get that on

18  the screen?

19          **MR. GUEVARA:**  Yes.

20          **MR. GASNER:**  Thank you, sir.

21  **Q.**   So this is one of the emails you discussed yesterday,

22  Agent White?

23  **A.**   Yes, it was.

24  **Q.**   And do you see where at the bottom Mr. Liew writes to

25  Mr. Maegerle and says:  (reading)

1              "Bob -

2              "Pangang gave me some of their input during my last

3       meeting with them in late October"?

4       Do you see that?

5  **A.**   I do see that.

6  **Q.**   And it goes on to talk about the requirements that Pangang

7  had in terms of the number of chlorine vaporizers and sizes and

8  numbers.  Do you see that under item one?

9  **A.**   (Witness examines document.)  Yes.

10             **MR. GASNER:**  Your Honor, I'm not sure if

11  Mr. Guevara -- we're having problems with the monitors.  It

12  looks like it may be coming up.

13             **THE CLERK:**  It's coming up now.

14             **MR. GASNER:**  Okay.

15             **THE CLERK:**  It should be.

16             **MR. GASNER:**  Just so that the jurors --

17             **THE COURT:**  I think it maybe needs its first cup of

18  coffee.

19                       (Laughter)

20             **MR. GASNER:**  We all do.  Thank you.

21             **THE COURT:**  There we go.

22             **THE CLERK:**  Is it on the witness'?

23             **THE WITNESS:**  Yes.

24             **MR. GASNER:**  I just want to make sure.

25             **THE COURT:**  Can the jurors see it?

1      **ALL:**  Yes.

2          **THE COURT:**  Great.  Okay.

3          **MR. GASNER:**  So if we go down, Mr. Guevara, if you

4   would, to the lower email where it talks about the sizes of the

5   chlorine vaporizers and number of vaporizers.

6   **Q.**   So this email chain starts with Mr. Liew talking to

7   Mr. Maegerle about input from Pangang; is that right?

8   **A.**   (Witness examines document.)  That looks to be correct.

9   **Q.**   And then if you go up to the top, Mr. Maegerle writes back

10   and says:  (reading)

11          "We should have three or four vaporizers.  They get a

12      buildup of 'taffy' and have to be taken out of service and

13      cleaned.  These units are fairly inexpensive and can be

14      bought as off-the-shelf items."

15      Do you see that?

16   **A.**   Yes.

17          **MR. AXELROD:**  I'm going to object to the narration.

18          **THE COURT:**  Overruled.

19   **BY MR. GASNER:**

20   **Q.**   So at least as to this email, the communications are about

21   items that can be bought as off-the-shelf items; true?

22   **A.**   I don't know.

23   **Q.**   Well, you can see it on the exhibit in front of you; can't

24   you, Agent White?

25   **A.**   Yes, but I don't know if they can be bought off the shelf

 1   or not.

 2   **Q.**   So you think Mr. Maegerle was not telling the truth when

 3   he said they can be bought as off-the-shelf items?

 4          **MR. AXELROD:**  Objection.

 5          **THE COURT:**  Sustained.

 6   **BY MR. GASNER:**

 7   **Q.**   Did you do any investigation as to whether you can just go

 8   to this particular company and buy these vaporizers off the

 9   shelf?  Did you investigate that?

10   **A.**   I did not go see if I can buy one of these off the shelf.

11   **Q.**   And I take it, Agent White, that it was also not part of

12   your assignment to look at textbooks or patents or articles to

13   see whether, for example, vaporizers are the subject of public

14   disclosures?  Was that not part of your job either?

15   **A.**   I did not do that, but I also don't know if I would

16   understand.  This stuff seems to be very complicated, all the

17   matters that would be in the textbooks or patents.

18   **Q.**   Who on the team at the FBI that did the investigation had

19   the knowledge necessary to look at those patents and textbooks

20   and articles, if anyone?

21   **A.**   I would say we didn't have anyone that was an expert and

22   able to read all that stuff to understand it.

23   **Q.**   You mentioned that you'd gone to the FBI Academy at

24   Quantico and had learned how to investigate various crimes; is

25   that right?

1    A.   Yes.

2    Q.   And investigating a trade secret case, is that part of the

3    specific training that you get at Quantico?

4    A.   No, it is not.

5    Q.   But you did learn, in the course of doing this

6    investigation, that it would be important to know whether

7    particular items claimed as trade secrets had been publicly

8    disclosed; did you not?

9    A.   Well, in these instances, because there's so much

10   information, we would rely on other people that have that

11   knowledge to provide that to us.

12   Q.   And those people were all from DuPont; were they not?

13   A.   No.

14   Q.   What other people did you rely upon for looking at the

15   public disclosures in the areas that you were investigating as

16   potential trade secrets?

17   A.   Well, we had also talked to former USAPTI employees who

18   discussed some of the patent stuff that they were tasked to do,

19   as well as other employees that had worked there, contractors;

20   and we also had other experts that provided information to us

21   on what was disclosed and not.

22   Q.   Okay.  So USAPTI employees, some contractors, and you

23   mentioned experts.  What experts did you rely upon on this

24   issue of public disclosure?

25   A.   I don't recall everything that he covered and whether this

1   person covered public disclosure, but Jim Fisher.

2   **Q.**   And is he a former DuPont employee?

3   **A.**   No, he is not.

4   **Q.**   He's a consultant to many TiO2 manufacturers; true?

5   **A.**   I don't recall his exact title or whatever he claims to

6   be.

7   **Q.**   He's with a company called IBMA; is that right?

8   **A.**   I don't recall the name of his company.

9   **Q.**   They're a company, though, that consults in TiO2 generally

10  and sells reports to people in the TiO2 industry; true?

11          **MR. AXELROD:**  Objection.

12          **THE COURT:**  Sustained.

13  **BY MR. GASNER:**

14  **Q.**   So you don't know what IBMA does?

15  **A.**   I don't know what they -- the full extent of what they do.

16  **Q.**   But Mr. Fisher was one of the experts that you relied

17  upon, or the FBI relied upon, for the public disclosure part of

18  your investigation?

19  **A.**   Again, I don't know if it was the public disclosure, but

20  we consulted with him.

21  **Q.**   Did you consider adding another column to the chart that

22  Mr. Axelrod was going over with you as to whether things had

23  been publicly disclosed in patents or textbooks or articles?

24          **MR. AXELROD:**  Objection.

25          **THE COURT:**  Sustained.

1   BY MR. GASNER:

2   **Q.**   We talked a little bit yesterday about Trial Exhibit 46,

3   which was a white notebook.  Do you recall talking about that?

4   **A.**   Yes.

5   **Q.**   And I believe that there are a number of notebooks that

6   were seized from various locations in the course of your

7   investigation; fair?

8   **A.**   Yes, that's true.

9   **Q.**   I just want to show you some of these notebooks, if I

10   might.

11          **MR. GASNER:**  May I approach, Your Honor, with

12   Exhibit 1131?

13          **THE COURT:**  Yes, you may.

14                    (Pause in proceedings.)

15   BY MR. GASNER:

16   **Q.**   Have you seen Exhibit 1131 before, Agent White?

17   **A.**   (Witness examines document.)  No.

18          **MR. GASNER:**  Your Honor, it's been stipulated at

19   paragraph 45 of our factual stipulation that this is a document

20   that was located at the USAPTI office in Oakland but not seized

21   during the searches; and they were thereafter kept in storage,

22   provided to our firm, and then produced to the Government by

23   Keker & Van Nest.

24          Did I read the stipulation accurately, Mr. Axelrod?

25          **MR. AXELROD:**  That does accurately reflect the

 1   stipulation.

 2          THE COURT:  All right.  So stipulated.

 3   BY MR. GASNER:

 4   Q.   And looking at Exhibit 1131, Agent, it's got a variety of

 5   patent references in it; does it not?

 6   A.   (Witness examines document.)

 7          MR. AXELROD:  Your Honor, just so the record's clear,

 8   we agree with Mr. Gasner's stipulation, but the agent has

 9   testified he hasn't looked at this.

10          THE COURT:  Well, are you offering this exhibit?

11          MR. GASNER:  No, Your Honor.  I'm just laying a

12   foundation, and we may introduce portions of this at a later

13   time.  So this is just foundational while the witness is on the

14   stand.

15          THE COURT:  All right.  You can continue.

16   BY MR. GASNER:

17   Q.   So, Agent White, this does have patents in it; does it

18   not?

19   A.   Yes.

20          THE COURT:  What's the objection?

21          MR. AXELROD:  No.  I'm just sitting down.  I was

22   sitting down, Your Honor.  Thank you.

23          THE COURT:  Oh, all right.

24   BY MR. GASNER:

25   Q.   And you participated, I think you said, in the searches of

1    the USAPTI office and the Roadway Inn and the Liew residence;

2    is that right?

3    **A.**   Yeah, I participated in those.

4    **Q.**   Is it true that the FBI chose not to seize certain

5    notebooks that had patents and other public disclosures in

6    them?

7    **A.**   Well, I wasn't there during all portions of actually all

8    of those searches, except for the Roadway Inn, and I didn't

9    search every room during that time, so I don't know what

10   decisions were made at the end of the day on what to seize and

11   what not to seize in its totality.

12           **MR. GASNER:**  Your Honor, I'd like to approach the

13   witness with Exhibit 1134.

14           **THE COURT:**  All right.

15                        (Pause in proceedings.)

16           **MR. GASNER:**  I'll note for the record this is another

17   notebook that was not seized.

18   **Q.**   Is this one, Agent White, that you've seen before?

19   **A.**   No.

20   **Q.**   Was there a person on the FBI team that was responsible

21   for looking at seized articles and textbooks and transmitting

22   them to the outside experts, such as Mr. Fisher?  Do you know

23   whether there was someone on the team that had that job?

24   **A.**   I don't know if there was any one person on the team; but

25   as stuff was found and we would like to have people review it,

**WHITE - CROSS / GASNER**

1   we would then collect it and send it out.

2   **Q.**   Do you know whether Exhibit 1134 was ever sent out to

3   experts for review?

4   **A.**   I doubt it since we did not seize it.

5   **Q.**   But when it was produced by our law firm to the

6   Government, do you know whether at that point it was

7   transmitted to any experts?

8   **A.**   I don't know for sure, but I don't believe it was.

9          **MR. GASNER:**  May I approach with 1133, Your Honor?

10         **THE COURT:**  Yes, you may.

11                 (Pause in proceedings.)

12  **BY MR. GASNER:**

13  **Q.**   Same question, Mr. White.  This one's a gray notebook,

14  subject to the same stipulation, not seized, later provided by

15  our firm to the Government.

16      Does that -- taking a look at that briefly, can you take a

17  look inside?  Does it refresh your recollection as to whether

18  this was a notebook that was provided to any experts for review

19  of the patents and other prior art contained in there?

20  **A.**   (Witness examines document.)  I do not recognize this.  I

21  don't know if this was sent out for sure or not.

22         **MR. GASNER:**  May I approach with Exhibit 1130,

23  Your Honor?

24         **THE COURT:**  Yes, you may.

25                 (Pause in proceedings.)

1   **BY MR. GASNER:**

2   **Q.**   This one's a red notebook.

3        Taking a look at the outside and taking a brief look at

4   the contents, Agent White, does that ring any bells as to

5   whether this was a document that the FBI transmitted to

6   experts, or otherwise evaluated, as to whether these public

7   disclosures had any effect on your investigation?

8   **A.**   (Witness examines document.)  I've never seen this before,

9   and I don't know if it was sent out for sure.

10  **Q.**   Now, I think you also testified about some collections of

11  paper that you found in the course of your searches.  Do you

12  remember talking about, I think it was, Exhibit 46?  It was

13  kind of a collection of loose papers.

14  **A.**   Yeah, 46 had some loose papers in it, I believe.

15  **Q.**   In the various searches that you did, there were many

16  collections of loose papers that the FBI seized; true?

17  **A.**   Yeah, there was a lot of paper.

18  **Q.**   Okay.  And some of them were piles of paper that had

19  mixtures of technical material and sketches from Mr. Maegerle,

20  and things of that nature; true?

21  **A.**   Yeah, that's probably true.  There was a mixture of stuff

22  in piles.

23  **Q.**   When you found kind of mixed piles of material, I take it

24  that during the activity of the search, you didn't have time to

25  kind of sit there and look at the whole thing; did you?

1   **A.**   You know, with these searches of the houses, I actually

2   didn't participate that much in the actual searching.  So I --

3   I was there for portions, but I didn't do much searching

4   myself, and --

5   **Q.**   Did -- I didn't mean to cut you off.  What were you going

6   to say?

7   **A.**   And, you know, when we did, we'd usually -- what I did is

8   I'd collect it and put it in a box.

9   **Q.**   You've been involved in a lot of searches in your four

10  years with the FBI, though; right?

11  **A.**   Yeah, I've been involved in a number.

12  **Q.**   Roughly how many?

13  **A.**   Probably 10 or more.

14  **Q.**   And is it fair to say that when you're doing a

15  document-intensive search, that you don't always have time to

16  review everything while you're searching; true?

17  **A.**   You usually look for stuff that's pertinent to the search

18  warrant, and that's where you decide to seize or not.

19          **MR. GASNER:**  May I approach with 1132, Your Honor?

20          **THE COURT:**  Yes, you may.

21                    (Pause in proceedings.)

22          **MR. GASNER:**  And just for the record, 1132 is a red

23  well with some loose papers inside it.

24  **Q.**   Looking at that, Agent White --

25          And just for the record, Your Honor, this is also covered

 1    by the stipulation.  This is something that was not seized but

 2    later provided by our firm from storage.

 3              THE COURT:  Is that correct?

 4              MR. AXELROD:  That's correct, Your Honor.

 5              THE CLERK:  I show that one page of this was admitted

 6    on January 15th, the second page of -- I can't read what she

 7    wrote.

 8              MR. GASNER:  I think that's right, Ms. Ottolini.

 9              MR. AXELROD:  I believe that's correct, Your Honor.

10              THE COURT:  All right.  So it's so stipulated.

11    BY MR. GASNER:

12    Q.  And, again, Agent White, just looking at this collection

13    of loose papers, do you recognize it as something that you or

14    somebody else on the team reviewed?

15    A.  I have never seen this before.

16              THE CLERK:  Counsel, just so I'm clear, is that

17    everything but what was admitted?

18              MR. GASNER:  No.  It's --

19              THE CLERK:  Everything?

20              MR. GASNER:  -- everything, including the page that

21    was admitted.

22              THE CLERK:  But you're only marking it for

23    identification?

24              MR. GASNER:  Yes.  We may seek to introduce other

25    parts later.

1           **THE CLERK:**  Thank you.

2    **BY MR. GASNER:**

3    **Q.**   Agent White, you also testified about a number of

4    photographs that were seized from various locations.  Do you

5    recall talking about that yesterday?

6    **A.**   I believe we talked about one set of photographs

7    yesterday.

8    **Q.**   And I believe you also --

9    **A.**   Or two sets.  I'm sorry.

10   **Q.**   Okay.  And I believe you also talked about a fellow by the

11   name of Hua Huang.  Do you recall talking about him?

12   **A.**   Yes.  I think I know who you're talking about.

13   **Q.**   Do you recall that in the course of your investigation,

14   you found other emails from Hua Huang besides Exhibit 171?

15   **A.**   I don't recall if we did find another one from Hua Huang.

16           **MR. GASNER:**  Your Honor, may I approach with

17   Exhibit 3488?

18           **THE COURT:**  Yes, you may.

19                     (Pause in proceedings.)

20   **BY MR. GASNER:**

21   **Q.**   Do you recognize this as a document that was seized in the

22   course of the FBI's investigation?

23   **A.**   I don't recognize this document.

24   **Q.**   Do you see down at the bottom it's got --

25           **THE CLERK:**  I'm sorry, Counsel, 3488?

1            MR. GASNER:  Yes.

2            THE CLERK:  And can you please tell me what that

3      document is?

4            MR. GASNER:  It is an email dated August 13, 2006,

5      from sghh2@performanceusainc.com from Walter Liew.

6            THE CLERK:  Thank you.

7            MR. GASNER:  You're welcome.

8      Q.   Do you see that number at the bottom that starts with "C2"

9      and goes on?

10     A.   (Witness examines document.)  Yes.

11     Q.   Do you recognize that as an identifying number for

12     documents produced by the Government in this case?

13     A.   I believe the "C2" and the first number after that was a

14     designation of a hard drive that was turned over to the

15     Defense.

16     Q.   And if you take a look at the second page, there's a

17     translation of this email in the English language.  Do you see

18     that in front of you?

19     A.   (Witness examines document.)  Yes.

20     Q.   Do you recall learning in your investigation that Mr. Liew

21     had this friend, Hua Huang, in Taiwan who volunteered to take

22     photos using a telephoto lens that he usually used for bird

23     watching?

24     A.   This is the first I've seen of that.

25            MR. GASNER:  Your Honor, move the admission of 3488.

1          **MR. AXELROD:**  Objection.  Hearsay.

2          **THE COURT:**  May I see it, please?

3                    (Pause in proceedings.)

4          **MR. GASNER:**  I believe it goes to state of mind,

5     Your Honor.

6                    (Pause in proceedings.)

7          **THE COURT:**  Overruled.  It's admitted.

8          **MR. AXELROD:**  Your Honor, just for the record, this is

9     a document that we just got recently.  We haven't even had a

10    chance to translate it ourselves, so I --

11         **THE COURT:**  Well, you can certainly follow-up; but

12    based upon the showing made, the objection is overruled and the

13    document is admitted.

14         **MR. AXELROD:**  Understood.

15         **THE COURT:**  All right.

16       (Trial Exhibit 3488 received in evidence)

17    **BY MR. GASNER:**

18    **Q.**   So directing your attention to 3488, Agent White, do you

19    see that Mr. Huang has said he has this friend with a telephoto

20    lens specializing in taking pictures of birds:  (reading)

21            "If needed, we can try to take pictures of the

22         manufacturing equipment of the DuPont factory at Guanyin

23         by telephoto camera and send them to you."

24         Do you see that?

25    **A.**   Yes.

1  Q.   In your assessment of photographs as relevant to a trade

2  secret investigation, does it matter to you where the photos

3  were taken from?

4        MR. AXELROD:  Objection.

5        THE COURT:  Sustained.

6  BY MR. GASNER:

7  Q.   Were you here for the testimony of Ms. Hubbard from

8  DuPont?

9  A.   I was not.

10 Q.   In fact, in the course of your investigation, you found

11 many photographs of DuPont plants taken from public vantage

12 points or published in articles; is that true?

13 A.   I don't know where the photos were necessarily taken from.

14 I did not take them.

15       MR. GASNER:  Your Honor, may I approach with

16 Exhibit 1726?

17       THE COURT:  Yes, you may.

18 BY MR. GASNER:

19 Q.   Do you recognize Exhibit 1726, Agent White?

20 A.   (Witness examines photograph.)  I do recognize this photo.

21 Q.   Do you recall finding any photographs of chlorinators on

22 the USAPTI servers?

23 A.   I don't recall, and I don't know if I would be able to

24 tell a picture if it was a chlorinator or not.

25 Q.   Do you recognize this piece of equipment anyway from your

1   investigation?

2   **A.**   (Witness examines photograph.)   I've seen the photo

3   before.

4   **Q.**   Where have you seen it?

5   **A.**   I believe the first time I saw it is when it was provided

6   by you all or identified by your firm, and I think I also saw

7   this one at Benicia Fabrication.

8   **Q.**   In fact, you saw it on the wall at Benicia Fabrication;

9   did you not?

10  **A.**   Yes.

11  **Q.**   Benicia Fabrication is a metalworks company right here in

12  the Bay Area?

13  **A.**   That's the way I understand.   That's what I understand

14  them to be.

15  **Q.**   And you understand that because you drove there and

16  visited them; right?

17  **A.**   Yes, and they work with metal, but I don't know what else

18  they do.

19  **Q.**   Okay.   And you saw Exhibit 1726 on the walls at

20  Benicia Fab; right?

21  **A.**   Yes.

22  **Q.**   Did you --

23      **MR. GASNER:**  Your Honor, let's move to admit 1726.

24      **THE COURT:**  Any objection?

25      **MR. AXELROD:**  No objection, Your Honor.

1      **THE COURT:**  It's admitted.

2         (Trial Exhibit 1726 received in evidence)

3      **MR. GASNER:**  Thank you.

4      If we could rotate that, Mr. Guevara.

5   **Q.**   And do you recognize this as a chlorinator from the

6   Antioch facility, which was a DuPont TiO2 factory?

7   **A.**   That's what they told us it was.

8   **Q.**   And Antioch was a TiO2 factory that used the

9   chloride-route process; right?

10  **A.**   That's what I understand, yes.

11  **Q.**   And Benicia Fabs built the chlorinator for Antioch; right?

12  **A.**   Yes, I believe so.

13  **Q.**   You learned, in the course of your investigation, that the

14  Antioch chlorinator was very similar to the one used at

15  Edgemoor in Delaware; right?

16     **MR. AXELROD:**  Objection.

17     **THE COURT:**  Sustained.

18  **BY MR. GASNER:**

19  **Q.**   Do you know what similarities there are, if any, between

20  the chlorinator used at Antioch and ones used at other DuPont

21  facilities?

22     **MR. AXELROD:**  Same objection.

23     **THE COURT:**  Sustained.

24  **BY MR. GASNER:**

25  **Q.**   And did you learn, Agent White, that what we're looking at

1    here is the array of fluidization pipes into the bottom of the

2    chlorinator?

3              **MR. AXELROD:**  Objection.

4              **THE WITNESS:**  I don't --

5              **THE COURT:**  Sustained.

6    BY MR. GASNER:

7    **Q.**   So looking at this picture, you personally don't know what

8    you're looking at; fair?

9    **A.**   Yeah, I don't know what all this at the bottom represents.

10   **Q.**   Did the folks at Benicia Fab tell you that they had

11   permission from DuPont to have this picture up in their

12   offices?

13   **A.**   I don't recall what they specifically said about that

14   picture.

15   **Q.**   They told you it had been up for a long time, though;

16   right?

17   **A.**   They told me it had been up for a while, yes.

18   **Q.**   In fact, that same picture is on their website too; is it

19   not?

20   **A.**   I don't know for sure.

21   **Q.**   Did you look?

22   **A.**   I did look at their website, but I don't know if I -- I

23   don't recall that picture specifically.

24   **Q.**   In fact, if you look through the documents that were

25   seized from various places in the course of your investigation,

1   there were other pictures of DuPont facilities that are in

2   magazines and other places; true?

3   **A.**   Could you rephrase -- could you repeat the question?  I'm

4   sorry.

5   **Q.**   Let me ask it a different way.

6           **MR. GASNER:**  And, Your Honor, if I might approach with

7   Exhibit 1140.

8           **THE COURT:**  Yes, you may.

9                      (Pause in proceedings.)

10  **BY MR. GASNER:**

11  **Q.**   Do you recognize Exhibit 1140, Agent White?

12  **A.**   (Witness examines document.)  I don't.

13  **Q.**   Do you see down at the bottom it says "043 Black Binder"

14  and then there's a number?

15  **A.**   Yes.

16  **Q.**   That indicates that this was seized from a binder found at

17  either the USAPTI office or Mr. Liew's home; correct?

18  **A.**   Yeah.

19  **Q.**   And this is an article about Cristal Global's TiO2 sites;

20  is that right?

21  **A.**   I don't know.  I haven't read it.

22  **Q.**   If you just take a look on the first page in the first

23  line, it talks about the world class Ashtabula titanium dioxide

24  complex.  Do you see that?

25          **MR. AXELROD:**  Objection.

 1            **THE COURT:**  Sustained.

 2   **BY MR. GASNER:**

 3   **Q.**   This exhibit was part of the binder seized from Mr. Liew's

 4   residence, true, or his business?

 5   **A.**   Yeah, I believe it was seized from his business.

 6   **Q.**   You've got the same joint exhibit list sheet in front of

 7   you --

 8   **A.**   Yes.

 9   **Q.**   -- to help refresh your memory?

10   **A.**   Yes.

11   **Q.**   And, so, this is from the USAPTI office?

12   **A.**   Yes.

13   **Q.**   And it relates to the Ashtabula plant?

14   **A.**   (Witness examines document.)  It appears to be about the

15   Ashtabula plant.

16            **MR. GASNER:**  Your Honor, move the admission of

17   Exhibit 1140.

18            **MR. AXELROD:**  Objection.

19            **THE COURT:**  Sustained.

20   **BY MR. GASNER:**

21   **Q.**   If you take a look -- just to try to lay a further

22   foundation, Your Honor -- at page 11, that's a picture of the

23   Ashtabula plant; is it not?

24            **MR. AXELROD:**  Objection.

25            **THE COURT:**  Sustained.

1    BY MR. GASNER:

2    Q.   Agent White, you talked a little bit about one of the

3    plans from USAPTI relating to the flue pond.  Do you remember

4    talking with Mr. Axelrod about that?

5    A.   Yes.

6    Q.   Let me show you, if I might, the plans that he showed you.

7         MR. GASNER:  If I might approach with 164, Your Honor.

8         THE COURT:  Yes.

9         MR. GASNER:  This was previously admitted.

10        THE CLERK:  Thank you.

11             (Pause in proceedings.)

12        MR. GASNER:  Mr. Guevara, if we could blow up the

13   lower right-hand corner.

14   Q.   So this is an equipment specification for the flue pond;

15   is it not?

16   A.   That's what the title says.

17   Q.   And if you go to the very far right, it says "Revision A";

18   correct?

19   A.   Yes.

20   Q.   Were you responsible for finding all the USAPTI plans and

21   reviewing them as part of the FBI team?

22   A.   No.  I reviewed some plans, but I don't know if I reviewed

23   all of them.  We found several.

24   Q.   Who else on the team focused on looking at the USAPTI

25   plans such as Exhibit 164?

1  **A.**   I would say Agent Ho has looked at them as well.  There's

2  been a lot of people that have helped throughout the time.  I

3  don't know if I know all of them that have looked at them, but

4  people involved have looked at the drawings.

5  **Q.**   Did you see, in the course of your investigation, that

6  there were many times other revisions other than Revision A,

7  there would be Revision B and C, et cetera?

8  **A.**   I don't recall that.

9  **Q.**   Do you recall that there were plans for the 100K project

10  and for the 30,000K project?  Do you recall that?

11  **A.**   I've seen plans for both, yes.

12  **Q.**   Okay.  So this particular one is just for the 100K

13  project; right?

14  **A.**   (Witness examines document.)  All of them say they're for

15  the 100K project.

16  **Q.**   And it's true, is it not, that for every aspect of the

17  plant in the 100K project, there were sets of plans at this

18  same level of detail; that is, an equipment specification?

19  **A.**   I don't know if I can speak to every aspect.

20  **Q.**   Did you ever print out all the plans for the 100K project?

21  **A.**   No.

22  **Q.**   Did you ever print out all the plans for the 30K project?

23  **A.**   You mean print out from electronically?

24  **Q.**   Yes.

25  **A.**   No.  We used the physical ones that we had seized during

WHITE - CROSS / GASNER

1    the searches.

2    **Q.**   And in terms of the electronic versions of both the 30K

3    plans and the 100K plans, there were many, many electronic

4    files; is that fair to say?

5    **A.**   There were quite a few.

6    **Q.**   So this kind of plan, did you have a name for this kind of

7    plan that we're looking at at 164?

8    **A.**   Other than maybe they were drawings from the 100K project,

9    I -- we had no other further name for them.

10   **Q.**   Did you look at the computer-assisted design files that

11   went into making each one of these plans, these sets of plans?

12   **A.**   No.

13   **Q.**   But you saw them in the course of your investigation;

14   true?

15   **A.**   I saw that there were some in computer items that we had

16   seized.

17   **Q.**   Do you think that you looked at all the calculations that

18   underlie each one of these plans?

19   **A.**   I don't know if I've seen all the calculations.

20   **Q.**   Would it be fair to say that it would be impossible to go

21   through all these plans and calculations and CAD drawings even

22   with the time that you had for your investigation?

23   **A.**   I don't know if it would be impossible.  I think the hard

24   part would be understanding what a particular calculation was

25   for, as I don't have knowledge of titanium dioxide at that

1    level.

2    **Q.**   So when you were talking with this one particular plan,

3    you weren't intending to give a representative plan for the

4    whole project; were you?

5    **A.**   Well, I believe when we were talking about this part, the

6    only portion I discussed was the confidential marking on the

7    plan.

8    **Q.**   Was it part of your assignment in looking for Kuan Yin

9    references in the emails to look at whether those references

10   actually played out in versions of the USAPTI plans?

11   **A.**   No, but I don't think I -- I don't understand the

12   technology enough to know if it translated or not to the paper.

13   **Q.**   We were looking earlier at an email that talked about the

14   number of fluidizers that Pangang was talking about using.  Do

15   you recall talking to me about that earlier this morning?

16   **A.**   I don't recall talking about fluidizers.

17   **Q.**   Oh, I'm sorry.  Chlorine vaporizers.  Do you remember

18   talking about that?

19   **A.**   Yes.

20   **Q.**   Okay.  Do you know how many chlorine vaporizers ended up

21   in the 100K plants?

22   **A.**   I don't, and I don't know if I actually know what a

23   chlorine vaporizer would look like or how it would be indicated

24   on a plan.

25   **Q.**   So for each of the emails that you went over with

1   Mr. Axelrod, it would be possible, although difficult, to

2   figure out whether the email reference actually ended up in an

3   actual plan?

4   **A.**   Maybe with more titanium dioxide knowledge, you could do

5   that comparison.

6   **Q.**   That's not something you did?

7   **A.**   No.

8   **Q.**   That is, you didn't link up the reference in the email to

9   what actually happened in the USAPTI drafts and revisions;

10  true?

11  **A.**   Well, I did see, throughout the course of emails and

12  everything that I'd seen, where information that -- from the

13  email and a calculation was sort of done and then translated to

14  a sketch, and then that sketch was put into the drawings.

15  **Q.**   Then you know from your review of the evidence that the

16  drawings would be presented to the customers, and there would

17  be extensive discussion about them; true?

18  **A.**   I don't know how much discussion or what presentation was

19  made to the clients.

20  **Q.**   But you've seen many emails and other communications about

21  a back and forth with Pangang for the 100K and Jinzhou for the

22  30K project; right?  You've seen those?

23  **A.**   I didn't -- I don't think I specifically have seen emails

24  between the clients and Walter Liew.

25  **Q.**   But you've seen memorializations of meetings where

1  engineering is discussed; true?

2  **A.**   I believe we have found documents that have discussed

3  that, yes.

4  **Q.**   So you know that what's in the sketch may have changed a

5  lot over the course of meetings and revisions; right?

6  **A.**   I don't know if it has or not.

7  **Q.**   You didn't examine that as part of your role in the

8  investigation?

9  **A.**   No, I did not investigate, sort of, any changes to the

10 plans throughout the process.  I don't know if I'd have enough

11 knowledge to understand changes if they were made or not.

12 **Q.**   You talked to Mr. Axelrod a bit yesterday about

13 confidentiality agreements.  Do you recall that?

14 **A.**   Yes, I do.

15 **Q.**   And you learned in the course of your investigation that

16 the confidentiality period varies from agreement to agreement;

17 right?

18 **A.**   I don't know if I've learned that or not.  I don't recall

19 seeing any variation in confidentiality agreement times that I

20 recall.

21       **MR. GASNER:**  Your Honor, may I approach with

22 Exhibit 786, which was admitted yesterday?

23       **THE COURT:**  Yes.

24              (Pause in proceedings.)

25       **THE WITNESS:**  Which number was this?

 1   **BY MR. GASNER:**

 2   **Q.**   786.

 3   **A.**   (Witness examines document.)

 4   **Q.**   This is an agreement from 2006 between Glenn Chase and

 5   Walter Liew; true?

 6   **A.**   Yes.

 7   **Q.**   And I believe the one portion that you looked at with

 8   Mr. Axelrod yesterday is that there would be a -- that both

 9   sides agreed that they would have access to and become

10   acquainted with operation and processes of each other.  That's

11   at page 2 of the agreement.

12   **A.**   (Witness examines document.)  Yeah, there is a part on

13   here that discusses that.

14   **Q.**   And did you learn in the course of your investigation how

15   parties go about figuring out, if they're both exchanging

16   information, what's a trade secret and what isn't?

17   **A.**   No.

18                         (Pause in proceedings.)

19          **MR. GASNER:**  Your Honor, may I approach with

20   Exhibit 835?

21          **THE COURT:**  Yes.

22                         (Pause in proceedings.)

23          **THE CLERK:**  Already admitted.

24          **MR. GASNER:**  It's already admitted?

25          **THE CLERK:**  Yes.

1          **MR. GASNER:**  Thank you.

2          **THE CLERK:**  835 and 835T.

3          **MR. GASNER:**  Okay.

4    **Q.**   If you could take a look at the English translation of

5    this document that's already been admitted.  This is a

6    confidentiality agreement with Pangang; is it not?

7    **A.**   (Witness examines document.)  Well, it does not mention

8    Pangang in here.  It talks about Panzhihua Iron and Steel, and

9    down at the bottom it talks about East China Engineering

10   Science and Technology Company.

11   **Q.**   So as far as you can tell, this is between East China

12   Engineering Science and Technology Co., which is a big

13   engineering company in China; is that right?

14   **A.**   I don't know about the size of the company but, yes, it

15   does appear to be between those two.

16   **Q.**   And if we could take a look at the text, Mr. Guevara, it

17   says that:  (reading)

18          "Because the information USAPTI Company has provided

19       contains commercial and technical secret, East China

20       Engineering Science and Technology has agreed to keep the

21       information confidential."

22       Do you remember Mr. Axelrod showing you that part of the

23   agreement to show Mr. Liew's familiarity with confidentiality

24   agreements?

25   **A.**   I do recall reading this.

1    Q.   Mr. Guevara, let's go down to the part that Mr. Axelrod

2    didn't show you.  It says:  (reading)

3           "This agreement shall take effect immediately upon

4       signature by both parties, and be valid for five years."

5       Do you see that?

6    A.   Yes.

7    Q.   So this is an agreement in which Mr. Liew and an

8    engineering company agreed that the confidentiality would only

9    last for five years; true?

10   A.   Yes.

11   Q.   Did you look at the Sherwin-Williams agreement that DuPont

12   entered into with the Sherwin-Williams Company?

13   A.   I did not.

14   Q.   So you don't know the length of that, of the

15   confidentiality obligation of that agreement?

16   A.   I don't.

17   Q.   And did you look at any of the other DuPont agreements

18   that they have with their consultants and vendors and others in

19   the course of your investigation?

20   A.   I do recall looking at some from former employees, but I

21   don't recall specifically what it says.

22   Q.   So DuPont had agreements with its former employees; right?

23   A.   And current employees I understood as well.

24   Q.   And, so, you looked at those and you're familiar with the

25   term of that confidentiality agreement?

1   **A.**   I'm not familiar with that term.

2   **Q.**   But you didn't look at the ones that deal with vendors and

3   consultants and other parties; is that correct?

4   **A.**   Not that I recall.

5   **Q.**   Okay.  So you're not really in a position to say how long

6   the period of confidentiality is in those agreements; right?

7            **MR. AXELROD:**  Objection.

8            **THE COURT:**  Sustained.

9            **MR. GASNER:**  No further questions, Your Honor.

10           **THE COURT:**  Thank you.

11       Any redirect?

12           **MR. FROELICH:**  I have some.

13           **THE COURT:**  Oh, I'm sorry, Mr. Froelich.  I apologize.

14   Of course, go ahead.

15                     (Pause in proceedings.)

16           **MR. GASNER:**  May I approach to retrieve the exhibits,

17   Your Honor?

18           **THE COURT:**  Please.

19                     (Pause in proceedings.)

20                     <u>**CROSS-EXAMINATION**</u>

21   **BY MR. FROELICH:**

22   **Q.**   Agent White, I'm Jerry Froelich.  I represent

23   Mr. Maegerle.

24   **A.**   Hello, sir.

25   **Q.**   I just have a few questions of you.

1    There were exhibits that you testified yesterday that were

2  put up in a chart basically; is that correct?

3  **A.**   Yeah, I believe some of the information was put on a

4  chart.

5  **Q.**   What you are were -- part of your job was you were a

6  document collector, isn't that correct, in this case?

7  **A.**   Well, we collected lots of documents and I reviewed them.

8  **Q.**   And you collected them in searches --

9  **A.**   Yes.

10  **Q.**   -- isn't that correct?

11    And what searches, again, just very quickly, did you

12  collect documents from?

13  **A.**   A lot, but the office of USAPTI, the Liew residence, the

14  Robert Maegerle residences, the bank safe-deposit box.

15  **Q.**   You weren't present at the Maegerle search, though?

16  **A.**   I was not.

17  **Q.**   Okay.  That's why -- but you were reviewing documents from

18  that search?

19  **A.**   Yes, I reviewed documents, as well as electronic items.

20  **Q.**   Did you review all the documents from that search?

21  **A.**   I don't think I've seen every document.

22  **Q.**   As far as the documents that you testified yesterday that

23  were in the --

24        **MR. FROELICH:**  Your Honor, may I approach him to

25  refresh his recollection with the chart?

1              THE COURT:  Yes.

2     BY MR. FROELICH:

3     Q.   I just want to ask you a few questions about this chart.

4     A.   Sure.

5     Q.   So I want to give it to you so you don't --

6     A.   Sure.

7     Q.   Now, in that chart, you have a lot -- you list a lot of

8     emails and other documents; isn't that correct?

9     A.   That's correct.

10    Q.   And most of the documents that you refer to in that chart,

11    there's some from 2008; is that correct?

12    A.   I believe that's correct.

13    Q.   There's about four; is that right?

14    A.   I don't know the specific number.

15    Q.   Okay.  Would you just take a quick look and tell me how

16    many of them there are from 2008?

17    A.   (Witness examines document.)  Four.

18    Q.   Okay.  There's four.

19         So the remainder of those would be in 2009 and 2010; is

20    that correct?

21    A.   (Witness examines document.)  Yes.

22    Q.   You know that Mr. Maegerle retired in 1991 from DuPont; is

23    that correct?

24    A.   That's what I understand.

25    Q.   So we're talking a period of 14, 15, 16 years, is that

1  correct, maybe as much as 19 years if you go to 2010?

2  A.   Yes.

3  Q.   So let me go back, and could we bring up Exhibit 54?  I'm

4  sorry.

5       MR. FROELICH:  Your Honor, it's Government Exhibit 54.

6  It's admitted.

7       THE COURT:  Yes.

8  BY MR. FROELICH:

9  Q.   Now, you talked about -- you were shown and this was

10 admitted, this is a May 14th, 1998, letter from Mr. Maegerle to

11 Dennis Dakin at DuPont; is that correct?

12 A.   I believe it's 1996.

13 Q.   Excuse me, 1996.

14 A.   Yes.

15 Q.   Okay.  And it deals -- it doesn't deal with -- it deals

16 with Gaylord Chemical; isn't that correct?

17 A.   Yes, that's what it says.

18 Q.   All right.  And that's not a TiO2 company; is it?

19 A.   I don't know the extent of their -- of what their company

20 does.

21 Q.   Okay.  But it has nothing to do with Mr. Liew or USAPTI;

22 does it?  I mean, it doesn't refer to that at all.  It's

23 strictly about Gaylord Chemical; isn't it?

24 A.   (Witness examines document.)  I don't see a reference to

25 Mr. Liew in the letter.

**WHITE - CROSS / FROELICH**

1  Q.   Well, you have reviewed this letter.  You were handed it

2  by the Government and you put it in on a chart.  You reviewed

3  the letter and you know, don't you, that it deals with

4  Gaylord Chemical, it doesn't deal with USAPTI?

5           **MR. AXELROD:**  Objection.  It misstates the evidence.

6           **THE COURT:**  Sustained.  Sustained.

7           **MR. FROELICH:**  I'll move on to another topic.

8           **THE COURT:**  Can we take a break, a stretch break?

9           **MR. FROELICH:**  Sure, Your Honor.

10          **THE COURT:**  Ladies and gentlemen, why don't you stand.

11 We've been going for about an hour.

12                    (Pause in proceedings.)

13          **THE COURT:**  All right.  Please be seated whenever

14 you're ready, ladies and gentlemen.

15     Mr. Froelich, you may continue.

16          **MR. FROELICH:**  Yes, Your Honor.

17 Q.   You talked about yesterday and Mr. Axelrod talked to you

18 and he showed various exhibits about confidentiality agreements

19 between USAPTI and various employees; is that correct?

20 A.   That's correct.

21 Q.   You didn't have one with Mr. Maegerle, you didn't find a

22 confidentiality agreement with USAPTI and Mr. Maegerle; did

23 you?

24 A.   I don't know for sure if we found one or not, but I did

25 not talk about it yesterday.

**WHITE - CROSS / FROELICH**

1   Q.   Okay.  So that, you didn't mention.

2        Now, you talked about two other exhibits, Exhibits 5 and

3   10; is that correct?

4   A.   That's correct.

5   Q.   Those were emails of certain documents; isn't that

6   correct?

7   A.   No, they were not.  They were digital items.

8   Q.   Okay.  Now, when you talk about digital items, what do you

9   mean by "digital items"?

10  A.   It was an item found on an electronic device, like a

11  computer or a thumb drive, hard drive, something along those

12  lines.

13  Q.   Okay.  Those, in fact, were found on a thumb drive; were

14  they not?

15  A.   I don't know for sure if they were found on a thumb drive

16  or not.

17  Q.   Do you know that there were seven thumb drives retrieved

18  at Mr. Maegerle's residence?

19  A.   I do recall there being several thumb drives.

20  Q.   Does your list of exhibits tell you where it came from?

21  A.   Yes.  It tells me which potential -- or which electronic

22  item it came from, but it just gives a number.  I have to go

23  back and look at that number and match it up to tell you

24  specifically which item it was from.

25  Q.   But you didn't do that before you came in and talked about

**WHITE - CROSS / FROELICH**

1  the exhibits, you didn't look -- you didn't determine on what

2  item they came after?

3  **A.**    No.  The way we did the review is all the digital items

4  usually came in together in sort of a group and, so, that's how

5  I would review it.

6  **Q.**    Do you know what a thumb drive is?

7  **A.**    Do I know what a thumb drive is?

8  **Q.**    A thumb drive is.

9  **A.**    Yes, I do.

10  **Q.**    Could you explain what your understanding of a thumb drive

11  is?

12  **A.**    It's a media device that you plug into a computer that you

13  can save information to or retrieve information off of.

14  **Q.**    Okay.  And if you plug that into the computer, the

15  computer will open what's on the thumb drive; isn't that

16  correct?

17  **A.**    Yeah.  If you plug it in, you can open up the contents of

18  the thumb drive.

19  **Q.**    And then that contents of that thumb drive is then on the

20  computer.  Is it not on the computer's hard drive?

21  **A.**    I believe you have to save it onto the computer to do

22  that.

23  **Q.**    You believe if you open it onto the computer or view it on

24  the computer, it will be on the hard drive?

25  **A.**    I don't think it will be if you just view it.  I think you

 1   have to actually save it onto the computer.

 2   **Q.**   Will the hard drive -- will the thumb drive tell you how

 3   that device will track how that material or information got on

 4   the thumb drive?

 5           **MR. AXELROD:**  Objection.

 6           **THE COURT:**  Sustained.

 7   **BY MR. FROELICH:**

 8   **Q.**   Did you track to see how those two documents, 5 and 10,

 9   the two exhibits, got on the thumb drive?

10   **A.**   I did not, no.  I don't believe so.

11   **Q.**   Okay.

12           **MR. FROELICH:**  That's all I have.

13           **THE COURT:**  All right.  Any redirect?

14           **MR. AXELROD:**  Briefly, Your Honor.

15           **THE COURT:**  All right.

16                    <u>**REDIRECT EXAMINATION**</u>

17   **BY MR. AXELROD:**

18   **Q.**   Agent White, do you recall on cross-examination Mr. Gasner

19   asked you about consultants that the FBI consulted with during

20   the course of its investigation?

21   **A.**   Yes.

22   **Q.**   And you had mentioned, I believe, Jim Fisher?

23   **A.**   Yes.

24   **Q.**   Was there another consultant that the government worked

25   with during the course of the investigation?

1    **A.**    Yeah.  Mr. Gibney.

2    **Q.**    Okay.  And what's his full name?

3    **A.**    I don't recall his first name at this moment.

4    **Q.**    But he's --

5    **A.**    Robert, is it?

6    **Q.**    Robert Gibney.

7    **A.**    That's what I thought.

8    **Q.**    Okay.  Mr. Gasner also asked you and showed you a

9    photograph, Exhibit 1726, of a piece of equipment from the

10   Benicia Fabrication.  Do you recall that?

11   **A.**    Yes.

12   **Q.**    Did the picture show the inside of that device?

13   **A.**    Not as I could tell.

14   **Q.**    And did the folks at Benicia tell you whether they had

15   anything to do with the inside of that device?

16   **A.**    Yeah.  They said they did not have anything to do with the

17   inside of that device.

18   **Q.**    I want to --

19          **MR. AXELROD:**  Your Honor, may I approach with

20   Exhibit 787?

21          **THE COURT:**  Yes.

22   **BY MR. AXELROD:**

23   **Q.**    Agent White, I'm handing you what has been marked as

24   Exhibit 787.

25   **A.**    Yes.

1    Q.   Do you recognize that document?

2    A.   I do.

3    Q.   What is it?

4    A.   It says it's a confidential disclosure agreement.  And it

5    has a Gaylord Chemical symbol at the top.

6    Q.   And is this -- is the document a series of disclosure

7    agreements between Gaylord Chemical and Robert Maegerle?

8    A.   Yes.

9    Q.   And was this provided pursuant to a subpoena?

10   A.   It was.

11        MR. AXELROD:   The United States offers Exhibit 787

12   into evidence.

13        MR. FROELICH:   I object.

14        THE COURT:   Yes.  Subject to the objection previously

15   made, the objection is overruled and it's admitted.

16        (Trial Exhibit 787 received in evidence.)

17        MR. AXELROD:   And I think we're going to try to pull

18   that up on the computer.  It may take a moment.

19        MR. HEMANN:   It should be up.

20        THE CLERK:   It's taking a moment.  Sorry.

21        MR. AXELROD:   I should let the Court know that

22   Mr. Hemann will not be fulfilling this duty for the rest of the

23   trial.

24        (Laughter)

25        MR. AXELROD:   It's a temporary fix.

1             THE COURT:  He had a very short life career in

2    technology.  All right.

3             MR. HEMANN:  I can see it on my screen, Your Honor.

4    The system is taking longer.

5             THE CLERK:  And I've cleared it twice now.

6             THE COURT:  It sounds like it didn't link up to --

7             THE CLERK:  I'm going to clear it again.

8             MR. GUEVARA:  Your Honor, may I assist?

9             THE COURT:  Yes.  Let's get a real technology person

10   here.

11        (Laughter)

12           MR. AXELROD:  My day is improving.

13           THE COURT:  All right.

14           MR. HEMANN:  There we go.  Thank you.

15        (Document displayed.)

16        (Laughter)

17           THE COURT:  Thank you, Mr. Guevara.  Appreciate it.

18   All right.

19           MR. AXELROD:  And if we could highlight just the top

20   of the first page there underneath "Confidential Disclosure

21   Agreement."

22   BY MR. AXELROD:

23   Q.   Do you see that?  And could you read that?

24   A.   (reading)

25              "This agreement made and entered into this 1st day of

1          February 1999, by and between Gaylord Chemical

2          Corporation, a Delaware corporation duly authorized to do

3          business in the state of Louisiana, and having its

4          principal place of business in Louisiana at P.O. Box 1209,

5          Slidell, Louisiana 70459 (Gaylord) and Robert J. Maegerle,

6          30 Pinewater Drive, Harbeson, Delaware 19951 (Maegerle)."

7               **MR. AXELROD:**   And if you could -- if we could scroll

8     down, Mr. Hemann.

9     **BY MR. AXELROD:**

10    **Q.**   And, Agent White, if you could just read from the next

11    section, "Witness It," just through the first sentence of

12    paragraph 1.

13    **A.**   Through the first sentence that what's marked 1?

14    **Q.**   Yeah, through the first sentence of paragraph 1

15    "Definition."

16    **A.**   (reading)

17          "Whereas, in connection with mechanical design, it

18          may be necessary for Gaylord to disclose to Maegerle

19          certain confidential information.  Whereas, in order to

20          protect the confidential nature of said confidential

21          information, subject to the terms of this agreement,

22          Maegerle agrees not to disclose said confidential

23          agreement.  Now, therefore, in consideration of the mutual

24          promises set forth herein, the parties hereto agree as

25          follows:

**WHITE - REDIRECT / AXELROD**

1           "1.  Definition.  Confidential information as used

2       herein shall mean all information, documentation, and

3       devices disclosed or made available to Maegerle in

4       connection with, but not limited to, information relating

5       to mechanical design."

6  **Q.**  And if you could read at the bottom of paragraph 2, "Trade

7  Secret Agreement."  And all the way through on to paragraph 3,

8  "Treatment of Confidential Information" on the next page.

9  **A.**  (reading)

10          "2.  Trade Secret Agreement.  Maegerle acknowledges

11      and agrees that confidential information is a valuable

12      trade secret of Gaylord, and that any disclosure or

13      unauthorized use thereof will cause irreparable harm and

14      loss to Gaylord.

15          "3.  Treatment of Confidential Information.  In

16      consideration of the disclosure to Maegerle of

17      confidential information, both parties agree to treat

18      confidential information in confidence and to undertake

19      the following additional obligations with respect thereto:

20          "(a) to use confidential information for the sole

21      purpose of performing its obligation in connection with

22      mechanical design;

23          "(b) not to disclose confidential information outside

24      of Maegerle;

25          "(c) to limit dissemination of confidential

1        information to only those of Maegerle's employees who have

2        a need to know to perform the limited tasks set forth in

3        item (a) above;

4            "(d) not to copy confidential information or any

5        portion thereof; and.

6            "(e) to return confidential information and all

7        documents, notes or physical evidence hereto (sic) to

8        Gaylord upon the termination of this agreement."

9   Q.   And if you could just read paragraphs 4 and 5.

10  A.   (reading)

11           "4.   Termination of Agreement Period.  This agreement

12       shall terminate on 12/31/1999.

13           "5, Survival of Obligation.  The restrictions and

14       obligations of paragraph 3 of this agreement shall survive

15       any termination (or the terms of this agreement or

16       otherwise) of this agreement."

17  Q.   And paragraph 3 was the paragraph relating to the

18  treatment of confidential information?

19  A.   Yes.

20           MR. AXELROD:  I have no further questions, Your Honor.

21           THE COURT:  Anything further?

22           MR. FROELICH:  I do, Your Honor.  I have a few now.

23           THE COURT:  Okay.

24

25  ///

1              <u>RECROSS-EXAMINATION</u>

2  **BY MR. FROELICH:**

3  **Q.**   There are three agreements in that; isn't that correct?

4  **A.**   Yes.

5  **Q.**   Now, the agreement that you just read from was dated

6  February of 1999; is that correct?

7  **A.**   Yes.

8  **Q.**   Do you know, under this agreement, what Mr. Maegerle was

9  doing for Gaylord?

10  **A.**   I do not.

11  **Q.**   So you don't know what -- what documents or anything this

12  agreement affects, do you?

13  **A.**   I don't know what he received, no.

14  **Q.**   Okay.  Another one -- if you notice, also, Gaylord is a

15  Delaware corporation; isn't that correct?

16  **A.**   I don't know if it is.  I thought it said Louisiana.

17  **Q.**   Well, look at the top of the document.

18         **MR. FROELICH:**  If you would pull up the first

19  paragraph of that document.

20      (Document displayed.)

21         **THE WITNESS:**  Yes.  Yes, it does say that.

22  **BY MR. FROELICH:**

23  **Q.**   And then they're talking about Louisiana in that same

24  paragraph; isn't that correct?

25  **A.**   Yes.

1   **Q.**   The -- if you would look at -- if you could look at

2   paragraph 7, on page 2.

3        (Document displayed.)

4   **Q.**   And do you see where it says "applicable law"?

5   **A.**   Yes.

6   **Q.**   All right.  And it says "applicable law in Louisiana"; is

7   that correct?

8   **A.**   Yes, "with the laws of the state of Louisiana."

9   **Q.**   Exactly.  And do you know that each state has different

10  laws and rules about how long you can bind someone with

11  confidentiality?

12  **A.**   I don't know.

13  **Q.**   Okay.  So you don't know that?

14  **A.**   I don't know all the different rules.

15  **Q.**   Well, let's go to the second -- the other document, the

16  other agreement that you have, which would be 004 and 5.

17       (Document displayed.)

18       **MR. FROELICH:**  If you could turn to the -- if you

19  could pull up --

20  **Q.**   What is the date on the bottom of that agreement?  If you

21  look, you'll see the signatures.  Blow up the signatures.

22  **A.**   One day is January 15th, 1998.  And another date is

23  December 18th, 1997.

24  **Q.**   Okay.  Do you know what documents or -- let me ask you

25  this:  Under this agreement, do you know what Mr. Maegerle was

1    doing for Gaylord Chemical?

2    **A.**    I don't know specifically.

3    **Q.**    Okay.  Do you know if it was -- if -- you don't know what

4    documents or anything was covered by this agreement either, do

5    you?

6    **A.**    Well, it just says "any information."

7    **Q.**    Well, let's go to paragraph 5, which talks about the

8    length of the contract, or how long it's covered.

9          That -- this agreement is only for a period of five years;

10   isn't that correct?

11   **A.**    Yes, that's what it says.

12   **Q.**    Okay.  Now, let's go to the third agreement.  If we go to

13   the bottom of that page.  What -- what's the dates in that?

14   **A.**    The first date is October 1st, 1993.  And the second date

15   is September 8th, 1993.

16   **Q.**    Do you know what Mr. -- what this agreement covered, what

17   Mr. Maegerle was doing under this agreement?

18   **A.**    Not specifically, no.

19   **Q.**    And do you know what documents were covered under this

20   agreement?

21   **A.**    No.  Again, it just says "any information."

22        **MR. FROELICH:**  And we'll go to -- go to paragraph 5.

23      (Document displayed.)

24   BY MR. FROELICH:

25   **Q.**    This is a 5-year confidentiality agreement too, isn't it?

WHITE - RECROSS / FROELICH

1  **A.**   It does say for a period of five years.

2  **Q.**   All right.  Do you know if Mr. Maegerle did any work for

3  Gaylord without an agreement?

4  **A.**   I -- I don't have that knowledge.

5  **Q.**   So over this period of time, you know that he had at least

6  three separate agreements with Gaylord, right?

7  **A.**   Yes.

8  **Q.**   And you don't know whether he did any work without an

9  agreement, do you?

10  **A.**   I do not.

11      **MR. FROELICH:**  Thank you.

12      **THE COURT:**  Thank you.  All right.  You may be

13  excused.  Thank you very much.

14    Next witness, please.

15      **MR. AXELROD:**  Thank you.  The United States calls Dan

16  Dayton, D-a-y-t-o-n.

17      **THE CLERK:**  Counsel, do you want to retrieve the

18  exhibits?

19      **THE COURT:**  We'll take care of the exhibits.  Thank

20  you very much.

21    Would you please retrieve the exhibits.  Thank you very

22  much.

23      **THE CLERK:**  Raise your right hand, please.

24

25

1                      **DANIEL DAYTON,**

2   called as a witness for the Government, having been duly sworn,

3   testified as follows:

4             **THE WITNESS:**  I do.

5             **THE CLERK:**  Thank you.  Please be seated and state and

6   spell your full name for the record.

7             **THE WITNESS:**  Okay.  My name is Daniel Dayton.

8             **THE CLERK:**  Spell it, please.  Spell your name,

9   please.

10            **THE WITNESS:**  D-a-y-t-o-n.

11            **THE CLERK:**  Thank you.  Please speak into the

12  microphone.

13            **MR. AXELROD:**  May I proceed, Your Honor?

14            **THE COURT:**  Yes, please.

15            **MR. AXELROD:**  Thank you.

16                    **DIRECT EXAMINATION**

17  BY MR. AXELROD:

18  **Q.**   Good morning, Mr. Dayton.

19  **A.**   Good morning.

20  **Q.**   Did you -- did you briefly work for DuPont?

21  **A.**   Yes, I did.

22  **Q.**   And in the TiO2 business?

23  **A.**   Yes, I did.

24  **Q.**   For how long?

25  **A.**   38 years.

**DAYTON - DIRECT / AXELROD**

1   **Q.**   So when -- when did you start?

2   **A.**   I started on June 18th, 1973, and I worked through the end

3   of July in 2011.

4   **Q.**   So -- and during that 38-year period, you worked in TiO2

5   the whole time?

6   **A.**   Yes, I did.

7   **Q.**   Can you describe your educational background prior to

8   joining DuPont?

9   **A.**   Yes.  I went to Oregon State University.  I graduated in

10   1973 with a Bachelor of Science in chemical engineering.

11   **Q.**   And when you went to DuPont, what was your first position

12   there?

13   **A.**   I was a team manager at the New Johnsonville, Tennessee,

14   plant.  And that particular role I was directly supervising

15   operators.

16   **Q.**   And the New Johnsonville plant, that's a chloride route

17   TiO2 plant?

18   **A.**   Yes, it is.

19   **Q.**   And how long did you have that particular job?

20   **A.**   I had that job just slightly over a year.

21   **Q.**   And after that -- and New Johnsonville is where?

22   **A.**   It's about 80 miles west of Nashville.

23   **Q.**   Okay.  So that's Tennessee?

24   **A.**   Yes.

25   **Q.**   And after that, what was your next position?

1   **A.**   I went to Wilmington, Delaware, and I was put on the task

2   force that was working on the DeLisle project.  This was a new

3   site in Mississippi.

4   **Q.**   And what was your role on that task force?

5   **A.**   My job was to work with one of the R&D engineers to test

6   some new technology that we were considering to put into that

7   plant.

8          **THE COURT:**  Sir, would you speak right into the

9   microphone.  Yes.  Thank you very much.  You have a very soft

10  voice.

11         **THE WITNESS:**  I'm picking it up.

12         **THE COURT:**  That's better.

13         **MR. AXELROD:**  And if it helps you can move your seat

14  in.

15         **THE WITNESS:**  Okay.

16         **MR. AXELROD:**  It's important for the court reporter

17  and everyone to be able to hear you.

18         **THE WITNESS:**  I'm sorry I wasn't picking it up.

19         **MR. AXELROD:**  Not at all.

20  **Q.**   And so you were working on DeLisle.  Were you involved in

21  the design of the DeLisle facility at that time?

22  **A.**   The role I had in there was not a -- designed as far as

23  making prints or anything like that.  It was more associated

24  with trying to determine the type of technology we're going to

25  use and actually testing pieces of equipment from various

1   vendors to see if their equipment was suitable.

2   **Q.**   Okay.  And during that time -- now, you said you were --

3   you were in Delaware at that point?

4   **A.**   Yes.  I was actually located at the Edgemoor pigments

5   plant in Wilmington.

6   **Q.**   And Edgemoor is also a chloride route TiO2 facility?

7   **A.**   At that time, Edgemoor had both a sulfate and a chloride

8   route plant on the site.

9   **Q.**   What -- what did you -- did you work on the Edgemoor plant

10  at all on anything at Edgemoor?

11  **A.**   Yes, I did.  There was -- we had the -- one of the oil

12  embargoes that was like late 1974, early '75.  And the DeLisle

13  project was slowed down and we were starting up line 2 at

14  Edgemoor.  And I was moved over to help start up that facility.

15  **Q.**   And what did you do to help start up that facility?

16  **A.**   I worked in the oxidation area of the plant and actually

17  ran that part of the plant for -- it was about a year.  And

18  then I was reassigned to a day job, where I was working on

19  operating procedures and design of the -- some of the finishing

20  equipment that was associated with line 2.

21       And then, finally, I was promoted to a second-level

22  supervisor so that the team manager would be working directly

23  for me.  And we started up some new equipment associated with

24  the line 2 finishing operation.

25  **Q.**   And so that we're clear, line 2 was a chloride route line?

**DAYTON - DIRECT / AXELROD**

1    **A.**    It was a chloride route plant, yes.

2    **Q.**    Okay.  At some point in time after the '74 time frame, did

3    you move on from Edgemoor?

4    **A.**    Yes.  In late 1978, we were constructing the DeLisle

5    plant, and I was relocated down to DeLisle to work on that

6    site.

7    **Q.**    And DeLisle is where?

8    **A.**    It's near Gulfport, Mississippi, on the Mississippi gulf

9    coast.

10   **Q.**    And what was your responsibility at DeLisle?  What were

11   you doing there?

12   **A.**    I was responsible for start-up work in the finishing

13   operation.  It was the first assignment, so I worked on

14   procedures and checkout of the finishing equipment.

15   **Q.**    And at some point in time when you were at DeLisle, did

16   you move over to R&D?

17   **A.**    Yes, in 1980.

18   **Q.**    And could you explain to the jury what R&D is at a plant

19   site?

20   **A.**    Yeah.  R&D was a research and development group.  And we

21   had two -- two groups.  We had one group that covered the front

22   part of the plant, so the reaction/purification/oxidation

23   areas.  And we had a second group that covered the back part of

24   the plant, which was the finishing and the power and other

25   support facilities.

1        And my jobs that I had when I was working in R&D, first, I

2   had the group that was on the back part of the plant.  Then I

3   picked up another organization, which was the plant project

4   group.  Each of the sites have their own group of project

5   engineers that handle small projects and do design work that

6   may help out in R&D tests, or the optional maintenance needs

7   some new design, we would work on small design tasks.

8        So I had about six engineers in the design organization

9   that reported to me.  And after about a year or so, I was moved

10  from the R&D group on the back side of the plant to the group

11  that had the reaction/purification/oxidation area.  And this

12  was part of -- we had moved some other people, and the person

13  that was coming in behind me couldn't do the front part.  So I

14  had the front part of the plant and I also had the project

15  group.

16  **Q.**   Okay.  And after your time -- at some point in time, did

17  you move on from -- from DeLisle?

18  **A.**   Yes.  In 1984, I moved to Wilmington, Delaware, to the

19  corporate offices.

20  **Q.**   And what was your position at the corporate office?

21  **A.**   My official title was business analyst.  I had a number of

22  different assignments.  One of my jobs was to do competitive

23  intelligence for the business, so to try to figure out what our

24  competition was doing.  I also did economics for many of our

25  ore projects and other TiO2 projects, and also did some other

1    work that -- whenever the management needed other things done.

2    Because of my technical background, they often assigned me

3    other things that were kind of outside of what a business

4    analyst might do.

5    **Q.**   And after -- did you take another position after that,

6    after sort of serving as a business analyst in Wilmington?

7    **A.**   Yes.  In 1990, I was moved to a project to look at

8    building a plant in Korea.

9    **Q.**   Okay.

10   **A.**   And I was actually located in the engineering building at

11   Newark, Delaware.

12   **Q.**   Okay.  So you stayed in Delaware, but you went over to the

13   engineering department?

14   **A.**   Yes.

15   **Q.**   Okay.  And could you describe briefly what your -- as a

16   project manager on the Korea project what your responsibilities

17   were?

18   **A.**   Actually, I was the head -- the U.S. part of the liaison

19   team.  So I was actually in the business.  I wasn't an

20   engineering department project manager.  So I actually did work

21   on the scope for the Korea project.

22        I also did a lot of work for the Kuan Yin project.  The

23   Kuan Yin liaison team had all gone over to Taiwan at that

24   point.  So if they needed anything done in the United States,

25   they asked me to do that.

**DAYTON - DIRECT / AXELROD**

1    And I was also acting, at that point, as the lead project

2  engineer for the Korea project.  The person engineering that

3  was training into that role was quite new and having quite a

4  bit of learning to get up to speed.

5  **Q.**  Okay.  At some point, did you go over to Edgemoor?

6  **A.**  Yes.  I went to Edgemoor in 1992, to be the head of the

7  construction and project groups.

8  **Q.**  And Edgemoor was the, at that time, was still running a

9  chloride-route process?

10  **A.**  Yes.  It was only running chloride at that point.  The

11  sulfate-route process had been shut down in 1975.

12  **Q.**  And -- and what was your responsibility when you went back

13  with this project group?

14  **A.**  I was responsible for all the projects work that was being

15  done at the Edgemoor site.

16  **Q.**  What does that mean?  I mean, could you just give us some

17  idea --

18  **A.**  I was responsible --

19  **Q.**  -- what kind of projects?

20  **A.**  Yeah.  I was responsible -- for example, the R&D did a

21  basic data and they wanted to do repiping in the purification

22  area.  I would be responsible to receive that basic data, turn

23  that into a design, do the estimate authorization papers, do

24  the detailed design of the project, and then supervise the

25  construction.

1   Q.   And you mentioned basic data.  What's -- what's that?

2   What's basic data?

3   A.   Basic data is a document that comes from the R&D

4   organization.  And it contains all the information that you

5   need to do the conceptual design on your project.  So they may

6   say you want to have three tanks, five pumps, they need to have

7   these capacities.  So you have the information there to be able

8   to size the tanks, size the pumps, figure out how big a

9   pipelines you might need, what electrical facilities you might

10  need to support this equipment.

11       That's a pretty simple example.  It can be quite

12  complicated, as you get to a bigger and bigger project.

13  Q.   Now, after Edgemoor -- how long did you stay at Edgemoor?

14  A.   Until 1996.

15  Q.   And what did you do after that?

16  A.   In 1996, DuPont was -- had an agreement to buy another

17  TiO2 manufacturer called Tioxide.  And I was put on the

18  acquisition team.  And my role in the acquisition team was to

19  go out to the Tioxide facilities and tour them and determine

20  the condition of their plants.

21  Q.   And after that project, what did you do?

22  A.   After that was done, I was moved, again, back to the

23  business center.  But what I was assigned to do was various

24  engineering tasks for all the TiO2 plants within DuPont.

25  Q.   Okay.

1  **A.**    So I led many different teams, did design for heat

2  exchangers for the business and many, many other tasks.

3  **Q.**    And how long were you -- so how long were you at the

4  business center on that tour?

5  **A.**    I was there until my retirement in -- in 2011.

6  **Q.**    Okay.  And so what other kinds of projects did you do

7  during that time at the business center?

8  **A.**    Well, there was a lot of them.  For example, I -- we had a

9  problem with one of the dryers at Altamira.  And I had to

10  redesign all the ductwork for it.

11      I led a team for relief devices for the business.  The

12  DuPont TiO2 business has about 3500 relief devices.  And I had

13  a group of engineers.  We were going through and reworking all

14  the documentation.  And that included I had to do training for

15  many of these engineers on how to do it.

16      **THE COURT:**  Before we go on, I think this would be a

17  good time to break.

18      **MR. AXELROD:**  Great.

19      **THE COURT:**  All right.  Ladies and gentlemen, we're

20  going to take our first break.  Just to reorient you for today

21  with the additional hour and 15 minutes, we're going to take

22  our regular break times, and then about 1:30 we're going to

23  take another break, just to break up the day.

24      So please remember the Court's usual admonitions.  Keep an

25  open mind.  Don't do any outside research or allow any other

```
 1   information to come to your attention.  Don't discuss the case.
 2   And we'll see you in 15 minutes.  Thank you.
 3        You may step down, sir.
 4        (Jury out at 9:44 a.m.)
 5        THE COURT:  A couple of quick housekeeping matters.
 6   Has the government decided on its position with respect to the
 7   verdict form?
 8        MR. HEMANN:  Yes, Your Honor.  We have two very
 9   small --
10        THE COURT:  How about this, rather than take time, why
11   don't you E file by the end of today your -- or meet and confer
12   with the other side, and if there's an agreement upon one,
13   fine.
14        MR. HEMANN:  We're in almost complete agreement.
15        THE COURT:  Okay.  So if you agree just file the
16   amended one, with everybody's approval as to form, and that
17   will be the verdict form we'll use.
18        MR. HEMANN:  Thank you, Your Honor.
19        THE COURT:  Thank you.
20        The other thing I wanted to mention to Mr. Gasner and
21   Ms. Agnolucci, the Court has been in communication with
22   Magistrate Judge Cousins' chambers as well as Pretrial
23   Services, and I'm trying to arrange an appearance before him
24   this afternoon.  He has law and motion, at which time I've
25   recommended some bail conditions, which are similar to the ones
```

1   before, the secured bail and wearing GPS monitoring, et cetera,

2   in order to effectuate the order to have Mr. Liew released on

3   the restrictive conditions that I've requested.

4           **MR. GASNER:**  Thank you.

5           **THE COURT:**  You can all hash that out with the

6   magistrate judge this afternoon.

7           **MR. GASNER:**  We will be there.

8           **THE COURT:**  Thank you very much.

9           **MR. AXELROD:**  Thank you, Your Honor.

10                  (Recess taken at 9:46 a.m.)

11                  (Proceedings resumed at 10:04 a.m.)

12      **(Proceedings were heard out of presence of the jury:)**

13          **THE COURT:**  Let's bring in the jury.

14          **THE CLERK:**  All rise for the jury.

15      **(Proceedings were heard in the presence of the jury:)**

16          **THE COURT:**  All right.  Please be seated.

17      You may continue with your direct examination.

18          **MR. AXELROD:**  Thank you, Your Honor.

19  **Q.**   Mr. Dayton, when you started at DuPont, did you sign a

20  confidentiality agreement?

21  **A.**   Yes, I did.  That's the first thing that happened right

22  after I did my W-4 form, before I could do anything else.

23  **Q.**   And during your time at DuPont, were you provided training

24  related to the protection of DuPont's intellectual property?

25  **A.**   Yes.  You had to have at least annual training.

DAYTON - DIRECT / AXELROD

1   Q.   And could you sort of describe, in general terms, what

2   that training consisted of?

3           MR. FROELICH:   Object as irrelevant, Your Honor.

4           THE COURT:   Overruled.

5           THE WITNESS:   It -- it varied over the years that I

6   was with DuPont.   When I first joined the company, we would be

7   given the PIP manual, which was the corporate Proprietary

8   Information Protection manual, and told that we had to review

9   it and we had to tell our boss that we had reviewed it.

10          We also had group meetings, where our supervisors would go

11  over various things that had happened.

12          In the corporation, we had fliers that came out.   For

13  instance, if someone tried to break into one of our plants to

14  gain technology or some other unusual event, those fliers came

15  out to the entire corporation.   We were told what happened,

16  what steps needed to be taken at our sites to prevent that same

17  thing from happening at the site we were at.

18          And as time went on, these things where we came out in

19  manuals, as we got more and more computers, it became a

20  computer-based system.

21          So by the time I left, you would have to go in once a

22  year, review the entire document, and then take a test to prove

23  that you understood the information.

24  BY MR. AXELROD:

25  Q.   When you left DuPont, did you sign any affirmation of that

1    confidentiality agreement?

2    **A.**    Yes, I did.  And I had to prove that I did not take any

3    DuPont documents with me; nothing was at home or any other

4    place.

5    **Q.**    And we're going to be talking a bit about the chloride

6    route TiO2 process.  And what I'd like to do, with the Court's

7    permission, is ask you to step down and come over to the

8    whiteboard to provide a basic schematic of the process.

9         **THE COURT:**  All right.

10   **BY MR. AXELROD:**

11   **Q.**   And, Mr. Dayton, there's dry erase markers there.

12        **THE COURT:**  Let me ask you this.  Why are we doing it

13   on a board that can't be preserved?  Shouldn't we be doing it

14   on paper so we can preserve whatever he does?

15        **MR. AXELROD:**  Well, this is just a demonstrative.

16        **THE COURT:**  I understand that.  But if there's ever a

17   need to have this reviewed, then I think we need to have some

18   memorialization, either a photograph or --

19        **MR. AXELROD:**  We could take a photograph of it after

20   the drawing is created.

21        **THE COURT:**  All right.

22      Mr. Gasner, do you have any objection to that?

23        **MR. GASNER:**  No objection.

24        **THE COURT:**  All right.  Let's do that, then.  Thank

25   you.

1              **MR. AXELROD:**  Thank you, Your Honor.

2              **THE COURT:**  Maybe we'll get Mr. Hemann to take care

3    of ...

4         (Laughter)

5              **MR. HEMANN:**  Mr. Guevara and I will get together and

6    work something out.

7              **MR. AXELROD:**  I appreciate the Court's confidence in

8    Mr. Hemann, but I don't want to overextend him.

9         (Laughter)

10             **THE COURT:**  Okay.

11   BY MR. AXELROD:

12   **Q.**   Mr. Dayton, could you describe for the jury, sort of maybe

13   in a block diagram, the chloride route TiO2 process?

14   **A.**   Okay.  In a chloride process, you start out with several

15   raw materials.  And one of the raw materials is ore.  And the

16   ore for this process looks like black beach sand.

17        And I'm from Oregon originally, and you'll see down on the

18   beaches in Oregon, I suspect in Northern California, you'll sea

19   strands of black sand mixed in with the other sands.  And this

20   is ore that contains titanium.

21        This ore -- and there's a bunch of different technical

22   names for the various qualities of ore.  This ore could range

23   anywhere from about 40 percent titanium up to about 97 percent

24   titanium.

25        The next raw material that's used is coke.  And coke in

1    this case is pure carbon.  It's -- it's a granular material.

2    And its composition kind of looks like pencil lead a little

3    bit.

4        And the third raw material that's used is chlorine.  These

5    are fed into a chlorinator.

6           THE CLERK:  Sir, you're going to need to keep your

7    voice up, please.

8           THE WITNESS:  Yes, certainly.  This is fed into a

9    chlorinator.  And the chlorinator is a large vessel that's

10   ceramic lined.  It runs at very high temperature.  And it's

11   about 1800 -- it's about 1800 Fahrenheit.  And the material

12   inside here resembles lava.  This is like running a big

13   volcano, is probably the best description I can give you.

14          THE COURT:  It would help, sir, if, as you're writing

15   something down, if you would just paint a word picture for the

16   record of what you're writing down.

17          THE WITNESS:  Okay.  Thank you.  I'm writing down here

18   "condensation."

19          THE COURT:  All right.

20   BY MR. AXELROD:

21   Q.   And let me assist.  So the top of your drawing you

22   identified the basic raw materials that go into the process,

23   right?

24   A.   Yes, I did.

25   Q.   And so you got a block for ore, a block for coke and a

**DAYTON - DIRECT / AXELROD**

1  block for chlorine, which you wrote up as Cl2?

2  **A.**   Yes, that's the chemical symbol for chlorine.

3  **Q.**   And those materials go into the chlorinator?

4  **A.**   Yes, they do.

5  **Q.**   And you've got a block for that?

6  **A.**   Yes.

7  **Q.**   Okay.  And then I think you drew a block for condensation.

8  So could you explain the process coming out of the chlorinator

9  going into condensation --

10  **A.**   Yes.

11  **Q.**   -- what's happening?

12  **A.**   Okay.  We're coming out of this chlorinator, it was

13  running about 1800 Fahrenheit.  So most of the material coming

14  out of this chlorinator is gas.  There's a little bit of the

15  ore doesn't react.  It comes out.  A little bit of the coke

16  doesn't react, it comes out.  They're solids.

17      So our next steps that we want to do is we want to take

18  this very hot gas and we want to condense it.  And we're going

19  to condense it in steps so that we collect up these solids.

20  And they're going to go off in one stream.  And we're going to

21  condense off other miscellaneous metals, which is what makes

22  this ore black, and send that off to be treated.

23      And then what we're going to come up with is a chemical

24  called titanium tetrachloride.  Okay.  And that's the product

25  we want.

1      So this temperature here (indicating) is about 1800

2  Fahrenheit.  This temperature here (indicating) is about zero

3  Fahrenheit coming out the bottom.

4      So our product -- I'm going to use the chemical formula

5  for it because, otherwise, I'm going to have a very long title

6  across here, is titanium tetrachloride.  And some people call

7  it tickle just for a short name, okay.  TiCl4.  Okay.

8      Now, where we've made this liquid, it's not pure enough

9  for us to make our white pigment that we need as a product.  So

10  our next step -- and I'm drawing a block in that says

11  "purification."

12      And in the purification step, we're going to incorporate

13  an additive that ties up some of the chemicals that we don't

14  want, and then we run it through a column.  And what we're

15  going to do is heat this back up to a vapor again and separate.

16  The parts we want don't heat up and don't vaporize, okay.

17      And the part we do want, the tickle, the pure tickle,

18  comes out and we condense it back down to a liquid again.

19      So what we're coming up with, this -- this product right

20  here tends to be brown, reddish or black, with a contaminant

21  that's in it.  But after a purification, we're going to have a

22  pure titanium tetrachloride.  And it's kind of a slightly

23  yellowish, clear liquid.  You can look right through it, okay.

24      So what I'm writing down here now is "pure tickle."

25      Our next block is called "oxidation."  And I've drawn a

1   line coming into the side here that has oxygen.  So what we're

2   doing now is we're going to take our pure tickle, and we're

3   going to heat it back up again because we need very high

4   temperature to get it to react to the oxygen.  And then we mix

5   it with oxygen and we literally burn it, is probably the best

6   way to describe this.

7       And this particular step is where we make our titanium

8   dioxide pigment.  So this is a very critical step in the

9   overall process because we want to get a product that has a

10  particle size that our customers want.

11      And in this case, it's about the consistency of face

12  powder.  It's -- if you measure it, it's three-tenths of a

13  micron, is the best measurement.  It's kind of hard to

14  understand what that is.

15  **Q.**   It sounds small?

16  **A.**   It's very, very fine.  So if you think like women's face

17  powder, that's pretty close.  Okay.

18      So what happens, we've -- we've turned this titanium

19  tetrachloride into TiO2 by combining it with oxygen.  We've

20  liberated all the chlorine that's tied up with the tickle that

21  came in.  So we take the chlorine, we don't want to waste that.

22  It's -- it's very toxic stuff.

23  **Q.**   So in your oxidation box, on the left side there, is that

24  where it's showing the chlorine going back?

25  **A.**   Yeah, it goes back up to the chlorinator and we use it

1    over again.

2    **Q.**    Okay.

3    **A.**    Okay.   So now, we have our TiO2 pigment.   And in most of

4    the manufacturers, at this point they mix it with water so you

5    can pump it, okay.   So you have this solid suspended in water.

6    And then you send it to a finishing operation.

7         So my last block that I've drawn on here is called

8    finishing.

9         And our customers want very specific characteristics for

10   their pigment.   The person who's making your latex house paint

11   wants to have one-coat coverage, okay.   That's called opacity.

12   That's his most important measurement.

13        The person who is making automotive paint wants to make

14   sure that it's very durable, that it holds up on your car.   You

15   don't want to be able to run your hand across the car and have

16   the paint come off and the color of your car come off on your

17   hand, okay.   And that's called chalking.

18        So each of these companies wants very controlled product.

19   So this product actually goes into many, many things.   It goes

20   into paints that I've mentioned.   It goes into plastics.   So if

21   any of you happen to have PVC windows, the PVC window casings,

22   it has a lot of TiO2 in it to make the PVC hold up to the sun.

23        It goes into paper.   So if you have *Time* magazine or any

24   of the other magazines, they don't want you to be able to see

25   the printing on the other side of the page, so they put a lot

1    of TiO2 in their paper.  Same thing with Bible paper, for

2    example.  Okay.

3         And it also goes into cosmetics, in drugs, into foods.  If

4    you ever buy Oreo cookies, it's in the white filling in the

5    middle, okay.

6         And each of these people want to have a slightly different

7    product.  So what we do to accommodate them is we would put on

8    top of our TiO2, we would precipitate other things to give it

9    those properties.  So like alumina, okay.

10        So there's a wet treatment step that goes on in here, and

11   then we take it and we filter it, dry it, so it's gone from a

12   slurry to a dry powder.  And we make sure the sizing is

13   correct, and we put it in the packages that our customers want.

14        So some of the customers want to have things in bags.

15   Some of our people, like our paint folks that make the

16   architectural paints for your house, their paint is water

17   based.  So they actually want it, again, mixed with water in a

18   railcar so they can just pump it out and pump it right into

19   their process so they don't have to have bags of waste product.

20   Q.   In general terms, is the process broken up into different

21   sections?  Sort of in normal parlance about TiO2, is there sort

22   of a front end part?  Can you --

23   A.   Yeah, there's really three sections that we would have in

24   most plants, okay.

25        From the coke and ore section through oxidation is usually

1    one plant, okay.  And in many of our facilities the finishing

2    section would be across the street in its own group of

3    buildings.

4        There's another section I have not drawn on here, which is

5    our environmental facilities.  And environmental facilities, it

6    would take the blow-over material that comes out of here and

7    the miscellaneous metal chlorides that we're taking out of the

8    ore and treat those.  And that facility varies dramatically

9    from site to site so there's no one nice description for it.

10   Q.   Okay.  So there's the -- from the front end, the ore and

11   the materials down through oxidation is sort of one piece.  And

12   then finishing is another piece?

13   A.   Yes.

14   Q.   Okay.  And you can go back up now.  We'll leave that up.

15   We may refer to it as we're talking.

16           MR. HEMANN:  Should I take this now?

17           MR. AXELROD:  Yeah.

18       (Photograph taken of diagram.)

19   BY MR. AXELROD:

20   Q.   Mr. Dayton, at some point during your time at DuPont, were

21   you involved in an effort to formalize DuPont's intellectual

22   property protection or security policies?

23   A.   I had an effort.  It was around the TiO2 business

24   specifically.

25   Q.   Okay.  And -- right.  In the TiO2 business?

DAYTON - DIRECT / AXELROD

1    **A.**    Yes.

2    **Q.**    Could you describe -- so you were involved?

3    **A.**    Yes, I was.

4    **Q.**    And could you describe the circumstances that led to that

5    effort.

6    **A.**    Yes.   The corporation had their own procedures for

7    handling systems.   The engineering department had their own

8    procedure.   And the TiO2 business had a number of procedures.

9    They were kind of somewhat informal.   There wasn't any one book

10   that said here's how we're going to handle everything.

11       And in about 1985, we started looking at three sites to

12   build plants outside the United States.   We had one in Brazil,

13   we had one in Taiwan, and we had one in Korea.   And we were

14   concerned that since we were going to have to use design

15   organizations outside the United States for these foreign

16   countries, that we had the potential to lose technology.

17       So a committee was formed.   It was led by Wally Kremer,

18   who was an R&D manager.   It included myself and Harry Pollen

19   from our Johnsonville plant, a couple of other peoples, and

20   Bill Tray from the engineering department.

21       And our job was to formalize these procedures, to make

22   sure that we did not lose technology as we went forward on

23   these three projects.

24   **Q.**    What -- what was your role with respect to that effort?

25   **A.**    I was doing the competitive intelligence at that point,

**DAYTON - DIRECT / AXELROD**

1    for the business.  And I had knowledge of not only how we had

2    lost some information at that point, but also how I was able to

3    gain information on our competitors.

4        So I was brought in to talk to the group about those areas

5    that we saw that either was a competitor's weakness or our own

6    weakness in controlling our technology, so that we could put

7    things in place that would prevent that from happening in the

8    future to DuPont.

9    **Q.**   Did -- did Mr. Maegerle have a role in that effort?

10   **A.**   In the early part of this, in 1985, I do not believe so.

11   **Q.**   Okay.  At some point later did he have a role?

12   **A.**   Yes.

13   **Q.**   And what --

14   **A.**   After the committee had put together the procedures we

15   were going to follow, Mr. Maegerle was responsible for going to

16   the contractor that we were using in Taiwan and working with

17   them to put together their plan on how they were going to

18   implement these procedures.

19   **Q.**   And in conjunction with his -- his efforts, did you attend

20   meetings and exchange communications related to that?

21   **A.**   Yes, I did.

22   **Q.**   And the Taiwan -- you said DuPont was considering a plant

23   in Taiwan, a plant in Korea, and a plant in Brazil?

24   **A.**   That's correct.

25   **Q.**   And, ultimately, this was a choice made to go with Taiwan?

1   **A.**   Yeah.  What had happened is it was down to where we -- who

2   would give us permits first to build the plant.  And the

3   Taiwanese did that.

4       In the case of Brazil, they changed a number of their

5   laws, and made it very difficult to have a wholly owned

6   venture.

7       So we actually did open the site.  We built a much smaller

8   facility.  And we elected not to build a facility in Korea.

9   **Q.**   So I want to focus for a moment on the efforts to do the

10  project security for the Taiwan plant.

11  **A.**   Right.

12  **Q.**   And I want to --

13        **MR. AXELROD:**  Your Honor, may I approach with Exhibit

14  895?

15        **THE COURT:**  Yes, you may.

16  **BY MR. AXELROD:**

17  **Q.**   Mr. Dayton, I'm handing you what's been marked as Exhibit

18  895.  Do you recognize that document?

19  **A.**   Yes, I do.

20  **Q.**   Okay.  What is it?

21  **A.**   It's what we would call a pre-project planning meeting.

22  In DuPont, when you have a very large project -- and these

23  plants cost hundreds of millions of dollars.  So we would have

24  to go to the DuPont board of directors to get that kind of

25  money.  Smaller projects we could go to a lower level in the

1  organization and they could give us other money.

2      But when you get to this size, we had some -- DuPont had

3  some very formal procedures of things you had to do before you

4  could take the appropriation request.  And one of the things

5  was this pre-project planning meeting where the senior

6  management from the business and from engineering had to sit

7  down, and they had a number of things that they have to go

8  through to check off that, yes, everything has been done

9  correctly before we were allowed to take the appropriation

10  request forward.

11  **Q.**   And this document, 895, relates to this pre-project

12  planning?

13  **A.**   Yes, it is.  It's a summary of the meetings.

14  **Q.**   Okay.  And who's the author of that document?

15  **A.**   It is Bob Maegerle.

16      **MR. AXELROD:**  And the parties stipulate that this

17  document is from DuPont and authentic.

18      **THE COURT:**  Is that correct?

19      **MR. GASNER:**  Yes, Your Honor.

20      **MR. FROELICH:**  No objection.

21      **THE COURT:**  All right.

22      **MR. AXELROD:**  The government offers Exhibit 895 into

23  evidence.

24      **MR. GASNER:**  No objection.

25      **MR. FROELICH:**  No objection.

1           **THE COURT:**  It's admitted.

2        (Trial Exhibit 895 received in evidence.)

3        (Document displayed.)

4    **BY MR. AXELROD:**

5    **Q.**   Mr. Dayton, if we could look at the bottom of that

6    document, there's a reference that says "P4010 C&P Department

7    Taiwan."  Do you see that?

8    **A.**   Yes, I do.

9    **Q.**   What is P4010?

10   **A.**   Every project in DuPont is given a number for accounting

11   purposes.  And the P4010 says this is Project 4010.

12   **Q.**   Okay.  And is 4010 the Taiwan project?

13   **A.**   Yes, it is.

14   **Q.**   Okay.  And, ultimately, that becomes a plant in Kuan Yin?

15   **A.**   Yes, that's correct.

16   **Q.**   Okay.  And if you could go to the next page.

17        And if you could just read that text that is being blown

18   up there.

19   **A.**   Okay.

20           "Attached are the charts from the Taiwan TiO2 project

21        planning meeting held December 11, 1986.  Please restrict

22        use of this information to DuPont or 'secure eyes'

23        personnel only.  The listing of non-DuPonters satisfying

24        the 'secure eyes' criteria is currently maintained by Ted

25        Lewis."

DAYTON - DIRECT / AXELROD

1   Q.   And it's signed by Mr. Maegerle?

2   A.   Yes, it is.

3   Q.   And it says "secure eyes."  Can --

4   A.   Yeah.

5   Q.   What's that?

6   A.   One of the things that the committee that I had started

7   working with in 1985 dealt with was we were starting to use

8   more and more contractors to do our design, as opposed to

9   DuPont employees.

10      And some of those contractors had been working with the

11   company for a very long time.  Currently, we have some of these

12   people that have been working for us for more than 20 years.

13   And these are the people that we trust with our confidential

14   information.

15      So given that certain people we know they're very

16   trustworthy, they've got a long relationship with us, we allow

17   them to have this confidential information that we would not

18   allow other contractors to have.  And the designation for those

19   individuals is "secure eyes contractors."

20   Q.   And I gather they were required to sign very specific

21   confidentiality agreements?

22   A.   Ah, yes.

23          MR. AXELROD:  Okay.  If we could look at the next page

24   of the document and blow up that top third.

25      (Document displayed.)

DAYTON - DIRECT / AXELROD

1    BY MR. AXELROD:

2    Q.    And could you read that -- the highlighted portion, or the

3    blown-up portion?

4    A.    Certainly.  The agenda starts out with project Background

5    by Bob.  Project objectives, alternatives, and then a section

6    on security objectives.

7    Q.    Okay.  So this is -- is this an agenda for the meeting

8    that occurred, and the role that Mr. Maegerle had at the

9    meeting?

10   A.    Yes.

11   Q.    Okay.

12         THE COURT:  Before we go further can you move that

13   screen back, because I fear that it's blocking some counsel and

14   Mr. Liew's view of the witness.  Thank you very much.

15         MS. AGNOLUCCI:  Thank you.

16         MR. AXELROD:  Sure.  You bet.

17   BY MR. AXELROD:

18   Q.    And in the bottom of that page, in the right corner, do

19   you see some initials?

20   A.    Yes.  Those are Bob's initials.

21   Q.    And when you say "Bob," is that Mr. Maegerle?

22   A.    That's Mr. Maegerle.

23   Q.    Okay.  And if we could go to page 14.

24         (Document displayed.)

25   Q.    And could you read that blown-up portion.

**DAYTON - DIRECT / AXELROD**

1    **A.**    Yes.  This is the security objectives chart.

2          And it talks about "Limited Information to FSC."  And FSC

3    is a full-service contractor.  This would be a design

4    organization that would be doing design for the project.

5          "Retain DuPont Procurement of Security Equipment."  And we

6    had -- actually, in the committee we identified certain

7    equipment.  We called them "A Security" as our title.  And they

8    are the most secure, most critical pieces for our process.

9          And then last is "Control Sensitive Design Data."

10   **Q.**    And in the bottom, are Mr. Maegerle's initials there?

11   **A.**    Yes.

12   **Q.**    And when you say "A Security Equipment," could you give an

13   example of what you're talking about.

14   **A.**    "A security equipment" is that is most sensitive.  One

15   example would be the oxidation reactor, where as we went

16   through our thing we're going and we're combining the oxygen

17   and the pure titanium tetrachloride to make our TiO2.  And it

18   controls particle size and other things of our product, which

19   is very, very critical to our overall process.

20   **Q.**    So to go back to your diagram -- can you see me?

21   **A.**    Yes, enough.

22   **Q.**    -- where this oxidation step occurs --

23   **A.**    Yes.

24   **Q.**    -- there's actually a piece of equipment called a

25   oxidation reactor?

**DAYTON - DIRECT / AXELROD**

1    A.    Yes, there is.

2    Q.    And that's a highly proprietary --

3    A.    Absolutely.

4    Q.    Why?  What is it about it?

5    A.    Well, there's several things that we get into here.  And

6    one I mentioned, the quality of our product.  Many of our

7    competitors cannot make reactors to run in the capacity that

8    the DuPont reactor runs.  So on some sites we would have one

9    reactor and one system, where the competitors would have six to

10   do exactly the same thing.

11         And what this leads you to is they have six times as many

12   pieces that can break.  They have six times as many pieces

13   they've got to operate.  Their operators are going around

14   trying to keep everything running.  They have six times as many

15   pieces their maintenance guys have to keep repairing.  And

16   there is a very large cost penalty associated with doing that.

17   Q.    So -- and let me go back to this document.  And if we

18   could go to page 19.

19         (Document displayed.)

20   Q.    And do you see the highlighted portion that says -- can

21   you --

22   A.    Yes.

23   Q.    Can you tell the jury what we're looking at?

24   A.    Yes.  This is the lead designer's responsibilities chart.

25   And there's two columns on here.  The left column is labeled

DAYTON - DIRECT / AXELROD

1    "Louviers."  And that is the building where our central

2    engineering organization is located.

3         The right column says "Taiwan FSC."  And that's the Taiwan

4    full service design contractor.  In this case, it was Pacific

5    and East Coast Engineering.  PECL was their acronym.

6         So we have a number of names here of people who are

7    leading various functions.  You can see Mr. Maegerle's name is

8    located under "process" --

9    **Q.**   Right.

10   **A.**   -- as the engineer.

11   **Q.**   Let me stop you there.

12        So what was Mr. Maegerle's role on the Taiwan project as

13   reflected --

14   **A.**   I believe his title was the lead project engineer.

15   **Q.**   What did that mean in practical terms?

16   **A.**   He was responsible for getting the other engineers that

17   worked on the project.  So if you needed someone that was doing

18   structural design, for example, for your building steel, that

19   he would arrange to have one of the structural engineers.  If

20   he needed five, he would go get five, whatever was needed.  So

21   he was responsible for getting the manpower to do the design.

22        **MR. AXELROD:**  Your Honor, may I approach with Exhibit

23   849?

24        **THE COURT:**  Yes, you may.

25

DAYTON - DIRECT / AXELROD

1   BY MR. AXELROD:

2   Q.   Mr. Dayton, I'm handing you what's been marked as Exhibit

3   849.

4   A.   Okay.

5   Q.   Do you recognize that document?

6   A.   Yes, I do.

7   Q.   What is it?

8   A.   It's a report from Bob Maegerle back to Wally Kremer, who

9   was the head of our security committee, discussing how we were

10  going to handle logic diagrams from a security standpoint.

11       And a logic diagram is one that describes the

12  instrumentation and control system that you would have for

13  various piece of equipment.  And for your interlocks, where you

14  have alarms that would alert the operators that things are not

15  going right, is all located on it.

16       This is a very confidential document.  And we normally

17  don't release this outside anywhere.  This is all nonpublic

18  information.

19  Q.   The logic diagrams?

20  A.   Yes.

21  Q.   Okay.  And does Exhibit 849, do you see Mr. Maegerle's

22  signature on it?

23  A.   Yes.  He signed it at the bottom.

24       MR. AXELROD:  And the parties have stipulated that

25  this document is from DuPont and authentic.

 1              THE COURT:  Correct?

 2              MR. GASNER:  Yes, Your Honor.

 3              MR. FROELICH:  Yes, Your Honor.

 4              THE COURT:  So stipulated.

 5              MR. AXELROD:  And the government offers 849 into

 6     evidence.

 7              MR. FROELICH:  No objection.

 8              MR. GASNER:  No objection.

 9              THE COURT:  Admitted.

10         (Trial Exhibit 849 received in evidence.)

11         (Document displayed.)

12              MR. AXELROD:  And if we could bring up the first page

13     and highlight that for a moment, blow it up.

14     BY MR. AXELROD:

15     Q.   So this letter is February 9, 1987?

16     A.   Yes, it is.

17     Q.   And this is during this period that you and Mr. Maegerle

18     are working on project security for the Taiwan project?

19     A.   Yeah.  Actually, in 1987, we were also starting to put in

20     a second line at DeLisle, Mississippi.  And the business had

21     felt that the security plant for Taiwan was so good that we

22     decided to implement it for all of our other major projects.

23          And in '87, we had a number of meetings around how we were

24     using this at -- for our DeLisle project, which would be using

25     a different design contractor that was located in Ohio.

1   Q.   Okay.  I want to -- on the letter here for a minute, if we

2   could highlight the last paragraph there.  And if could you

3   read that, please.

4   A.   (reading)

5            "This information is transmitted to answer security

6        questions raised in regard to maximizing protection of

7        TiO2 technology with full-service contracting of

8        production design and construction.  If you have any

9        additional questions, please call."

10           MR. AXELROD:  And, Your Honor, may I approach with

11  Exhibit 847?

12           THE COURT:  Yes.

13  BY MR. AXELROD:

14  Q.   Mr. Dayton, I'm going to hand you what's been marked

15  Exhibit 847, and ask if you recognize that?

16  A.   Yes, I did.  It actually came out of one of my old files.

17  Q.   Okay.  What is it?

18  A.   Uhm, this is a document that relates to a meeting we had

19  on January 28th, 1987, around the security of our process.

20  Q.   And was it addressed to -- the letter addressed to you and

21  to Mr. Maegerle, among other people?

22  A.   Yes.

23           MR. AXELROD:  The parties have stipulated that this

24  document is from DuPont and authentic.

25           MR. GASNER:  True.

1          MR. FROELICH:  That's true, Your Honor.

2          THE COURT:  All right.  So stipulated.

3          MR. AXELROD:  The government offers 847 into evidence.

4          MR. GASNER:  No objection.

5          THE COURT:  It's admitted.

6       (Trial Exhibit 847 received in evidence.)

7       (Document displayed.)

8          MR. AXELROD:  And if we could highlight the first two

9    paragraphs.

10   BY MR. AXELROD:

11   Q.   And could you read that, please.

12   A.   Certainly.

13          "A joint engineering-chemical and pigments" --

14       chemical and pigments was the division in DuPont that had

15       the TiO2 business at that time -- "committee held (sic) on

16       January 28th to review security systems for RDO."  RDO was

17       a regional design office that was outside the Louviers

18       building.  "The Taiwan project."  And the proposed project

19       was Ferguson, and Ferguson was the design contractor for

20       the DeLisle line 2 facility.

21          "D.M. Dayton provided perspective on security and

22       competitors with a talk based on his experience in

23       competitive intelligence and activities."

24   Q.   That's you?

25   A.   That's me.  "D.C. Dakin," which is Dennis Dakin,

1    Mr. Maegerle and Mr. Sergeant reviewed security programs for

2    the regional design office and Taiwan project respectively.

3         "General concepts were similar.  Some details were

4         different.  The group detailed five subjects for

5         additional discussion."

6         **MR. AXELROD:**  And if we could go to the next page,

7    there's another section called "Security Areas."  If we could

8    blow that up.

9         (Document displayed.)

10   **BY MR. AXELROD:**

11   **Q.**   And if you could read that, please.

12   **A.**   Okay.

13        "All DuPont information should be treated as

14        confidential.  A super-sensitive equipment list has been

15        developed and is available from the R&D site heads.  R&D

16        is responsible for the technology and the R&D site heads

17        must provide security guidance.  Wally Kremer and Dan

18        Dayton are available for overall guidance.  Although one

19        of our competitors knows about our Antioch technology,

20        others do not have that degree of knowledge.  Even with

21        Antioch technology, we all know that other plants have

22        technology beyond the Antioch process."

23   **Q.**   Then there's another section called "CAD Security."  If we

24   could go down.

25   **A.**   Yes, there is.

**DAYTON - DIRECT / AXELROD**

1           "A subcommittee chaired by Ken Cowley, engineering,

2      and the Intergraph committee was set up to address CAD

3      security."

4      Intergraph was an early computer aided design program that

5 ran on the IBM main frame.

6  **Q.**   It says --

7  **A.**   Then it says:

8           "See attached letter R.J. Maegerle to Mr. Cowley."

9  **Q.**   We'll come back to that in a minute but is there, in fact,

10 an attached letter to Mr. Maegerle?

11 **A.**   Yeah, I believe there is.

12 **Q.**   And if you could go to the next page, to page 3, and read,

13 there's a paragraph called "DCS."

14     (Document displayed.)

15 **A.**   Okay.

16          "Does the use of DCS system" --

17 DCS Is called distributed control system.  It's actually a

18 computer system that has the instruments on the plant so,

19 actually, you would feed your signals coming in for your field

20 instruments, it does the calculations and sends out the signals

21 to your control valves and other pieces.

22          -- "require the full-service contractor to have logic

23     diagrams?  Attached letter by R.J. Maegerle indicates

24     logic diagrams are needed by the full-service contractor.

25     Logic diagrams are extremely sensitive documents.  Special

1      contracts will be needed.  An additional discussion of the

2      need to know and is there another way to complete the

3      tasks without the full-service contractor involvement will

4      be held."

5            **MR. AXELROD:**  Your Honor, may I approach with Exhibit

6      848?

7            **THE COURT:**  Yes.

8      BY MR. AXELROD:

9      **Q.**   Mr. Dayton, I'm handing you what's been marked Exhibit

10     848.

11     **A.**   Okay.

12     **Q.**   Do you recognize that document?

13     **A.**   Yes, I do.

14     **Q.**   What is it?

15     **A.**   It's a letter from Mr. Maegerle to Ken Cowley, detailing

16     the review they had on Intergraph security.

17     **Q.**   And is this the letter that was referenced in Exhibit 847,

18     that we were just looking at?

19     **A.**   It was.

20            **MR. AXELROD:**  The government and the parties have

21     stipulated that 848 is a document from DuPont and authentic.

22            **THE COURT:**  Is that correct?

23            **MR. FROELICH:**  That's correct, Your Honor.

24            **THE COURT:**  So stipulated.

25            **MR. AXELROD:**  The government moves 848 into evidence.

1          **MR. GASNER:**  No objection.

2          **MR. FROELICH:**  No objection.

3          **THE COURT:**  Admitted.

4      (Trial Exhibit 848 received in evidence.)

5      (Document displayed.)

6          **MR. AXELROD:**  If we could bring that up, just the top

7  where it says "To," "From," and the date.

8  **BY MR. AXELROD:**

9  **Q.**   So this is --

10 **A.**   This is February 6, 1987.

11 **Q.**   Okay.

12 **A.**   And from Mr. Maegerle to Mr. Cowley.

13 **Q.**   And if you could read in the middle of that first

14 paragraph, where it begins -- and we'll try to blow this up for

15 you.  Where it begins "As a general guideline."

16 **A.**   Certainly.

17 **Q.**   And finish that paragraph.

18 **A.**   Yeah.

19          "As a general guideline DuPont's TiO2 process is to

20      be considered DuPont confidential with selected process

21      information and design data sent to full cost and cost

22      plus contractors on a need to know only basis."

23 **Q.**   Let me stop you there.  When it says considered --

24 "DuPont's TiO2 process is to be considered DuPont

25 confidential" --

**DAYTON - DIRECT / AXELROD**

1   **A.**   Yes.

2   **Q.**   -- what does that mean?

3   **A.**   DuPont has several classifications for security of

4   documents.  And the -- obviously, the lowest classification is

5   public, where we would have like marketing documents and that

6   sort of thing, that we give out to our customers.

7       The next is internal use only, which would include things

8   like our phone lists and other things we just don't put out to

9   the public.  But there's no tremendous classification security

10  associated with them.

11      The third one is our DuPont confidential.  And DuPont

12  confidential includes a lot of trade secrets.  And it's

13  something that we would keep locked up.  But, in fact, we would

14  allow, say, most of our DuPont employees within the TiO2

15  business to have access to them.

16      And the final is confidential special control.  These are

17  the most critical documents.  And they're not only locked up,

18  but they're only passed out on a need-to-know basis, so there's

19  only a handful of people who would have access to them.

20  **Q.**   The -- you had mentioned earlier that the -- the security

21  procedure that Mr. Maegerle was involved in for Taiwan became a

22  model?

23  **A.**   Yes, that's correct.

24  **Q.**   Did you have occasion, yourself, to use that model in your

25  work at DuPont?

**DAYTON - DIRECT / AXELROD**

1   **A.**   Yes, I did.

2   **Q.**   Okay.  And can you describe.

3   **A.**   When -- several times.  The first time was when we were

4   working on the Korea project, that we were picking a

5   full-service contractor to work on Korea, and we had them put

6   together their security plan how they were going to meet our

7   rules that we put together as a committee.

8      And we actually used some of the information that

9   Mr. Maegerle created with PECL in Taiwan, and shared that with

10   them to help them create their security plan.

11         **MR. AXELROD:**  Your Honor, may I approach with Exhibit

12   894?

13         **THE COURT:**  Yes, you may.

14   **BY MR. AXELROD:**

15   **Q.**   Mr. Dayton, I'm handing you what's been marked as Exhibit

16   894, and ask if you recognize that document?

17   **A.**   Yes.  This is the first draft of the security plan created

18   by PECL, and was sent to Mr. Maegerle for approval.

19   **Q.**   And this is a document that you'd seen before in your

20   work?

21   **A.**   Yes, I've seen this document.

22         **MR. AXELROD:**  The parties stipulate that this document

23   is from DuPont and authentic.

24         **MR. GASNER:**  That's true.

25         **MR. FROELICH:**  Yes, Your Honor.

1          THE COURT:  So stipulated.

2          MR. AXELROD:  The government moves 894 into evidence.

3          MR. GASNER:  No objection.

4          THE COURT:  It's admitted.

5          (Trial Exhibit 894 received in evidence.)

6          (Document displayed.)

7   BY MR. AXELROD:

8   Q.   And you said -- if we could just highlight the top half.

9   And that's addressed to Mr. Maegerle?

10  A.   Yes, it is.

11  Q.   And what's the subject?

12  A.   The subject is "Safeguard DuPont Proprietary Information."

13  Q.   And could you -- if we scroll down a little bit, could you

14  just read the text of that letter.

15  A.   Certainly.

16          "Attached is a draft procedure prepared and

17      implemented by PECL presently for safeguarding DuPont

18      proprietary information during the consultant service

19      period in addition to the control of proprietary documents

20      provided by DuPont, the PECL's overall security program

21      for the full-service contract period would also cover the

22      following areas:

23          "Permanent office security program.  Project

24      assignment approval.  Access control."  And, dash, is for

25      their PECL home office.  "Wordprocessor security plan.

1    Secrecy agreement with suppliers."  And "Job site security

2    program."

3  **Q.**   And if we go down to the signature block, who is the

4  letter from?

5  **A.**   Sherman Chen.

6  **Q.**   Who was Sherman Chen?

7  **A.**   He was the project manager from PECL, for the Taiwan

8  facility.

9  **Q.**   Okay.

10       **MR. AXELROD:**  Your Honor, may I approach with Exhibit

11  161?

12       **THE COURT:**  Yes, you may.

13  **BY MR. AXELROD:**

14  **Q.**   Mr. Dayton, I'm going to hand you what's been marked as

15  Exhibit 161.

16       Do you recognize that document?

17  **A.**   Yes, I do.  This is the Basic Data for the Taiwan project.

18  **Q.**   And how -- how do you recognize it?

19  **A.**   Uhm, I have actually utilized this same Basic Data for the

20  Korea project that I worked on.  I also did the economics for

21  the Taiwan project.  And I used information out of this Basic

22  Data for my economics report.

23       And I also, when I was working on Korea, I was doing work

24  for the Taiwan project at the same time, so I used some

25  information, also, out of that while I was assisting them

**DAYTON - DIRECT / AXELROD**

1    during -- later, in the project phase.

2    **Q.**    So in the mid '80s, you were doing economic analysis for

3    the Taiwan project?

4    **A.**    That was one of my tasks, yes.

5    **Q.**    And you had use of the Basic Data Document at that time?

6    **A.**    Yes.  I needed information included in it to do my

7    economics.

8         **MR. AXELROD:**    The parties stipulate that Exhibit 161

9    is from DuPont and authentic.

10        **MR. FROELICH:**    Yes, Your Honor.

11        **MR. GASNER:**    Yes, Your Honor.

12        **THE COURT:**    So stipulated, ladies and gentlemen.

13        **MR. AXELROD:**    The government offers Exhibit 161 into

14   evidence.

15        **MR. GASNER:**    No objection.

16        **MR. FROELICH:**    No objection.

17        **THE COURT:**    It's admitted.

18        **(Trial Exhibit 161 received in evidence.)**

19        (Document displayed.)

20        **MR. AXELROD:**    And if we could go to the second page.

21   **BY MR. AXELROD:**

22   **Q.**    Before we talk about the contents of the document,

23   Mr. Dayton, could you explain what's the purpose of a Basic

24   Data Document in general?

25   **A.**    The Basic Data Document is the information that's needed

1  to start on the design of the plant.  So your first step of

2  doing design is what you would call conceptual design.  In this

3  phase of the overall design effort, you start saying:  I need a

4  chlorinator; I need certain other pieces to be able to run our

5  process.

6       And as we go through, we would specify in that section,

7  for example, the chlorinator, we would specify what it's made

8  from, what our experience has been in operating our existing

9  chlorinators that would be useful for the engineers.  We would

10 specify the number of pieces of equipment, capacities of

11 equipment, and all of the stuff -- it may even reference other

12 drawings and things that would help the engineer create that

13 initial design.

14      And so that once we got the conceptual design done, the

15 business wants to know, is this going to be a viable project?

16 So we use that information from the conceptual design to create

17 an estimate of how much it's going to cost us.

18      And then we can go back to the management and say, okay,

19 the project is going to cost us this many dollars for this

20 facility; is that something you want us to proceed with, or

21 would you like us to modify the package?

22      It may cost too much, is typically what you hear in doing

23 designs.

24      So this is all the information you needed to start your

25 conceptual design on a project.

**DAYTON - DIRECT / AXELROD**

1    **Q.**   And what's the nature of the information contained in the

2    Basic Data Document?

3    **A.**   It's very detailed.  It may tell you on a vessel that you

4    need nozzles of a certain diameter.  Or it may tell you that

5    you need a specific flow rate.  Or you may need to buy a pump

6    from a specific manufacturer because we found out that that

7    manufacturer's pump is the only one that really works quite

8    well.

9        So it's just a tremendous amount of information.  And as

10   you can see, this is quite a thick document.  It has hundreds

11   of pages.

12   **Q.**   And is there sort of a system or format that organizes the

13   document and its contents?

14   **A.**   Yes, there is.

15       **MR. AXELROD:**  Okay.  And I'm going to ask Mr. Hemann

16   to pull up page 161-230.  So page 230 from the document.

17       (Document displayed.)

18   **BY MR. AXELROD:**

19   **Q.**   And let's use this as sort of a reference point for

20   explaining how the document is formatted.

21   **A.**   Okay.  What we do is we would have a section for each

22   major piece of equipment or system.  Okay.  And in the case of

23   a very simple system like we have here, you'd only have one

24   page.  And other areas you would have many pages for a single

25   piece of equipment in that whole system, depending how much

DAYTON - DIRECT / AXELROD

1    information is needed.

2        So this particular one is a caustic storage tank.  And the

3    first section in there is called project requirements.  And the

4    project requirements will tell you how big something needs to

5    be or what capacity it needs to have.

6        And in this case, it says "One 25,000-gallon tank is

7    required to store 50 percent caustic," this is sodium

8    hydroxide, "solution."

9    **Q.**   And then there is another section called "Available Data

10   and Experience" --

11   **A.**   Yes.

12   **Q.**   -- Roman numeral II.

13   **A.**   Yes.  So Roman numeral II is an extra required section.

14   And in this section we talk about what's our experience in our

15   existing plants?  And in this case it talks that we would have

16   a carbon steel tank, but it must be stress relieved.

17       And if you just put a standard carbon steel tank in in

18   this kind of caustic surface, the caustic will actually eat the

19   welds out.  So it tells the engineer he must have the welds

20   stress relieved.

21       And it also says that we have to maintain the temperature

22   in the tank, so we have a heating system and insulation.

23   Otherwise, 50 percent caustic will actually freeze up.  So it

24   has to be at 20 centigrade.  20 centigrade is actually roughly

25   70 Fahrenheit.

**DAYTON - DIRECT / AXELROD**

1  **Q.**   Okay.  And then there's a third section, called "Factors

2  Affecting Design."

3  **A.**   Yes.  And here ――

4  **Q.**   Could you speak to that section, what goes into there.

5  **A.**   In the Factors Affecting Design section you would put

6  details that would help the engineer pick pieces of equipment,

7  or other facilities need to be involved.

8         In this case, we have to have a measuring stick to measure

9  the level for our auditing of inventory control for our cost

10 analysis of the plant.  We have to have the temperature to make

11 sure that we're maintaining our 20 centigrade.  So the

12 operator, he goes around, he records the temperature every two

13 hours to make sure that this thing is working correctly.

14        And we also specify in here that a certain type of ――

15 Viking pump is a brand name of a gear pump, for the unloading.

16 And we found that this particular pump and this model works the

17 best for unloading caustic.

18        So this section may be very short as it is in this case.

19 It could be four or five pages of information, details that we

20 would like to have included in this particular facility.

21 **Q.**   Okay.

22 **A.**   There's also some other optional sections you might put

23 in.  For example, duty.  If you've got something that's got a

24 heat transfer rate, the duty would be the heat transfer rate

25 that the equipment has to supply.

**DAYTON - DIRECT / AXELROD**

1    **Q.**    Okay.

2    **A.**    So there's some other sections we might have on other

3    pages, if we look at any.

4    **Q.**    So let me go back to the beginning of the document.

5         **MR. AXELROD:**  If we could go to page 2, Mr. Hemann.

6         (Document displayed.)

7         **MR. AXELROD:**  And if you could blow up from the DuPont

8    logo at the top through the signatures.

9    **BY MR. AXELROD:**

10   **Q.**    The first thing, who's this document addressed to?

11   **A.**    Mr. Maegerle.

12   **Q.**    Okay.  And it -- it says -- above his name there's a

13   designation.  And what's the date of this transmittal?

14   **A.**    October 31, 1985.

15   **Q.**    So this is during the time that the Korea project --

16   excuse me, the Taiwan project is being evaluated?

17   **A.**    We were actually looking at -- even at this time, we were

18   looking at the Korea site.  And we weren't sure which one was

19   going to get approvals first.  So this may well have been

20   Korea.  As it turned out, the Taiwanese government gave us

21   approvals first, and that's why that plant got built.

22   **Q.**    Okay.  And then right below the date it says "Confidential

23   Special Control"?

24   **A.**    Yes.

25   **Q.**    What does -- I think you talked about that, but if you

1   could just remind the jury in sort of the hierarchy of DuPont

2   confidentiality, what's -- where --

3   **A.**   The confidentiality, as I have mentioned previously, has

4   four classifications, ranging from public as the least

5   classified through internal use only, DuPont confidential, and

6   then, finally, confidential special control.

7        And confidential special control is the most severe

8   classification.  And in this case it means that the recipient

9   cannot pass this document on to others without the approval of

10  the authors, and that the document has to be destroyed at the

11  end of the work.

12  **Q.**   And if you could read the text of the letter.  And we're

13  going to blow that up.

14  **A.**   Okay.

15           "This scope/basic data is for the Asian I plant

16       presently planned for Taiwan.  Attached is a numbered list

17       of the individuals receiving copies.  This information is

18       for DuPont personnel only.  Flow sheets will be issued

19       separately.  Current studies are listed on the

20       attachment."

21  **Q.**   Why are flow sheets listed separately?

22  **A.**   Flow sheets are also special control items, and contain a

23  myriad of very confidential information.

24  **Q.**   Okay.  So let's go to the next page.

25           **THE COURT:**  Before we do that, let's take a stretch

1    break.  Thank you.

2                        (Pause in proceedings.)

3           **THE COURT:**  All right.  You may proceed.

4       Sir, would you wait a beat before answering the question,

5    making sure that Mr. Axelrod is done with his question?

6    Because we have a tendency when we speak normally outside of

7    court to anticipate what the question is going to be and then

8    start answering it.

9           **THE WITNESS:**  Yes, sir.

10          **THE COURT:**  But because we have a transcript going, in

11   order to avoid having sort of dashes and then your answer, wait

12   a couple seconds after you think Mr. Axelrod is done and then

13   answer.  Even though that might not be normal parlance, that's

14   what we do here.  Okay?

15          **THE WITNESS:**  Okay.

16          **THE COURT:**  Thank you very much.

17          **MR. AXELROD:**  Thank you, Your Honor.

18   **Q.**   Mr. Dayton, I'd like to direct your attention to page 3 of

19   the document, which is titled "Distribution List."

20       And what's the distribution list?  Can you reflect what --

21   can you explain what this is?

22   **A.**   Yes.  This is the distribution list for the document, and

23   we ended up with, I think, there's 14 copies going to people

24   and then one copy going to file.  And then Number 15, it says

25   BRS is a DuPont records system.  So that, you know, this would

**DAYTON - DIRECT / AXELROD**

 1    be stored in a locked file.

 2    **Q.**   Right.  And, in fact, the copy that we're looking at is

 3    that copy; right?  It says in the upper right corner "Copy

 4    Number 15"?

 5    **A.**   Yes.

 6    **Q.**   Okay.  And then for number -- for number three, who's

 7    identified as the recipient?

 8    **A.**   Mr. Maegerle.

 9    **Q.**   And I want to talk for a moment about the security

10    designation of this document.

11         Could we go to page 161-34?  And, Mr. Hemann, if you could

12    blow that up.

13         And, Mr. Dayton, if you could take a moment to read that

14    aloud.

15    **A.**   Okay.  (reading)

16              "This report is highly confidential and normal DuPont

17         and Chemicals & Pigments' policies on security apply.

18         Much of the report data are considered in the 'trade

19         secret' category and should not be released to vendor

20         representatives and non-Company personnel."

21    **Q.**   I want to go -- also there's a security section in the

22    back of this document; is that right?  If we go to page 439.

23    **A.**   (Witness examines document.)  Okay.

24    **Q.**   And if -- great.  If Mr. Hemann could blow that up.  Thank

25    you.

1        Could you read this section?

2   **A.**   Yes.  Certainly.  (reading)

3            "The guide for safeguarding DuPont Company documents

4        and information is to be followed."

5   And that's the corporate -- that section is the corporate

6   security manual.  (reading)

7            "The Chloride Process Security System developed by

8        the Engineering and C & P personnel is to be the basis for

9        this project."

10  And that was the product of the team that I was on with

11  Wally Kremer.  (reading)

12           "Class A, Design Package.  Secure personnel defined

13       by Chemical and Pigments Department and Engineering."

14  And then there's four dots below it.  One says, "Front-end

15  loading"; the second says, "Conceptual design"; the third says,

16  "Develop CAC."  A CAC is a current appraisal of cost estimate.

17  This is the final estimate for the project before

18  authorization.

19       "Contract Personnel.  Nonsensitive process areas," and

20  then, "PG & S."  And PG & S is power, general, and services.

21  So this is the equipment like your boiler, your air

22  compressors, your office buildings.

23       And then the next section is "Final Design."  "Foreign

24  Full Service Design Contractor," and two dots under that:

25  "Project Engineering and Design; Local Codes, Vendors and

DAYTON - DIRECT / AXELROD

1    Permits."

2        "Engineering Department" would be "Manage contractors into

3    sensitive areas."

4        And then finally it says:  (reading)

5            "R&D Off-Shore Technology Group will serve as

6        Security Clearance Organization."

7    **Q.**   Okay.  So what you -- the section you just read provides

8    some more direction for security control for this document?

9    **A.**   That's correct, and specifically to -- as we do the

10   project, who can see various pieces of information.

11   **Q.**   And in that regard, if we can just briefly look at the

12   next page, which is 161-440.

13       And it says at the top there, "DeLisle PIP Principles."

14   Do you see that?

15   **A.**   Yes, I do.

16   **Q.**   And if you could highlight.

17       At the bottom, it says, "No contractor access to flow

18   sheets," which is about two thirds of the way down.

19   **A.**   Yes, I see that.

20   **Q.**   Okay.  What does that mean?

21   **A.**   The flow sheets are very sensitive documents, and in this

22   case, they would provide actually the rates at which we would

23   size pipes for, temperatures, pressures.  It gives lots of

24   information that is not public and is very critical to our

25   process.  And these are all held as confidential special

1  control, which you remember is the top classification within

2  DuPont.  So contractors are not allowed access to those sheets.

3  **Q.**  Now, in conjunction with your testimony here today, were

4  you asked to review documents provided by the Government to

5  determine if those documents contained specific information

6  found in the Basic Data Document?

7  **A.**  Yes, I did.

8  **Q.**  And did you find such references?

9  **A.**  Yes, I did.  Over a hundred.

10  **Q.**  What I'd like to do is, first, I'd like to give you --

11  we're going to go through those references.  I'd like to hand

12  you sort of a reference sheet.  I've provided this to the

13  Defense, and this will facilitate your testimony.  This is a

14  reference sheet for the citations.

15  **A.**  Thank you.

16  **Q.**  And what I'd like to do now, if we can bring up,

17  Mr. Hemann, the chart that we started yesterday.

18       And if we could go -- did you, Mr. Dayton, review

19  Exhibit 108?

20  **A.**  Yes, I did.

21  **Q.**  And did you find references to specific information

22  contained in the Basic Data Document in Exhibit 108?

23  **A.**  Yes, I did.

24  **Q.**  Okay.  And where were those references found?

25  **A.**  It's on page 177 of the Basic Data exhibit.

**DAYTON - DIRECT / AXELROD**

1   **Q.**   So the exhibit we're looking at, you've been looking at

2   Exhibit 161 on page 177, you found reference?

3   **A.**   Yes.

4   **Q.**   Okay.  Let's take a look.

5        Okay.  So on the left side of the screen is Exhibit 108;

6   right?

7   **A.**   That's correct.

8   **Q.**   And on the right side is a page from -- is the relevant

9   page from the Basic Data Document.

10        Okay.  So let's pull up the exhibit.

11        And I'm going to remind you, as we talk, when you refer to

12   information from the Basic Data Document, not to use the

13   specific figures referenced.

14   **A.**   Okay.

15   **Q.**   So if we could look at the -- okay.

16        So now the documents are side by side, and I'm going to

17   highlight a portion of the text of the email; and it says:

18   (reading)

19           "I checked Kuan Yin design feet squared and scaled up

20        to 100K T/Y to get a required pipe configuration."

21        Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   Is there a specific reference to that figure in the Basic

24   Data Document?

25   **A.**   Yes, there is.  It's under VI A.

**DAYTON - DIRECT / AXELROD**

1  **Q.**    Okay.  And could you read that section?

2  **A.**    (reading)

3          "A minimum of feet squared heat transfer area is

4      required to meet 55,000 metric ton per year rate."

5  **Q.**    And based on your experience, what's the significance of

6  the specific heat transfer area?

7  **A.**    The significance of this is that in the flue pond it's

8  very difficult to use typical engineering calculations to

9  determine how much area you need for the heat transfer.  The

10 calculations would lead you to coming up with a number of feet

11 of pipe that won't work very well, so this gets back to our

12 experience discussion of a little earlier.

13 **Q.**    And let me, just to orient everyone, the flue pond, does

14 that come right after oxidation?

15 **A.**    Yes, it does.  You're coming out of the oxidation reactor.

16 In my earlier testimony, I described it as burning it.

17 **Q.**    Yeah.

18 **A.**    And, so, you're coming out essentially like in a flame,

19 and then you must cool this down to a temperature where you

20 won't damage any of the downstream equipment.

21 **Q.**    Okay.

22 **A.**    So that's -- the cooling is done in this pond.

23 **Q.**    So looking at your diagram, would the flue pond between

24 the oxidation block and the finishing block?

25 **A.**    No.  It's actually inside the oxidation block.

DAYTON - DIRECT / AXELROD

1   **Q.**   So it's part of oxidation?

2   **A.**   Yes.

3   **Q.**   Okay.  Thank you.

4        Does this email contain another reference to the Basic

5   Data Document?

6   **A.**   Yes, it does.

7   **Q.**   And I'll read that from the email:  (reading)

8            "1 foot leg and [number] feet legs for a total pond

9        square footage of... including elbows."

10       Is some of that information found in the Basic Data

11  Document?

12  **A.**   Yes, there's one piece of that that's in the Basic Data.

13  **Q.**   Okay.  And where is that found?

14  **A.**   That's on B3.

15  **Q.**   And can you read that?

16  **A.**   Yes.  (reading)

17           "One nickel leg, length, and diameter of schedule 20

18       pipe."

19  **Q.**   Okay.

20  **A.**   "Schedule 20" is the thickness of the wall.

21  **Q.**   What's the significance of that particular length, that

22  particular figure?

23  **A.**   The first pipe leg, which is what this is, and its size

24  and length is critical to determining the particle size of our

25  product coming out of the oxidation area.  And if you don't get

**DAYTON - DIRECT / AXELROD**

1  this just right, you will end up with particles that are too

2  big.  For example, if you're trying to make automotive paint,

3  you can actually see bumps in the paint, which is something

4  that none of our customers want to have.

5  **Q.**  Okay.  So the specific number gives you the right length?

6  **A.**  Yes.  Right.

7  **Q.**  And let's move on to the next exhibit.  Did you review

8  Exhibit 78?

9  **A.**  Yes, I did.

10 **Q.**  And did you find in Exhibit 78 specific information

11 contained in the Basic Data Document?

12 **A.**  Yes, I did.

13 **Q.**  And where are those references found?

14 **A.**  Pages 70 and 72 of the exhibit.

15 **Q.**  And let's pull that up.

16     Okay.  So we've got, again, the exhibit, the email, and

17 we'll pull this up a little bit closer so we can compare these.

18     So let's look at for the first reference here, and I'll

19 read:  (reading)

20         "What was used to size the chlorinator diameter and

21     number of jets was the Basic Data for Taiwan 60K T/Y

22     plant.  That data states:  Brick inside diameter

23     [number]."

24     Is that information found in the Basic Data Document?

25 **A.**  Yes, it is.  It's under A3.

**DAYTON - DIRECT / AXELROD**

1  Q.   Okay.  And can you please read that?

2  A.   (reading)

3           "Increase chlorinator diameter to feet inside

4       diameter."

5  Q.   What's the significance of the inside diameter of the

6  chlorinator?

7  A.   If you size the chlorinator too small, you will end up

8  having too high of velocity, and the coke and ore inside the

9  chlorinator blows out.  Remember my description.  You can lose

10  solids that have to be treated in the waste system.

11       If you make it too big, the bed in there isn't stirred up

12  adequately; and when that happens, things can actually, like

13  lava, can actually sit there and solidify into chunks, and then

14  it won't react properly; and you'll lose control, and chlorine

15  will come out, and you'll have to scrub the chlorine.

16  Q.   And is there another reference in the email?

17  A.   Yes, there is.

18  Q.   Okay.

19           THE COURT:  Again, you need to wait just a beat --

20           THE WITNESS:  I'm sorry, sir.

21           THE COURT:  -- until he finishes his question.  Thank

22  you.

23  BY MR. AXELROD:

24  Q.   It says:  (reading)

25           "Normal velocity [number] FPS, minimum velocity

DAYTON - DIRECT / AXELROD

1        [number] FPS."

2        Is that information found in the Basic Data Document?

3   **A.**   Yes, it is.  It's in VI.

4   **Q.**   Okay.  And could you read what it says there?

5   **A.**   Okay.  (reading)

6           "Superficial bed velocity at feet per second minimum

7        preferably feet per second."

8   **Q.**   And what does that refer to?

9   **A.**   This talks to how fast the gas is going up inside the

10  chlorinator; and this is critical to, again, keep things

11  properly stirred up so that we don't end up having solids,

12  chunks forming, or we don't have such a high flow rate that

13  would blow out solids out of the chlorinator.

14  **Q.**   And is there another reference to the Basic Data Document?

15  **A.**   Yes, there is.

16  **Q.**   Okay.  (reading)

17          "The [number] velocity for the Altamira was stated to

18       give excess blowover."

19       Is that found in the Basic Data Document?

20  **A.**   Yes, it is.  It's in paragraph A.

21  **Q.**   And could you please read that?

22  **A.**   I'll start with Altamira data on the first line.

23  (reading)

24          "Altamira is excessive ranging from percent to

25       percent of feed at feet per second superficial bed

**DAYTON - DIRECT / AXELROD**

1          velocity."

2    **Q.**   Okay.  So Altamira is another DuPont facility?

3    **A.**   It's the TiO2 plant located at Altamira, Mexico.

4    **Q.**   And, so, the information -- what's the significance of the

5    information that's provided there about the excessive blowover?

6    **A.**   In this case it tells us that the velocity that's quoted

7    here is too high, and there's extra cost associated with that

8    plant because we are losing coke and ore out of the

9    chlorinator.

10   **Q.**   And is there another reference to the Basic Data from the

11   email?

12   **A.**   Yes, there is.

13   **Q.**   Okay.  And what's the reference where it says, "Jets

14   [number] inches pipes"?  Do you see that?

15   **A.**   Yes, I do.  It's in G.

16   **Q.**   And, so, can you read that?

17   **A.**   Yes.  (reading)

18              "Recommend [number] of jets.  Jet spacing should be

19         the same as the Altamira design.  A jet pipe diameter of

20         inches is recommended to reduce jet metal erosion in the

21         spiral area."

22   **Q.**   Now, we just looked at two references in the Basic Data

23   Document that reference the Altamira facility; right?

24   **A.**   That's correct.

25   **Q.**   Why does the Kuan Yin Basic Data Document reference the --

1    have information about Altamira?

2    **A.**    The Basic Data Document is -- and experience is -- we're

3    trying to take experience from all of our DuPont sites for TiO2

4    and come up with the best plant we possibly can come up with.

5    So if we have experience at Johnsonville or Edgemoor or DeLisle

6    or Altamira that would lead us to modify the design for

7    Kuan Yin, we want to put that in this document so that the

8    engineers give us the best possible facility that we can get.

9    **Q.**    I want to ask, did you look at Exhibit 67?

10   **A.**    Yes, I did.

11   **Q.**    And did you find in Exhibit 67 specific references to

12   information from the Basic Data Document?

13   **A.**    Yes, I did.

14   **Q.**    And where are those found?

15   **A.**    Page 254 and 398 of the exhibit.

16   **Q.**    Let's take a look.  Okay.  And let's look at the first

17   reference.  It says:  (reading)

18            "Following are the peak demineralized water and

19        nitrogen flow requirements from" --

20            **THE COURT:**  Slow down, please.  I think you'll be

21   harming our court reporter if you read that fast.

22            **MR. AXELROD:**  Very well.  I apologize.

23            **THE COURT:**  Thank you.

24   **BY MR. AXELROD:**

25   **Q.**    (reading)

DAYTON - DIRECT / AXELROD

1          "Following are the peak demineralized water and

2       nitrogen flow requirements from the Taiwan Basic Data.

3       Demin water [number] gpm."

4       Is that information in the --

5    **A.**   Yes.

6          **THE COURT:**  Again, you have to wait.  You said "yes"

7    before he finished his question.

8          **THE WITNESS:**  I'm sorry, sir.

9          **THE COURT:**  Thank you.

10   **BY MR. AXELROD:**

11   **Q.**   Where is that in the Basic Data Document?

12   **A.**   This one's a little bit harder because the email has an

13   error in it.

14   **Q.**   Okay.  And is that actually acknowledged in the email?

15   **A.**   Yes.  If you go down to where it says:  (reading)

16          "Walter -

17          "I was somewhat mistaken.  Kuan Yin Basic Data does

18       not call for demineralized water but does call for a hot

19       water head tank to supply water to the filters."

20   **Q.**   Okay.

21   **A.**   And then if we go down to I, "Project Requirements," for

22   the hot water head tank it says:  (reading)

23          "The maximum flow rate will be 900 gpm."

24   **Q.**   Okay.  And then does it identify additional information?

25   There's a reference in the email:  (reading)

**DAYTON - DIRECT / AXELROD**

1          "Oxygen/nitrogen [number] and [number] metric tons

2     per hour respectively."

3     Do you see that?

4  **A.**  (No response.)

5  **Q.**  Is that information --

6  **A.**  Yes.  That's under III A.

7  **Q.**  Okay.  And what's the significance -- I'm sorry.  Can you

8  read III A --

9  **A.**  Certainly.

10  **Q.**  -- omitting the numbers?

11  **A.**  Yes.  (reading)

12          "Peak oxygen and nitrogen demands are metric tons per

13     hour and metric tons per hour, respectively."

14     So this tells us the size of equipment that we would have

15  to have to vaporize, because these are stored as liquids,

16  vaporize the oxygen and the nitrogen and send it to the plant,

17  which also includes typically some compression.  So that would

18  size that piece -- those pieces of equipment.

19  **Q.**  Are there other -- is there another reference here in the

20  email that says, something and something storage capacity to be

21  provided for 20 hours of operation?

22  **A.**  Yes.  That also appears at III C.

23  **Q.**  What does that relate to?

24  **A.**  It says:  (reading)

25          "Provide LOX and LIN vaporization and usable storage

**DAYTON - DIRECT / AXELROD**

1      capacity for number of hours of operation."

2      And LOX is liquid oxygen and LIN is liquid nitrogen.  As I

3 mentioned, these are stored as liquids.  And this tells you how

4 big those storage tanks have to be.

5 **Q.**  Okay.

6 **A.**  So, again, the size part of that facility of the plant.

7 **Q.**  And is there one more reference?  I think you already hit

8 on this.  It wasn't the demineralized water, but it was the hot

9 water tank.

10 **A.**  Yes.

11 **Q.**  Okay.  Did you look at Exhibit 119?

12 **A.**  Yes, I did.

13 **Q.**  And did you find information, specific information, from

14 the Basic Data Document in Exhibit 119?

15 **A.**  Yes, I did.

16 **Q.**  On what page?

17 **A.**  161.

18 **Q.**  Okay.  And if we could pull that up, Mr. Hemann.

19      And the email says, if we could highlight that:  (reading)

20        "The specified Kuan Yin purge rate to the oxidation

21      reactor perforated wall is [number] kg/hr of chlorine at

22      [number] T/Y production rate."

23      Is that information in the Basic Data Document?

24 **A.**  Yes, it is.  It's under C.

25 **Q.**  Okay.  And could you read that?

1    A.   Certainly.  (reading)

2         "Insert to be cooled with [number] pounds per hour,"

3    and then in parentheses, "[number] of kilograms per hour

4    of chlorine at a certain flow rate."

5    Q.   What's the significance of that information?

6    A.   The addition of chlorine at this point helps us keep the

7    reactor from plugging up, and it relates to the utility of that

8    whole oxidation system.

9    Q.   And let's move on to the next one.  Did you look at

10   Exhibit 126?

11   A.   Yes, I did.

12   Q.   And does Exhibit 126 contain specific information you

13   found in the Basic Data Document?

14   A.   Yes, it does.

15   Q.   At what pages?

16   A.   57 and 70.

17   Q.   And let's take a look at those.

18        Okay.  So the email says, and maybe we could highlight the

19   portions:  (reading)

20        "The Kuan Yin nitrogen flow to inject ore and coke

21   solids into the chlorinator is number of pounds per hour."

22        Do you see that?

23   A.   Yes, I do.

24   Q.   And is there a corresponding document in the Basic Data

25   Document?

1   **A.**   It's under item III, number 2.

2   **Q.**   And what's the significance of that information?

3   **A.**   The -- DuPont uses a pressurized feed system, and this is

4   the flow rate that's required with the piping size information

5   as you get the coke and ore to go in the chlorinator.

6   **Q.**   And there's another reference in here.  This is through a

7   number inch line that's in the email.  Do you see that?

8   **A.**   Yes.

9   **Q.**   Is that information found in the Basic Data Document?

10   **A.**   That's under B.

11   **Q.**   Okay.  And what's the significance of that?

12   **A.**   This is the same line and it matches up with the flow rate

13   that we looked at.  You need to have a certain velocity in the

14   line to make this work; and, so, you have to have a certain

15   diameter and a certain flow rate to be able to get this to

16   function correctly.

17   **Q.**   Did you look at Exhibit 82?

18   **A.**   Yes, I did.

19   **Q.**   And did 82 contain specific information found in the Basic

20   Data Document?

21   **A.**   Yes, it did.

22   **Q.**   And what page?

23   **A.**   Page 70.

24   **Q.**   And let's take a look at that.

25        And if we could highlight the email, it says:  (reading)

**DAYTON - DIRECT / AXELROD**

1          "Using Kuan Yin as a base, [number] chlorinator

2      plant, they were designed as a 60K T/Y plant and are

3      running at 90K T/Y.  The Kuan Yin chlorinator brick ID is

4      [number] or [number] meters."

5      Is that specific reference found in the Basic Data

6  Document?

7  **A.**   Yes, it is.  It's under 3.

8  **Q.**   And I believe we talked earlier about the chlorinator

9  diameter dimensions and their significance?

10 **A.**   Yes, we did.

11 **Q.**   Okay.  Is there another reference that says, "Flow for

12 [number] FPS"?

13 **A.**   Yes.  That appears under 4.

14 **Q.**   And did we discuss that earlier as well?

15 **A.**   Yes, we did.

16 **Q.**   Okay.  Let's move on to Exhibit 69.  Did you look at

17 Exhibit 69?

18 **A.**   Yes, I did.

19 **Q.**   Does 69 contain specific information found in the Basic

20 Data Document?

21 **A.**   Yes, it does.

22 **Q.**   And what page?

23 **A.**   Pages 337 and 338.

24 **Q.**   And let's look at those.

25      And now we're talking about a different area.  The email

**DAYTON - DIRECT / AXELROD**

1  is entitled "Tail Gas Stack Velocities."  What's -- and the

2  first reference there it says:  (reading)

3          "The tail gas stack should be designed for [number]

4      FPS."

5      Is that found in the Basic Data Document?

6  **A.**   Yes, it is.  It's under G.

7  **Q.**   And what's the significance of that specific information?

8  **A.**   In the tail gas stack, it's possible to have entrained

9  liquids, and you don't want to throw these liquids out the top

10  of the stack.  So you size this so that any liquid actually

11  would fall to the bottom of the stack and be collected.

12  **Q.**   Okay.  So this assists in the design of the stack knowing

13  how big to make it?

14  **A.**   Exactly.

15  **Q.**   And I believe there's another reference in here.  It says:

16  (reading)

17          With a tip velocity [number] FPS."

18      Is that also found in the Basic Data Document?

19  **A.**   Yes, it is.  It's under B.

20  **Q.**   Okay.  And is that also significant for the same reason?

21  **A.**   It's significant for a different reason.  When you have

22  gases going out of the stack, you want to mix it with the air

23  and not have a stream that's heavier than air, which these

24  gases are heavier than air.

25      You don't want them to just go up the top of the stack and

**DAYTON - DIRECT / AXELROD**

1  then go right straight to the ground.  You want to mix them

2  well with the air so you don't have any pollution problems.

3  And this particular velocity quoted here will give you that

4  mixing that's needed.

5  **Q.**   And I believe there's another reference.  It says:

6  (reading)

7          "Gas velocities should include the dilution air which

8      will equal [number] the tail gas."

9      Is that in the Basic Data Document as well?

10 **A.**   Yes, it is.  It's under E.

11 **Q.**   Okay.  And what's the significance of that piece of

12 information?

13 **A.**   Again, we are designing this so that we are able to have

14 no pollution coming out of our plant.  And the dilution air is

15 needed to control the amount of CO that might come out.  So

16 that not only are we running our pollution control, but we

17 don't end up with any hazardous mixtures coming out of the

18 stack.

19 **Q.**   And, finally, it says:  (reading)

20          "Tail gas for the 60,000 T/Y Taiwan plant was

21      estimated to be [number] SCFM."

22      Is that reference also found in the Basic Data Document?

23 **A.**   That's also in E.

24 **Q.**   Okay.  Did you look at Exhibit 85?

25 **A.**   Yes, I did.

**DAYTON - DIRECT / AXELROD**

1  **Q.**   And did that contain specific information found in the

2  Basic Data Document?

3  **A.**   Yes, it did.

4  **Q.**   And on what pages?

5  **A.**   There are several:  70, 71, 72, 77, and 79.

6  **Q.**   And let's take a look at those documents.

7       Okay.  And the first one -- and just sort of to step back

8  for a minute, this is -- we're talking now about the

9  chlorinator; right?

10  **A.**   Yes, we are.

11  **Q.**   This is the device at the beginning you said is sort of

12  like a volcano inside it?

13  **A.**   That's correct.

14  **Q.**   Okay.  So the first reference it says, "[number] of

15  chlorinator plant."  Do you see that?

16  **A.**   Yes, I do.

17  **Q.**   And that's in the Basic Data?

18  **A.**   Yes, it is.

19  **Q.**   What's the significance of that figure?

20  **A.**   This is about the utility of the plant.  The chlorinators,

21  like anything that's trying to contain a volcano, wear out over

22  time and have to be rebuilt.  Some plants only have one, and

23  then they try to rebuild them very quickly.

24       In DuPont we do things differently than that, and it gives

25  us better utility and lower cost.

**DAYTON - DIRECT / AXELROD**

1  **Q.**   Okay.  Let's look at the next reference.

2       This is, "[number] ID brick."

3  **A.**   Yes.

4  **Q.**   And is that found in the Basic Data Document?

5  **A.**   Yes, it is.

6  **Q.**   Okay.  And is that the internal diameter that we discussed

7  earlier?

8  **A.**   That's correct.

9  **Q.**   And the next reference has, "[number] ID steel."  Is that

10 found in the Basic Data?

11 **A.**   Yes.  That's also found in A3.

12 **Q.**   Okay.  And what's the significance?  That's a different

13 number, I think, than what we've talked about.  What's the

14 significance of that one?

15 **A.**   What that lets you understand is the thickness of the

16 brick that we're installing in the chlorinator --

17 **Q.**   Okay.

18 **A.**   -- which would lead you to give some idea of heat losses

19 and other measurements to be able to design systems like this.

20 **Q.**   Let's go to the next reference.  It says, "[number] brick

21 lower sidewall white side mortar."  Do you see that?  And then

22 there's another reference to the number down below.  Is that

23 found in the Basic Data Document?

24 **A.**   Yes, it is.  I'm not spotting it right off, though.

25 **Q.**   Let's try to see if we can identify it.

**DAYTON - DIRECT / AXELROD**

1   **A.**   There it is.  I'm sorry.

2   **Q.**   Okay.  What's the significance of that information?

3   **A.**   The -- we're actually telling exactly what company and

4   what kind of brick is utilized in the chlorinator; and many of

5   our competitors use different brick that does not hold up as

6   well.  So our chlorinators last longer because of that.

7   **Q.**   Okay.  And it's giving a specific size for the brick?

8   **A.**   Yes, it gives absolutely specific sizes.

9   **Q.**   All right.  Let's go to the next reference.

10      And it says, "[number] PSIG design."  Do you see that?

11  **A.**   Yes.

12  **Q.**   Is that in the Basic Data?

13  **A.**   Yes, it is.  It's under C.

14  **Q.**   Okay.  And what's the significance of that information?

15  **A.**   Again, the operating pressure and the capability of the

16  systems is important.  If you don't have -- if you have a

17  vessel that has a lower pressure rating, you're not able to

18  operate it as higher rates as DuPont does.

19  **Q.**   Okay.  Let's go to the next reference.

20      And it says, "Startup blow system," and it provides a

21  criteria for that.  Do you see that?

22  **A.**   Yes, I do.

23  **Q.**   And is that also found in the Basic Data Document?

24  **A.**   Yes, it is.

25  **Q.**   Where?

**DAYTON - DIRECT / AXELROD**

1   **A.**   Under "Duty."

2   **Q.**   Okay.  And what's the significance of that information?

3   **A.**   It gives you an idea of how long the chlorinators last

4   between rebuilds.

5   **Q.**   And does that have significance for the plant utility?

6   **A.**   Yes.  And, also, if the competitors knew how long our

7   chlorinators worked, they would go to their R&D guys and say,

8   "DuPont's last, you know, 50 percent longer than ours.  Go fix

9   ours."

10   **Q.**   Okay.

11   **A.**   In many cases just knowing something is possible is about

12   half the battle in trying to come up with a new invention.

13   **Q.**   And did you -- were you on the receiving end of that from

14   time to time?

15   **A.**   I have been.

16   **Q.**   Let's look at the next reference.

17          "[number] pph air equiv. flow."  Do you see that?

18   **A.**   Yes, I do.  That's also under "Duty" in the previous

19   sentence.

20   **Q.**   Okay.  And what's the significance of that information?

21   **A.**   Again, we're talking about what's the sizing of all of the

22   system.  Once we know what that flow rate is, you can size all

23   the pipes and other pieces in this particular system.

24   **Q.**   Okay.  Let's go to the next reference.

25          So this has to do with elbows in a particular line, and

**DAYTON - DIRECT / AXELROD**

1   that's in the Basic Data Document?

2   **A.**   Yes, it is.

3   **Q.**   And can you describe what the significance of that

4   information is?

5   **A.**   This talks about how we switch from the normal operating

6   system to this blow system, and there are many ways to do it.

7   Some are more robust than others.  This is a very robust way

8   for us to do this.

9   **Q.**   Okay.  And let's keep going here.

10        It says, "Transfer line [number] DIA [number] FPS VEL."

11   Is that referencing Basic Data?

12   **A.**   Yes, it is.

13   **Q.**   And can you -- where?

14   **A.**   It's in a couple parts under IV.

15   **Q.**   Okay.

16   **A.**   Some of it is under A and some of it is under C.

17   **Q.**   And can you explain the significance of that information

18   in particular?

19   **A.**   Again, we're -- we find that when we run these things, our

20   available experience tells us that if we run it with the

21   velocity that's listed in here, the line doesn't plug up.  If

22   you try to run it with lower velocities, the line plugs.  If

23   you try to run higher velocities, the line simply wears out.

24        So this is the range we found where we're able to not have

25   operating problems and get the longest life out of the

**DAYTON - DIRECT / AXELROD**

1   equipment.

2   **Q.**   Okay.  And it also has a specific diameter?

3   **A.**   Yes.

4   **Q.**   What's the next reference?

5        Okay.  "Jet piping spacing from sidewall with," a number.

6   **A.**   Yes.

7   **Q.**   Is that in there, in Basic Data?

8   **A.**   Yes, under G.

9   **Q.**   Okay.  What's the significance of that information?

10  **A.**   This is part of the chlorinator design, and the jets is

11  where you would introduce the chlorine in the bottom.  And this

12  is what stirs up that whole bed.

13       And if you don't have the jets located within the range

14  that's listed here in the Basic Data, the bed isn't stirred up

15  properly and we can start forming these solid chunks, and then

16  the bed stops working and we stop having reactions, and

17  actually can have portions shut down of the chlorinator and

18  rebuild it.

19  **Q.**   What's the next reference?  It's just a number there.

20  **A.**   Yeah.  It's only highlighted a little bit.

21  **Q.**   Okay.

22  **A.**   If you look under G --

23  **Q.**   Okay.

24  **A.**   -- it says a jet pipe diameter of certain diameter is

25  recommended.

**DAYTON - DIRECT / AXELROD**

1   **Q.**   Okay.  Yeah.  And what's the significance of that pipe

2   diameter?

3   **A.**   This particular size is needed to prevent erosion of this

4   portion of the equipment that goes in the chlorinator.  If we

5   were to use a smaller pipe, it would erode it out.  We could

6   end up losing control and having chlorine come out, and that's

7   something we do not want.

8   **Q.**   That doesn't sound good.

9        What's the next reference?  Okay.  So it describes --

10  we're still talking about chlorinator design.  (reading)

11           "Bottom should be designed for [number] PSIG."

12  **A.**   Yes.

13  **Q.**   Okay.  And is that in the Basic Data?

14  **A.**   Yes, it is.  It's under C.

15  **Q.**   And what's the significance of that information?

16  **A.**   This tells you how strong you need to make the chlorinator

17  to be able to survive the conditions that we're requiring of

18  it.

19  **Q.**   What's the next reference?

20       Okay.  Down there it says, "[number] FPS VEL."  Is that

21  velocity?

22  **A.**   Yes.  That's the velocity.

23  **Q.**   And that's also in the Basic Data?

24  **A.**   Yes, it is.

25  **Q.**   Under what section?

**DAYTON - DIRECT / AXELROD**

1    **A.**    Under IV C.  You've got a different one highlighted there.

2    **Q.**    Yeah, it's a different one.

3          Okay.  So it's under IV C?

4    **A.**    Yeah.  It's IV C if you look at the very bottom.

5    **Q.**    And what's the significance of that information?

6    **A.**    Again, as we mentioned on the previous page, this is the

7    velocity that's needed to keep things from plugging up or

8    having erosion of your piping.

9    **Q.**    And let's go to the next reference.

10          And I think this is catching us up.  "Kuan Yin pipe is

11   [number]," and that number is in VI A of the Basic Data?

12   **A.**    This is correct.

13   **Q.**    Okay.  And what's the significance of that?

14   **A.**    Again, this matches up to the velocity that we looked at

15   in IV C.

16   **Q.**    Are there any more references in that document?  No.

17   **A.**    I don't believe so.

18   **Q.**    Okay.  So you looked at Exhibit 86?

19   **A.**    Yes, I did.

20   **Q.**    And the good news is, that's the same set of diagrams you

21   just looked at in 85; right?

22   **A.**    That's correct.

23   **Q.**    So we don't have to go through that conversation again.

24   **A.**    I hope not.

25   **Q.**    But there are the specific references the same as 85?

**DAYTON - DIRECT / AXELROD**

1   **A.**   I believe that's correct.

2   **Q.**   And did you look at Exhibit 84 --

3   **A.**   Yes, I did.

4   **Q.**   -- 83 and 84?

5        And did you find, I believe it's in 84, specific

6   references to information in the Basic Data Document?

7   **A.**   Yes, I did.

8   **Q.**   Where?

9   **A.**   Page 70.

10  **Q.**   And let's take a look at that.

11       Okay.  And there is that reference, I think we've seen

12  this before, of the chlorinator brick ID.  It gives a specific

13  dimension.

14  **A.**   Yes.

15  **Q.**   And that's in the Basic Data Document?

16  **A.**   Yes.  That's on 3, and you have meters in the email and

17  feet in the Basic Data Document.

18  **Q.**   Did you also look at Exhibit 97?

19  **A.**   Yes, I did.

20  **Q.**   Okay.  And what's -- actually, let me make sure -- I'm

21  sorry.  I skipped ahead.

22       On 84 there, "Design rate with [number] of chlorinators,"

23  I think we already discussed that.

24  **A.**   Yes, we did.

25  **Q.**   Okay.  And, also, we talked about the velocity?

**DAYTON - DIRECT / AXELROD**

1    **A.**    Yes.

2    **Q.**    So let's --

3         **THE COURT:**  Before we move to another exhibit, I think

4    this would be a good time for a break.

5         **MR. AXELROD:**  Great.

6         **THE COURT:**  All right.  Ladies and gentlemen, we're

7    going to take our 15-minute break.  For your information, we'll

8    be taking another one at 1:30 to reflect the schedule today.

9         So please keep an open mind.  Don't discuss the case.  And

10   we will see you in 15 minutes, and remember the Court's

11   admonitions.

12        (Proceedings were heard out of the presence of the jury:)

13        **THE COURT:**  All right.  15 minutes, Counsel.

14        **MR. AXELROD:**  Thank you, Your Honor.

15                  (Recess taken at 11:45 a.m.)

16             (Proceedings resumed at 12:07 p.m.)

17        (Proceedings were heard out of the presence of the jury:)

18        **THE COURT:**  Okay.  Please bring out the jury.

19        (Proceedings were heard in the presence of the jury:)

20        **THE COURT:**  It was just a request to reposition the

21   monitor, so we're going to do that for the jury so it's more

22   easily seen.  Ms. Ottolini will take care of that.

23        You may be seated.  Everyone may be seated.

24                  (Pause in proceedings.)

25        **THE COURT:**  Does that work?  Okay.  Great.

1    You may continue, Mr. Axelrod.

2         **MR. AXELROD:**  Thank you, Your Honor.

3  **Q.**  Mr. Dayton, when we broke, we were, I think, talking about

4  Exhibit 84; and I believe there's another reference in this

5  document, and that's -- it's, "[number] FPS min fluidizing

6  velocity."  Is that also found in the Basic Data?

7  **A.**  Yes, it is.  It's in number 4.

8  **Q.**  And we previously talked about that specific reference?

9  **A.**  Yes, we did.

10  **Q.**  Now, before we move on to the next exhibit, we've been

11  talking for a while about the Basic Data and these references,

12  is what we've been looking at mostly a chemical engineering

13  process?

14  **A.**  Yes, it is.

15  **Q.**  Okay.  And a number of the references to the chlorinator

16  have mentioned the fluidized bed, and could you explain a

17  little bit to the jury in general terms what a fluidized bed is

18  and how it works in the chlorinator?

19  **A.**  Okay.  A fluidized bed, in this case we have a large

20  enclosed vessel, and we have our solids coming in.  As you

21  remember, we talked about coke, we talked about ore coming in

22  and being put in the vessel.  And we put gas in the bottom and

23  it takes and stirs up the solids.  And, so, they're kind of

24  just rolling and circulating inside this bed, and that's why

25  they call it fluidized.

1      And then the reaction goes on inside this churning mass of

2   solids; and the gases come out the top of the solids, okay, and

3   then go out the exit pipe to our condensation system that we

4   talked about earlier when I did the little chart.

5   **Q.**   Thank you.

6      Did you look at Exhibit 97?

7   **A.**   Yes, I did.

8   **Q.**   Okay.  And in Exhibit 97, did you find specific references

9   to the Basic Data -- in the Basic Data Document?

10  **A.**   Yes, I did.

11  **Q.**   At what page or pages?

12  **A.**   338.

13  **Q.**   And let's pull up 97.  And if you could bring that up,

14  Mr. Hemann.

15     The first reference it says:  (reading)

16        "Kuan Yin is also based on a cooling tower Delta T."

17     Do you see that?

18  **A.**   Yes, I do.

19  **Q.**   Is that information found in the Basic Data Document?

20  **A.**   Yes, it is.

21  **Q.**   Where?

22  **A.**   Under B.

23  **Q.**   Okay.  What's the significance of that information?

24  **A.**   The temperature rise for the cooling tower water

25  determines how much area you need in your heat exchanger.  If

1   you can only have a very small temperature rise, you need a

2   very large heat exchanger to transmit your heat.  If you have a

3   relatively large temperature rise, as the case we have here, we

4   can use a much more economical, smaller heat exchanger.  It

5   saves a lot of money in the plant investment.

6   **Q.**   And just to orient in the process, where is the cooling

7   tower in the diagram that you -- what stage?

8   **A.**   The cooling tower is used in the reaction, purification,

9   oxidation areas.  There are heat exchangers in all three of

10  those buildings.

11  **Q.**   And I believe that's the only reference.

12       Did you look at Exhibit 100?

13  **A.**   Yes, I did.

14  **Q.**   And did that contain specific information found in the

15  Basic Data Document?

16  **A.**   Yes, it did.

17  **Q.**   Okay.  And at what page?

18  **A.**   161.

19  **Q.**   And let's look at Exhibit 100.

20       And the reference there it says:   (reading)

21           "My manual calls for [number] pph [number] kilograms

22       per hour Cl2 at 25,000 T/YR to the purge wall insert."

23       And there's a specific reference to that?

24  **A.**   Yes, there is.

25  **Q.**   Okay.

**DAYTON - DIRECT / AXELROD**

1    A.    In C.

2    Q.    I believe we talked about that one earlier?

3    A.    Yes, we did.

4    Q.    Did you also look at Exhibit 124?

5    A.    Yes, I did.

6    Q.    And did you find specific information in Exhibit 124 that

7    is in the Basic Data Document for Kuan Yin?

8    A.    Yes, I did.

9    Q.    And at what pages?

10   A.    202, 205, and 206.

11   Q.    And let's take a look at Exhibit 124.

12         Okay.  And I believe that we're looking at the second page

13   of 124 as an attachment, and it says, "Slurry Pumping Data."

14   Do you see that?

15   A.    Yes.

16   Q.    Okay.  And, so, where's the first -- and let me find the

17   first reference to the Basic Data Document.

18         So that just --

19   A.    Yeah.  This was the title of the section --

20   Q.    So this is just orienting us?

21   A.    -- for slurry pump.  Yes.

22   Q.    And then there's some actual specific information; right?

23   A.    Yes.

24   Q.    Okay.  So it says -- there's some [number] pumps installed

25   and then it describes the pumps.  And is that information found

**DAYTON - DIRECT / AXELROD**

1   in the Basic Data Document?

2   **A.**   Yes, it is.

3   **Q.**   Where?

4   **A.**   Under "Project Requirements."

5   **Q.**   Okay.  And can you explain the significance of this

6   information?

7   **A.**   The project requirements in this case talk about how many

8   pumps we need to have to get the system to work properly.  And

9   in this particular case, we've got one pump that's going to wet

10   treatment, I believe they call it blending in the email; one to

11   recirculate slurry back into the tank, and this is to mix in

12   the solids coming into the tank; and one spare.

13       And, you know, we could design this without the spare, but

14   then if a pump breaks down, the process shuts down.  So in this

15   particular case, the spare part tells us that we have to have

16   something because we've got a high-maintenance situation.

17   **Q.**   I see.  Okay.

18       And then are there other references from this document?

19   **A.**   Yes, there are.

20   **Q.**   Okay.  And let's look at the next one.  It says:

21   (reading)

22       "When the system is 'lined out,' slurry is blown,"

23       And then it goes on to talk about the operation of the

24   pump.

25   **A.**   Yes.

**DAYTON - DIRECT / AXELROD**

1  **Q.**  Could you -- and that information is found in the Basic

2  Data Document?

3  **A.**  Yes, it is.

4  **Q.**  Where?

5  **A.**  Also under "Project Requirements."

6  **Q.**  Okay.  What's the significance of that information?

7  **A.**  That tells us that once we get the plant operating

8  correctly, we really don't need the pump to move the slurry to

9  wet treatment.

10     And "blown" in this case means that it's using the

11 pressure in the tank to move the slurry over to the wet

12 treatment area.

13 **Q.**  Okay.  Any other references in this exhibit, Exhibit 124?

14 **A.**  Yes.  There are several more.

15 **Q.**  And it identifies a particular pH for the slurry?

16 **A.**  Yes.

17 **Q.**  That's directly from the Basic Data?

18 **A.**  Yes, it is.

19 **Q.**  Where?

20 **A.**  It's under A.

21 **Q.**  Okay.  And what's the significance of the pH for the

22 slurry?

23 **A.**  This tells us what kind of materials we can use in our

24 pumping system.  So if we were to try to use, for example,

25 carbon steel, 1.5 pH is very acid, it would eat up the pipe.

**DAYTON - DIRECT / AXELROD**

1   So we needed to pick a material of construction that can handle

2   relatively strong acids.

3   **Q.**   And let's look at the next reference.

4        It describes the pipe velocities.  Do you see that in the

5   document?  And is that information also contained in the Basic

6   Data Document?

7   **A.**   Yes, it is.  It's under B.

8   **Q.**   Okay.  And could you describe, sort of in general terms,

9   the information that we're looking at there with respect to the

10  velocities, you know, without getting into the specifics?

11  **A.**   If you make the pipe diameter too big, the velocity gets

12  quite low and the solids will settle out in the pipe, and

13  eventually you'll plug the pipe up.  So this is our experience,

14  that you have to have this minimum velocity to be able to keep

15  the pipe from plugging up.

16  **Q.**   Okay.  Let's go to the next one.  It identifies particular

17  material of pipe; right?

18  **A.**   That's correct.

19  **Q.**   And is that particular material identified in the Basic

20  Data Document?

21  **A.**   Yes, it is.

22  **Q.**   And what's the significance of that material?

23  **A.**   This material is resistant to the erosion.  We could

24  actually gouge holes in the side of the pipe.  We've tried

25  other materials in this service, and they failed fairly

**DAYTON - DIRECT / AXELROD**

1  quickly, and we found through experience that this particular

2  material will hold up and not fail for us.

3  **Q.**   And let's go to the next reference.

4      So it identifies a company and a particular type of pump.

5  Do you see that?

6  **A.**   Yes, also material of construction.

7  **Q.**   And material of construction.  Is that information also in

8  Basic Data?

9  **A.**   Yes, it is.

10 **Q.**   In C and K?

11 **A.**   This is correct.

12 **Q.**   Okay.  And what's the significance of that highlighted

13 information without getting into the specifics?

14 **A.**   Yeah.  Again, this is like our discussion with the pipe a

15 second ago.  We found this particular pump and this particular

16 material of construction with the control system that's

17 specified here will hold up much better than anything we had

18 tried previously.

19 **Q.**   Okay.  And it identifies a particular design to use?

20 **A.**   Yes.

21 **Q.**   Let's go to the next reference.

22      Right.  It's got this recirculation rate of a particular

23 gpm.  That's in Basic Data as well?

24 **A.**   That's correct --

25 **Q.**   Okay.

**DAYTON - DIRECT / AXELROD**

1    **A.**    -- it is.

2    **Q.**    At line D there.  What's the significance of that?

3    **A.**    The flow rate that's shown here is what is needed to mix

4    the dry powder that's going into this tank into the slurry.

5    **Q.**    Okay.

6    **A.**    So if we operate at a much lower flow rate, it wouldn't

7    mix up properly.

8    **Q.**    And, so, this is in the part of the process I think you

9    talked about earlier where it gets -- water is added to the

10   powder to mix it up and make into a slurry form?

11   **A.**    Yes, that's correct.

12   **Q.**    Okay.

13   **A.**    We need to be able to move this material to another area,

14   and the best way to do that is mix it with water and pump it.

15   **Q.**    I see.  Let's go to the next reference.  It identifies a

16   particular type of pump that's performed well?

17   **A.**    Yes.  It's under E.

18   **Q.**    Okay.  So it's E in the Basic Data there.  What's the

19   significance of that information?

20   **A.**    Again, we're talking about the reliability of this

21   particular pump; and with this type of impeller that goes in

22   it, we get a higher reliability than other impellers that we

23   had tested previously.

24   **Q.**    I see.

25          And the next reference.

**DAYTON - DIRECT / AXELROD**

1          Okay.  And it identifies how the pumping rate is handled?

2     **A.**   Yes.

3     **Q.**   And that's specifically in the Basic Data Document?

4     **A.**   Yes.  It's under A.

5     **Q.**   Could you explain in general terms the significance of

6     that piece of information?

7     **A.**   When you're running a tank with a liquid in it, you don't

8     want it to go empty and you don't want it to run over the top.

9     So what we're going to do in this particular case is we take

10    the level instrument that measures how high -- how full the

11    tank is, we have connected that through our control system to

12    the pumps with the variable speed drive.  If the tank gets too

13    high, it speeds the pump up a little bit more and pumps more.

14    If the tank starts dropping down too low, it slows the pump

15    down and pumps a little bit less so that we're able to maintain

16    a constant level in the tank.

17    **Q.**   I see.

18          Let's go to the next reference that identifies a

19    particular number for the certain lines.  Do you see that?

20    **A.**   Yes.

21    **Q.**   And is that identified in the Basic Data Document?

22    **A.**   Yes.  That's under B.

23    **Q.**   Okay.  What's the significance of that piece of

24    information?

25    **A.**   If -- in a system like this where you have a liquid like

1    water and it's relatively warm, which this is, if your line

2    going from the tank to the pump is too small, you can actually

3    pull a vacuum.

4    **Q.**   I'm sorry, you could what?

5    **A.**   Pull a vacuum.

6    **Q.**   Okay.  What does that mean?

7    **A.**   What happens is the water vaporizes into a gas, and then

8    it goes through the pump and the pressure of the pump forces

9    that gas bubble to collapse.  When that happens, the forces

10   exerted by that collapsing bubble on the pump is in millions of

11   PSI, and it will literally gouge chunks of metal right out of

12   the pump when that bubble collapses.

13        So what we're talking about here is we know that if we

14   keep these pipes at least the size that's shown here, we don't

15   have that particular phenomenon happening.

16   **Q.**   I see.

17        And let's go to the next one.  And that identifies

18   particular seals and control, tank control, with a particular

19   TDH.  Is that information contained in the Basic Data Document?

20   **A.**   Yes, it is.

21   **Q.**   Is that under 3A?

22   **A.**   Yes, it is.

23   **Q.**   Again, in keeping it in general terms, what is the

24   significance of that information?

25   **A.**   This is the sizing information for this particular water

**DAYTON - DIRECT / AXELROD**

1  system.  It talks about how big the tank needs to be.  We

2  mention here we need to have two different pumps because we've

3  got to have -- one of them's for reliability to make sure

4  nothing happens.  If one of these pumps fails, you could shut

5  down the whole process.  You want to be able to switch to the

6  other one.

7      You have the flow rate that's for these pumps, and then

8  the TDH is the total discharge head.  That's the pressure that

9  comes out of the pump.

10  **Q.**   I see.

11  **A.**   So you could specify the entire system based on this

12  information.

13  **Q.**   Now, I notice here, again, it references Altamira?

14  **A.**   Yes.

15  **Q.**   Is that a reference to how it works in an existing

16  facility?

17  **A.**   Yes.  That's the facility at Altamira, and in this case it

18  says existing facility; but, you know, if I was designing this

19  and I looked at it and I said, "This works well at our Altamira

20  plant," I would be inclined to do something very similar for

21  Kuan Yin.

22  **Q.**   I see.

23      And are there any other references?  No.

24  **A.**   I don't believe so, no.

25  **Q.**   Okay.  Did you look at Exhibit 87?

**DAYTON - DIRECT / AXELROD**

1    **A.**   Yes, I did.

2    **Q.**   And does Exhibit 87 contain specific references to

3    information found in the Basic Data Document?

4    **A.**   Yes, it does.

5    **Q.**   And let's take a look at Exhibit 87?

6    **A.**   Okay.  Page 83 and 86.

7    **Q.**   And, so, on the left we have one of the drawings from 87.

8          And can we highlight the first reference there?

9          Okay.  So before we talk about it, this involves a

10   particular line for a piece of equipment?

11   **A.**   Yes, it does.

12   **Q.**   And can you just give us some context?  What's that piece

13   of equipment that we're looking at?

14   **A.**   This is one of the first condenser vessels.  Remember we

15   were coming out of our chlorination step, our chlorinator, and

16   we're coming out at about 1800 Fahrenheit, and then we go to

17   this particular vessel.  If you can see the chart there on the

18   very far right-hand side, it says "From Chlorinator" with an

19   arrow.

20        And in this vessel we're going to drop the temperature

21   down, and we've got our solids that come through that blow out

22   of the chlorinator, and some of the miscellaneous metals are

23   condensed in this particular system and then are put into a

24   tank and then pumped off to further treatment.

25   **Q.**   Okay.  So the specific reference here about the lining --

**DAYTON - DIRECT / AXELROD**

1  first of all, it's contained in the Basic Data Document there

2  in Section C; right?

3  **A.**  That's correct.

4  **Q.**  And that identifies the material of construction?

5  **A.**  Yes, it does.

6  **Q.**  And what's the significance of that?

7  **A.**  Again, if -- essentially you have solids coming in this

8  gas stream.  If you don't have something that's very robust,

9  you can actually sandblast a hole right through the side of the

10  equipment.  So we've determined that we need to have this

11  particular piece lined; and for corrosion resistance, we need

12  to have a particular material of construction.

13  **Q.**  I see.

14      Are there other references in this sketch or this drawing?

15  **A.**  Yes, there are.

16  **Q.**  Okay.  And let's look at the next one.

17      And could you explain -- I see highlighted on the drawing

18  a block that says, "To SR COND," and then there's a reference

19  to Basic Data.  Do you see that reference?

20  **A.**  Yes, I do.

21  **Q.**  And could you explain the linkage between the two?

22  **A.**  Yes.  This reference --

23  **Q.**  In general.  Again, in general terms.

24  **A.**  Yeah.  This reference actually refers to the small piece

25  that is just immediately to the right of that arrow that says

**DAYTON - DIRECT / AXELROD**

1    "To SR."

2    **Q.**   Yes.

3    **A.**   And it talks about how the opening needs to be in the

4    bottom of it.  So we're really talking about how do we design

5    that small piece so that it operates -- the system operates at

6    its highest efficiency.

7    **Q.**   Okay.  And the information about that piece is identified

8    in L in the Basic Data?

9    **A.**   Yes.

10   **Q.**   And, again, it says there, "The outlet nozzle," it says,

11   "duplicates JV-I..."  I think maybe that's supposed to be

12   "design" there.

13   **A.**   Yes.  That's a typo.

14   **Q.**   Okay.  What's "JV-I"?

15   **A.**   We have two reaction lines at the Johnsonville plant,

16   they're JV-I and JV-II.  So the engineer who wrote this

17   particular section, after looking at all the pieces that we had

18   in our various lines, determined that the design used at the

19   JV-I line was the best.

20   **Q.**   Let's look at the next reference.  Okay.  So this has to

21   do with tracing, is that right, and insulation?

22   **A.**   That's correct.

23   **Q.**   And could you explain, again, the reference -- explain the

24   reference to Basic Data and how it's depicted in the drawing.

25   **A.**   Well, this is under N.  It says:

**DAYTON - DIRECT / AXELROD**

1              "This vessel is to be heat traced and insulated."

2       And then it says:

3              "Consider DeLisle specifications."

4       Again, we were trying to pick the best of all of our

5  lines, as far as which ones worked the best.  So he mentioned

6  right here that using DeLisle would be the best choice.

7  **Q.**   Okay.  And what's -- let's look at the next item.

8        **(Document displayed.)**

9  **Q.**   Yes.  Okay.  So this identifies a particular piece of

10 equipment?

11 **A.**   Yeah.

12 **Q.**   In the drawing you can see highlighted in purple on the

13 bottom.  And then is the reference in B in the Basic Data

14 Document?

15 **A.**   Yes.

16 **Q.**   And could --

17 **A.**   B --

18 **Q.**   Could you explain, again in general terms, the linkage

19 between that drawing and the Basic Data reference.

20 **A.**   In this particular piece of equipment, the solids we're

21 creating don't flow freely to the tank.  You have to -- you

22 have to do something to kind of work on them a little bit, to

23 get them to move down.

24      And in this case it's these particular timed impact units

25 that was specified.  And this is a specific brand and a

1    specific model number that shows up in the Basic Data.

2    **Q.**   And it identifies the -- there's been success with them at

3    Antioch and Johnsonville?

4    **A.**   Yes.

5    **Q.**   And are those two DuPont facilities?

6    **A.**   Yes, they are.

7    **Q.**   And let's look at the next reference.

8         And can you describe, in general terms, the linkage

9    between the highlighted in orange portion on the drawing and

10   the Basic Data reference.

11   **A.**   Okay.  Well, the Basic Data is in 5, is being shown up

12   here.  And we need to know what the level is in this particular

13   unit toward the bottom.  That's very important when you have

14   solids that tend to stick because if they stick up you can fill

15   the whole thing up.

16        And so what we have is a very specific type of level

17   detector that's utilized on this piece of equipment, and a

18   specific length of it.  And that's quoted in both places.

19   **Q.**   Okay.  And let's go to the next reference.

20        (Document displayed.)

21   **BY MR. AXELROD:**

22   **Q.**   Okay.  So that's it for 87.  Did you look at 88?

23   **A.**   Yes, I did.

24   **Q.**   And I believe 88's the same set of sketches, right?

25   **A.**   I believe it is.

**DAYTON - DIRECT / AXELROD**

1   **Q.**   Okay.  So you found specific references, and they're the

2   same as 87?

3   **A.**   I believe that's correct, yes.

4   **Q.**   Okay.  Did you look at Exhibit 115?

5   **A.**   Yes, I did.

6   **Q.**   And did 115 have specific information found in the Basic

7   Data Document?

8   **A.**   Yes, it did.

9   **Q.**   And let's take a look at -- on what page is --

10  **A.**   221.

11  **Q.**   Okay.  Let's take a look at that.

12       (Document displayed.)

13  **BY MR. AXELROD:**

14  **Q.**   Okay.  So the email identifies a procedure for making

15  sodium aluminate.  Do you see that?

16  **A.**   Yes, I do.

17  **Q.**   And is that procedure the same as what's found in the

18  Basic Data Document?

19  **A.**   Yes.  It's under D.

20  **Q.**   And what is the significance of that particular

21  information?

22  **A.**   I think the big thing here is this is absolutely, word for

23  word, the procedure used at our New Johnsonville plant.

24       It's -- there's other formulas you could use to make this

25  chemical, other amounts.  And, you know, nothing is different

**DAYTON - DIRECT / AXELROD**

1   than, absolutely, what we use at our Johnsonville facility.

2   **Q.**   Okay.  And I gather from your earlier testimony that

3   you're going to put in there the best sort of recipe you've

4   got?

5   **A.**   Absolutely.

6   **Q.**   Okay.  Did you look at Exhibit 92?

7   **A.**   Yes, I did.

8   **Q.**   And did you find specific references in Exhibit 92, in the

9   Basic Data Document?

10  **A.**   Yes, I did.

11  **Q.**   And what -- on what page of the Basic Data Document did

12  you find those?

13  **A.**   Pages 177, 182, and 184.

14       **MR. AXELROD:**  Let's pull that up.

15     (Document displayed.)

16  **BY MR. AXELROD:**

17  **Q.**   Okay.  And we're looking -- the drawing says, "Oxid flue

18  pond."  Is that the oxidation flue pond?

19  **A.**   Yes, it is.

20  **Q.**   And underneath the section called "Design Guidelines" it

21  identifies a particular type of pipe, particular pressure, and

22  a particular temperature.  Do you see that?

23  **A.**   Yes, I do.  I see that.

24  **Q.**   Is that information also found in the Basic Data Document?

25  **A.**   Under C you show the material of construction.

**DAYTON - DIRECT / AXELROD**

1    Q.    Okay.  And how about the rest of it?  Maybe that's it?

2    A.    Yeah, I think -- I don't think we had -- in this

3    particular one, we didn't have an exact match.

4    Q.    So the material of construction, what's the significance

5    of that?

6    A.    Again, you could construct this out of several different

7    materials.  And the ones that we had specified are the ones

8    that are going to last the longest and give us the best service

9    life.

10   Q.    Okay.  And is there another -- right.  So let's look at

11   the next reference.  It identifies a material, and then

12   provides some additional information about it in the email.

13   It's highlighted there in blue.  Is that information also found

14   in the Basic Data Document?

15   A.    Yes, it is.

16   Q.    Where?

17   A.    I believe it's under O.

18   Q.    Okay.  And could you explain what that information is, and

19   its significance?

20   A.    Yes.  When someone is using a slip flange, what we're

21   trying to do, if we make this thing completely of high-alloy

22   material, it's very, very expensive and very thick.

23        So what we're doing is taking a carbon steel flange, which

24   is much more reasonably priced, and we're cutting the face off

25   the front of it, and then we're weld overlaying the alloy.  And

**DAYTON - DIRECT / AXELROD**

1  then we machine it down.

2      So what you end up with, then, is a face that's corrosion

3  resistent, but you have the strength of the carbon steel for

4  the flange, and you can do it at a reasonable cost.

5  **Q.**   Okay.  Let's look at the next reference.

6      Okay.  Again, we're looking at a specific gas velocity --

7  a couple of specific velocities.  Do you see that?

8  **A.**   Yes, I do.

9  **Q.**   Is that information also found in the Basic Data Document?

10  **A.**   Yes, it is.  It's under L.

11  **Q.**   Okay.  And what's the significance of those -- is that a

12  range of velocities?

13  **A.**   Yes, it is.

14  **Q.**   So what's the significance of that range?

15  **A.**   If -- again, if we get very, very high velocities, the

16  solids in this particular pipe would actually chew through the

17  pipe walls.

18  **Q.**   I'm sorry?

19  **A.**   It will chew through the pipe wall.

20  **Q.**   Okay.

21  **A.**   And fail the pipe.  If you have too low a velocity, which

22  is specified here, the solids will drop out and lay in the

23  bottom of the pipe, and eventually the pipe will plug up.

24      So for operations you need to be above the minimum so you

25  don't have operating problems; below the maximum so you don't

**DAYTON - DIRECT / AXELROD**

 1   chew up your piping.

 2   **Q.**    Let's look at the next reference.  It identifies a

 3   particular length.  Do you see that?

 4   **A.**    Yes, I do.

 5   **Q.**    And is that particular length identified in the Basic Data

 6   Document?

 7   **A.**    Yes, it is.

 8   **Q.**    Okay.  And what's the significance of that piece of

 9   information?

10   **A.**    If you have a reducer, if you're going from a 12-inch

11   diameter pipe to a 10-inch diameter pipe, say, and you try to

12   do that very suddenly over a very short distance, you create

13   tremendous turbulence inside the piping.  And you'll actually

14   chew a hole, again, through the side of the piping.

15        So what you want is a reducer that's several feet long so

16   that it's kind of a gentle change between the two diameters.

17   And that prevents the piping from failing.

18   **Q.**    And so this identifies the appropriate length?

19   **A.**    Yes.

20   **Q.**    Okay.  And let's look at the next example there.

21   Highlighted in red there's information with some degrees on

22   there.  Is that information also found in the Basic Data

23   Document?

24   **A.**    Yes, it is.

25   **Q.**    Okay.  At what line?

1   A.   I believe that you've got line 4, has one of them.  And I
2   think line 4 is where it is.

3   Q.   What's the -- what's the significance -- I think --

4   A.   We got out of sync on this one.

5   Q.   We got out of sync.  But what's the significance of that
6   information?

7   A.   What they're referring to here is we have a very specific
8   design for these elbows --

9   Q.   Okay.

10  A.   -- that we have developed over quite a few years, so that
11  they hold up.

12       Again, if you don't design these right, you end up chewing
13  holes through the side of the elbow because you're trying to
14  take all these solids and trying to make them turn, and they
15  don't want to.  They'd like to keep going straight ahead.

16  Q.   Okay.  And what's the next reference?  Oh, so there we go.
17  It identifies the length of the first leg.  That's what's in
18  the Basic Data at B3?

19  A.   Yes.  We mentioned that one previously.

20  Q.   Okay.  Any more on -- is there another one on this
21  document?

22  A.   I don't think so.  Nope, one more.

23  Q.   Okay.  So that identifies a particular temperature.  Do
24  you see that?

25  A.   Yes.  That's under II and Function on the third line.

1   Q.   Okay.  What's the significance of that particular

2   temperature?

3   A.   That temperature is there because the equipment downstream

4   can only handle that as a maximum.  So if we exceeded that

5   temperature we would damage the downstream equipment.

6   Q.   I see.

7        So the way the facility is designed or to be designed it

8   would accommodate for that particular design criteria?

9   A.   That's correct.

10  Q.   Okay.  And let's go to the next one, okay.  Did you look

11  at Exhibit 91?

12  A.   Yes, I did.

13  Q.   And in Exhibit 91 did you find specific references

14  contained in the Basic Data Document?

15  A.   Yes, I did.

16  Q.   And at what -- at what pages?

17  A.   There are a number here.  323, 329, 330, 335, 337, 338,

18  340, and 353.

19  Q.   And let's look at the email for 91.  Okay.

20       (Document displayed.)

21  Q.   And we're going to talk about this in a moment.  It's -- I

22  think the title to the email was "Fume Disposal Systems"?

23  A.   I think that's correct.

24  Q.   So what part of the process are we talking about?

25  A.   In the reaction area, after the condensation, you have

1    gases that's left over.  You've condensed out all the titanium

2    tetrachloride to go to purification.  But there's other gases.

3    There's CO2, there's CO, there's some nitrogen that have to be

4    handled.  And you want to make sure that whatever you discharge

5    is environmentally safe.  So fume disposal is designed to

6    remove a number of these gases from the discharge.

7    **Q.**   Okay.  So let's look at the email, and let's look at the

8    first reference that's found in the Basic Data.  And it

9    identifies tail gas and specific temperatures and pressure.  Do

10   you see that?

11   **A.**   Yes.

12   **Q.**   Is that information found in the Basic Data Document?

13   **A.**   Yes, it is.

14   **Q.**   Where?

15   **A.**   Under B.

16   **Q.**   And what's the significance of that information in the

17   process?

18   **A.**   This is the temperature and pressure as the stream leaves

19   the condensation area.

20        And this is something that we would never publish.

21   **Q.**   Okay.

22   **A.**   It's internal to the process.

23   **Q.**   Okay.  And what's the significance of that information for

24   the process?

25   **A.**   Uhm, well, this would tell people partly how we're

**DAYTON - DIRECT / AXELROD**

1   designing our condensation area, but also the pressures in the

2   system.  It would tell you how much pressure drop you've got in

3   fume disposal.

4   **Q.**   So let's go to the next reference.  And it identifies a

5   range -- or identifies specific numbers for two chemicals

6   there.  Do you see that?

7   **A.**   Yes.

8   **Q.**   Is that information also found in the Basic Data Document?

9   **A.**   Yes, it is.

10  **Q.**   Is that at 3C?

11  **A.**   That's 3C.

12  **Q.**   What's the significance of that information?

13  **A.**   Again, it tells us exactly what the instrument is capable

14  of, but also gives you an idea of what the composition of that

15  gas stream would be coming out of our process.

16  **Q.**   Let's go to the next reference.  Okay.  And this has to do

17  with a particular type of pump in part of the process there?

18  **A.**   Yes.

19  **Q.**   And is that identified in section II A of the Basic Data?

20  **A.**   Yes, it is.

21  **Q.**   Okay.  And what's the significance of this particular pump

22  and -- this information, I should say?

23  **A.**   In this particular system you have issues with buildup on

24  the pumps and damaging them.  And this particular make and

25  model of pump has had much higher reliability than other pumps

**DAYTON - DIRECT / AXELROD**

1    that we've tested.

2    **Q.**   I see.  And it says -- it describes Johnsonville, right?

3    **A.**   That's -- this particular one comes from Johnsonville,

4    yes.

5    **Q.**   So this reflects the -- how it went in Johnsonville for

6    this particular piece of equipment?

7    **A.**   Yes.

8    **Q.**   I see.  And let's go to the next reference.

9         It talks about a particular head tank.  Do you see that?

10   **A.**   Yes.

11   **Q.**   And that information is in the Basic Data at I?

12   **A.**   Yes, it is.

13   **Q.**   Can you explain the significance of that information?

14   **A.**   In this particular case, this head tank is something we

15   would use in the case of a power failure so that we don't have

16   any chlorine escaping out of our process.  So it's one of our

17   safety features.

18   **Q.**   Let's go to the next one.  I see there -- okay.  And this

19   has -- this is information about the stack and a particular tip

20   velocity and internal velocity.  Do you see that?

21   **A.**   Yes, I do.

22   **Q.**   And is there reference to that information in the Basic

23   Data?

24   **A.**   Yes, there is.

25   **Q.**   Where?

**DAYTON - DIRECT / AXELROD**

1   **A.**   B and G.

2   **Q.**   Okay.  And can you -- is there some information in H?

3   **A.**   Yeah, H is the material of construction.

4   **Q.**   What's the significance of that Basic Data information?

5   **A.**   We've talked about the B and G references of the velocity

6   at the tip we need for dispersion --

7   **Q.**   Right.

8   **A.**   -- and the need to keep below 15 feet a second in the

9   stack to keep from getting water droplets or other droplets

10  coming out of the system.

11       It's also possible, in the case of an emergency, to have a

12  flammable mixture in the stack.  And so we need to make sure

13  that this stack would be resistant to that flammable mixture

14  should it be ignited.  And that's what's in H.

15  **Q.**   Let's go to the next reference.  And this is a dilution

16  air guideline?

17  **A.**   Yes.

18  **Q.**   And that's in E in the Basic Data?

19  **A.**   Yes, it is.

20  **Q.**   What's the significance of that piece of information?

21  **A.**   In that particular piece we're looking at, you know, how

22  do we get the concentrations and maintain the concentrations in

23  the stack.  And it partly relates, also, when we get to the tip

24  to give us adequate dispersion.  We don't want gases coming out

25  of the stack and going back down to the ground.

1            **MR. AXELROD:**  Mr. Hemann, can we go to the next

2    reference after that one.  Okay.

3         (Document displayed.)

4    **BY MR. AXELROD:**

5    **Q.**   And this is information about the waste scrubbing system?

6    **A.**   Yes.

7    **Q.**   Is that information found in the Basic Data Document?

8    **A.**   Yes, it is.

9    **Q.**   Where?

10   **A.**   It's kind -- some of it is under I.

11   **Q.**   Okay.

12   **A.**   And I believe some of it is under II A.

13   **Q.**   Okay.  And then looks like there's a dilution percentage

14   that's under II F?

15   **A.**   Yes.

16   **Q.**   Could you explain the significance of this information?

17   **A.**   This has to do with the products that come off of our fume

18   disposal system.  When you -- if you have, say, a power failure

19   and some chlorine comes out, and we scrub it with caustic, it

20   basically makes bleach.  And the bleach is unstable.  So you

21   have to do something to this bleach so that it doesn't go back

22   and release chlorine gas out again.

23   **Q.**   Okay.

24   **A.**   Okay.  And the two ways -- there's a couple of different

25   ways you can do this.  One is to add hydrogen peroxide to the

**DAYTON - DIRECT / AXELROD**

1    solution.  Another one is to add urea.  And both of those

2    stabilize the bleach so that it can't go backwards, okay, to

3    caustic and chlorine gas.

4        Once you've stabilized it, then you can send the solution

5    to a waste treatment operation, which the plant has, and treat

6    it properly so you don't have any hazards.

7    **Q.**   Let's go to the next reference.  And this looks like it

8    relates to -- I'm not seeing it on the -- there we go.  This

9    has to do with the velocity on a particular system.  Do you see

10   that?

11   **A.**   Yes, I do.

12   **Q.**   And that's in E, in the --

13   **A.**   That's in E.

14   **Q.**   -- Basic Data?

15   **A.**   Yes.

16   **Q.**   What's the significance, what are we talking about here,

17   and what's the significance?

18   **A.**   We are -- in this particular system, this is a system that

19   if we have any maintenance and we open things up, we don't want

20   any fumes or other chemicals getting out to the operators or

21   mechanics.  So we actually can suck it up.  And this particular

22   system treats that gas that we've sucked up.  To get it to

23   scrub properly, we have to have a certain velocity across the

24   scrubbing system.  And this is the particular velocity that we

25   found works the best.

**DAYTON - DIRECT / AXELROD**

Q.   And the next reference, okay.  And the next reference there, highlighted in orange, mentions a -- looks like a flow rate.  Is that flow rate also found in D in the Basic Data Document?

A.   Yes, it is.

Q.   What's the significance of that flow rate?

A.   In this particular system, we need a certain amount of liquid to make sure that we're properly scrubbing.  And this particular amount is specified in the Basic Data.

If you did not have enough liquid, you probably would not -- you would not scrub properly.  And this happens to be a chlorine scrubber so, potentially, chlorine gas could escape the system.

Q.   Let's go to the next reference.  All right.  This one is going to require some explanation.

A.   Okay.

Q.   It says this relates to heat -- heat sync?

A.   Yeah.  When you're doing these scrubbing reactions, you actually liberate heat, okay.  In this particular reaction we have chlorine, we have caustic, okay, and we're going to mix them together.  And you're going to end up with some sodium chloride.

And it says aqueous, AQ.  That means it's in water, okay.  And then the NaOCl, that's bleach, and then plus water.  So what happens when we mix these two together, we get heat.  And

**DAYTON - DIRECT / AXELROD**

1  we need to know how much heat this particular scrubber will

2  liberate so we can design the heat removal equipment.

3  Otherwise, you potentially just keep heating it up and heating

4  it up, and this is a Fiberglas vessel and you melt it.

5  **Q.**   So the reference, there's a specific figure at the end of

6  this reaction?

7  **A.**   Yeah.

8  **Q.**   Is that the -- the heat --

9  **A.**   That's the heat.

10  **Q.**   -- reference?

11  **A.**   Yes.  What it is is it's PCU per pound mole of chlorine.

12  And PCU is a heat measurement.  Most of us here have heard of

13  BTUs.  And that works in degrees Fahrenheit.  But PCU is the

14  same thing, it works in degrees centigrade.  And a pound mole

15  is a measurement of how much chlorine is coming through.

16  **Q.**   Okay.  So this gives you the number you need to then

17  design around?

18  **A.**   Yes.

19  **Q.**   Okay.  Let's look at the next reference.

20      (Document displayed.)

21  **BY MR. AXELROD:**

22  **Q.**   Okay.  And this talks about flows from the tail gas, talks

23  about a number of things.

24      Could you explain this reference and the citation in the

25  Basic Data?

**DAYTON - DIRECT / AXELROD**

1   **A.**    Yes.  This shows up under Project Requirements in I.

2   **Q.**    Okay.

3   **A.**    And what it basically relates to is there are several

4   potential sources that need to go to the scrubber.  And they --

5   these particular sources all have to be able to release at one

6   time.  So this particular part of the Basic Data says you're

7   going to take the flows from each of these, add them all up,

8   and that's how you size your scrubber.

9   **Q.**    I see.

10  **A.**    I see five different things there that potentially could

11  go to the scrubber at a given time.

12  **Q.**    And the next reference.

13       (Document displayed.)

14  **BY MR. AXELROD:**

15  **Q.**    Okay.  So this identifies some criteria for the scrubber,

16  right?

17  **A.**    Yes, it does.

18  **Q.**    And does this come out of -- is this found in the Basic

19  Data Document?

20  **A.**    Yes.  It's under A.

21  **Q.**    Okay.  And what's the significance of that criteria?

22  **A.**    Again, we're -- this is a very severe upset condition that

23  might occur if, suddenly, the power is cut off to the plant.

24  And so we need to be safe and not release chlorine out to the

25  environment.  We have to be able to size for that kind of a

**DAYTON - DIRECT / AXELROD**

1   situation so we can get everything shut down and secured.

2   **Q.**   Okay.  And let's go to the next one.  Okay.  That -- the

3   next exhibit is 111.  Did you look at 111?

4   **A.**   Yes, I have.

5   **Q.**   And does 111 contain information found in the Basic Data

6   Document?

7   **A.**   Yes, it does.

8   **Q.**   And on what page is the Basic Data Document?

9   **A.**   On page 131, 132, 133, 136, and 137.

10          **MR. AXELROD:**  And if we could bring up 111.

11      (Document displayed.)

12   **BY MR. AXELROD:**

13   **Q.**   Okay.  So on the left side is the exhibit.  And let's

14   just -- well, let's take a first reference.  So the first

15   reference has to do with some tubes.  And is that found in the

16   Basic Data Document?

17   **A.**   Yes, it is.

18   **Q.**   And where?

19   **A.**   Part of it is in A.  And the helical design portion is in

20   B.

21   **Q.**   Okay.  What's the significance -- now we're talking about

22   this is in the oxidation area?

23   **A.**   Yes, this is oxidation.

24   **Q.**   Okay.  So what's the significance of the -- this

25   information about the material and the shape?

1   **A.**   For this particular piece of equipment, the material

2   construction is very critical to its operating life.  So we

3   specify a specific material.  And the shape is needed to --

4   because of the operation that's going on inside the vessel.  So

5   you could actually shape the coil many different ways.

6   **Q.**   Okay.

7   **A.**   And this is the one we found works the best.

8   **Q.**   Okay.  Let's look at the next reference.

9   **A.**   That's also under B.

10  **Q.**   Okay.  And let's go to the next one.

11       (Document displayed.)

12  **BY MR. AXELROD:**

13  **Q.**   Okay.  And this references a particular ratio?

14  **A.**   Yes.  This speaks to the burner in this unit.  And it's

15  the very last sentence under B.

16  **Q.**   Okay.  And what's the significance of that ratio?

17  **A.**   That tells us how -- how we can raise and lower the flame,

18  how much.  And, again, this would be useful to determining what

19  our minimum and maximum operating rates are.

20  **Q.**   Okay.  Let's go to the next reference.  And this says a

21  specific velocity.  Is that found in Basic Data at L?

22  **A.**   Yes, it is.

23  **Q.**   What is the significance of that velocity?

24  **A.**   Like many of the velocities we've talked about, where we

25  have a maximum, this is to protect the tubing.  If we exceed

1  that velocity, the tubing would be damaged.

2  **Q.**   Okay.  And let's go to the next reference.

3       This has to do with control for a particular piece of

4  equipment?

5  **A.**   Yes.  It's the same piece.

6  **Q.**   I'm sorry?

7  **A.**   It's the same piece.

8  **Q.**   Okay.  So this information is in the Basic Data Document?

9  **A.**   Yes.  It's the bottom one that you have shown there.

10 **Q.**   Okay.  And can you describe the information that we're

11 looking at, that's highlighted in red?  What's its significance

12 for the process?

13 **A.**   This damper is used to control the air going through the

14 burner.  And, again, like many pieces we run in plants, we have

15 to make sure that things burn cleanly.  In many places we have

16 to put burners in that do not emit nitrogen oxides.

17 **Q.**   Okay.

18 **A.**   And we need to keep that flow down so that the nitrogen

19 oxides are limited.  That's done through this damper.

20 **Q.**   Let's look at the next reference.

21      **THE COURT:**  Before we do, let's take a stretch break,

22 everybody.

23      (Pause)

24      **THE COURT:**  All right.  Please be seated.  You may

25 continue.

DAYTON - DIRECT / AXELROD

1              **MR. AXELROD:**  Thank you, Your Honor.

2         (Document displayed.)

3    **BY MR. AXELROD:**

4    **Q.**   Mr. Dayton, we were looking at Exhibit 111 and the Basic

5    Data references, and just brought up the next one, having to do

6    with the tube wall.  Do you see that?

7    **A.**   Yes, I do.

8    **Q.**   And is that information that's highlighted there in orange

9    also found in the Basic Data Document?

10   **A.**   Yes.  It's in the upper section shown below.

11   **Q.**   Okay.  Could you explain the significance of that

12   information.

13   **A.**   Yeah.  In this particular system, the temperature is very,

14   very hot.  And we actually measure the pipe wall temperatures

15   inside, in four locations.  If it gets excessive you can

16   actually damage the tubing.

17   **Q.**   Okay.  So does this tell you a particular type of system

18   you need to put on to address that issue?

19   **A.**   Yeah, a thermocouple is a temperature measurement device.

20   **Q.**   Okay.  And the next reference that we're going to go

21   to ...

22        (Document displayed.)

23   **BY MR. AXELROD:**

24   **Q.**   Okay.  So this is -- we're now into a different piece of

25   equipment?

**DAYTON - DIRECT / AXELROD**

1   **A.**   Yes.  This is the oxygen preheater.

2   **Q.**   Okay.  And is that part of the oxidation process?

3   **A.**   Yes.

4   **Q.**   Okay.  And the first reference talks about heating it up

5   to a particular temperature.  Do you see that?

6   **A.**   Yes, I do.

7   **Q.**   Is that the reference in the Basic Data?

8   **A.**   Yes.

9   **Q.**   Okay.

10  **A.**   We have a little mismatch in the highlighting here.

11  **Q.**   Right.  If you look at the email, below "oxygen heater" it

12  talks about heating it up to a particular temperature.  And

13  that temperature is also in the Basic Data, at number II?

14  **A.**   Yes, that's correct.

15  **Q.**   And then a little bit further down in the oxygen heater

16  discussion it talks about tube walls again.  Do you see that?

17  **A.**   Yes, it does.

18  **Q.**   Is that information found in the basic document at II C?

19  **A.**   Yes, it's II C.

20  **Q.**   What's the significance of that information?

21  **A.**   It's very similar to -- a TC is a thermocouple.  It's very

22  similar to what we just discussed on the vaporizer with the

23  four couples on that particular unit.

24  **Q.**   So, now, it looks like there's a reference to material of

25  construction.  So in the exhibit, which is Exhibit 111, it

1    mentions a particular material of construction for some tubes.

2    Do you see that?

3    **A.**    Yes, I do.

4    **Q.**    And does that match what's in J in the Basic Data?

5    **A.**    Yes, it does.

6    **Q.**    Okay.  And what's -- I think you've talked about this in

7    other context, but what's the significance in this context of

8    the material of construction?

9    **A.**    If you used other alloys in this particular unit, the

10   oxygen would attack the alloy and literally eat a hole right

11   through the pipe.  So this particular alloy that we've got

12   listed here is more resistant.

13   **Q.**    Let's go to the next reference.  Okay.  And that's going

14   to be Exhibit -- the next one is Exhibit 112.  Did you look at

15   11?

16   **A.**    Yes, I did.

17   **Q.**    And did 112 contain specific information found in the

18   Basic Data Document?

19   **A.**    Uhm, yes, it did.

20   **Q.**    And on what pages did you find the information in the

21   Basic Data Document?

22   **A.**    188 and 190.

23   **Q.**    Let's look at 112.

24        (Document displayed.)

25   **Q.**    And this has to do with oxidation bag filters?

**DAYTON - DIRECT / AXELROD**

1   **A.**   Yes, it does.

2   **Q.**   Okay.  And let's -- the first reference looks like it's to

3   material of construction?

4   **A.**   Yes.

5   **Q.**   And is that specific material of construction found in the

6   Basic Data under "Bag Filter"?

7   **A.**   Yes.  It's under D.

8   **Q.**   Okay.  And let's go to the next one.  Okay.  And it talks

9   about a specific measurement for the surface?

10  **A.**   This -- this is the -- how much gas can go through a

11  square foot of filter bag.

12  **Q.**   Okay.  And ask just to -- let's step back for a minute.

13          I know this is technical --

14  **A.**   Yes.

15  **Q.**   -- but what are bag filters?  What's the -- what's this

16  piece of equipment, and where are we in the process?

17  **A.**   Yeah.  We're in the oxidation step.  We've made our base

18  pigment, we've cooled it in the flue pond.  Now we have to

19  collect it up so we can send it to our tank where we're going

20  to mix it with water.

21          And we need to separate the pigment from the chlorine gas.

22  So one of the pieces of equipment that's used is a bag filter.

23  And what a bag filter is is a vessel that has a whole bunch of

24  tubes that come down, made of cloth, okay, like your vacuum

25  cleaner.  Except it's kind of reverse.  If you had the bag on

**DAYTON - DIRECT / AXELROD**

1  the vacuum cleaner, you put it in the side where the pocket is.

2  Okay.  This is on the other side.  So it goes backwards.  You

3  want to think of that.

4      And the solids are collected on the cloth.  And then you

5  take and you can either shake 'em or pulse gas back into the

6  bag.  It blows the solids off the cloth and they fall down into

7  the bottom of the vessel and are carried away, off to the next

8  step.

9      So what's important about this is each of the bags, these

10 tubes, can only handle so much gas flow and so much solids.  So

11 how big do I need to make my bag filter?  How many tubes do I

12 need to have?  Okay.

13      So when I take the number that's here in the Basic Data

14 and I take my total gas flow, how much gas I've got flowing

15 through it, I can tell you exactly how many square feet I've

16 got to have.  Each bag has got two- or three- or four-square

17 feet, so I figure out how many bags I have to have.  So I size

18 my whole bag filter using this particular piece of information

19 and total gas flow.

20 **Q.**   Okay.  Let's look at the next reference.  And this

21 identifies a material of construction for the bags?

22 **A.**   Yes, it does.

23 **Q.**   And is that information found in G in the Basic Data

24 Document?

25 **A.**   Yes, it is.

**DAYTON - DIRECT / AXELROD**

1  **Q.**   Okay.  And same question about the significance of the

2  material of construction?

3  **A.**   This is really an experience issue.  There's many

4  different materials that you can use to make bags.  You can

5  make them out of cloth.  You can make them out of fiberglass,

6  actually.  Or in this particular case, we've got a different

7  material.

8      And so we found that this material works the best in that

9  application, and gives us the longest life, because just like

10  your bag in your vacuum cleaner at home it wears out, okay.

11  These are something you have to replace from time to time, so

12  you'd like to not replace them for as long as you possibly can.

13  **Q.**   And let's go to the next reference.  This has to do with

14  designing for a particular pressure?

15  **A.**   Yes.

16  **Q.**   Do you see that --

17  **A.**   Yes.

18  **Q.**   -- in purple?

19      Is that information also in the Basic Data?

20  **A.**   Yes.  It's under H.

21  **Q.**   Okay.  And the numbers look a little bit different, right,

22  in the --

23  **A.**   Yes.  One is in inches of water pressure, and the other is

24  in psi.  They are the same.

25  **Q.**   Okay.  And let's look at the next reference.  Okay.

1       So this talks about, this orange text in the email talks

2   about how to fasten the bags?

3   **A.**   Yes.  This is a fastening system.

4   **Q.**   Okay.  And what's the significance of that system, are

5   they different systems?

6   **A.**   There are a number of different systems that you can use

7   for clamping these bags into the -- onto the tube sheet.  You

8   could use a regular band clamp like you buy at the hardware

9   store.  They don't hold up well in this system.

10      There's other ways of doing it.  We found that this

11  particular way is the best way to do it, to make it easy for

12  our maintenance guys when they have to go take these big, long

13  bags -- some of them are 10, 12 feet long; they are really kind

14  of hard to handle -- to get them off and be able to put the new

15  ones on.

16  **Q.**   I believe that that's it for Exhibit 112.

17      Did you -- did you look at Exhibit 125?

18  **A.**   Yes, I did.

19  **Q.**   And does Exhibit 125 have references that are found in the

20  Basic Data Document?

21  **A.**   Yes, it does.

22  **Q.**   And at what pages?

23  **A.**   197, 200, and 202.

24  **Q.**   Let's take a look.

25      (Document displayed.)

**DAYTON - DIRECT / AXELROD**

1   **Q.**   And this 125 is about slurry viscosity; is that right?

2   **A.**   That's correct.

3   **Q.**   Okay.  And the first reference is to a pH range.  Do you

4   see that?

5   **A.**   Yes.

6   **Q.**   Is that specific information found in the Basic Data

7   Document?

8   **A.**   Yes, it is.

9   **Q.**   Okay.

10         **MR. AXELROD:**  And maybe we could highlight that.

11         **THE WITNESS:**  It's in three places there.

12  **BY MR. AXELROD:**

13  **Q.**   So it's in C, F, and II A?

14  **A.**   Yes.

15  **Q.**   Okay.  What's the significance of these pH ranges, and the

16  average?

17  **A.**   Again, we kind of touched on this once previously.  This

18  is -- this is acidic material.  7 is neutral, okay, so anything

19  less than 7 is acid.  And the range that we're got here

20  dictates the materials of construction we can use in this

21  pumping and piping system.

22  **Q.**   Okay.  So you have to design around -- if you know what

23  your pH is going to be, that will help you select the materials

24  for that piece?

25  **A.**   Yes.

**DAYTON - DIRECT / AXELROD**

1  Q.    Okay.  Let's look at the next reference.  And it's got a

2  range.  Could you describe it?  I'm looking --

3  A.    Yeah.  This is the concentration of dissolved chlorine --

4  Q.    I see.

5  A.    -- in the slurry.

6  Q.    And is that specific information in the Basic Data at F?

7  A.    Yes.

8  Q.    Okay.  What's the significance of that concentration of

9  dissolved chlorine?

10  A.    Again, like the pH, it helps us pick the materials of

11  construction that we're going to be handling.  Some material --

12  materials will handle low pH's, but they won't handle low pH's

13  with chlorine in them.

14      So other materials, you have to pick something that will

15  handle both the pH and the chlorine.

16  Q.    I see.  And let's go to the next one, which is a range of

17  chlorides?

18  A.    Yes.

19  Q.    Is that information also found -- I think it is right

20  there -- in F?

21  A.    Yes, it's in F.

22  Q.    Okay.  Same idea --

23  A.    Very much, yes.

24  Q.    Okay.  So you need to know if your material construction

25  can fit that criteria.

1    Let's look at the next one.  Now, this identifies

2  particular grams per liter of TiO2 to water?

3  **A.**   Yes, that's correct.

4  **Q.**   Okay.  And is that specific information found in section

5  III of the Basic Data?

6  **A.**   Yes, it is.

7  **Q.**   And what's the significance of that information?

8  **A.**   This information gives us the density of the solution,

9  which in turn we would use to determine the horsepower of the

10  pump we need to move the slurry with.

11  **Q.**   And I believe there's one more on this document.  It's

12  density.  Do you see that, or density range?

13  **A.**   Yes, I do.

14  **Q.**   And is that specific range found in section B of the Basic

15  Data?

16  **A.**   Yes, it is.

17  **Q.**   What's the significance of that information?

18  **A.**   The –– what they call bulk density is utilized if you use

19  a screw conveyor or you use a –– other feeding device.  You

20  need to know how much volume you're going to be passing through

21  it.  And that sizes that equipment.  And this gives you,

22  actually, the volume that will be passing through it during our

23  operation.

24  **Q.**   And I believe that that takes us through 125.

25    And the next one is Exhibit 79.  Did you look at Exhibit

1    79?

2    **A.**    Yes, I did.

3    **Q.**    And did that contain information found in the Basic Data

4    Document?

5    **A.**    Yes, it did.

6    **Q.**    At what page?

7    **A.**    287.

8    **Q.**    And let's take a look at that.

9         (Document displayed.)

10   **BY MR. AXELROD:**

11   **Q.**    And specifically the exhibit, the email, talks about

12   packers, right?

13   **A.**    Yes.

14   **Q.**    And then it has a bunch of information about packing

15   manufacturers and specific equipment requirements.  Do you see

16   that?

17   **A.**    Yes, I do.

18   **Q.**    Is that information all found in the Basic Data Document?

19   **A.**    Yes, it is.

20   **Q.**    And what's -- so the first piece, I guess, there is the

21   identification of the supplier --

22   **A.**    Uhm, yes.

23   **Q.**    -- and some the requirements?

24   **A.**    Yes.

25   **Q.**    Where's that?

**DAYTON - DIRECT / AXELROD**

1  **A.**   It talks about the capacity.

2  **Q.**   Okay.  And that's in A?

3  **A.**   In A, yes.

4  **Q.**   And what's the significance of the capacity information?

5  **A.**   This tells us what -- what -- how much we can pack from

6  each one of these machines.  So each of the bags is either

7  going to be 50 pounds or 25 kilograms.

8      So if you know that you're packing a 50-pound bag and

9  doing five per minute, you can actually do the math and come up

10  with how much capacity you can pack on one of these systems.

11  **Q.**   And it also identifies a particular supplier?

12  **A.**   Yes, it does.  St. Regis.

13  **Q.**   What's the significance of a particular supplier, one over

14  the other?

15  **A.**   Some companies have better equipment than others.  And,

16  you know, we've settled on this particular company's packing

17  equipment.  We've tried some other company's equipment.  It

18  wasn't as good, wasn't as reliable.  High maintenance costs.

19  So we settled on this particular company's because they have a

20  better system.

21  **Q.**   And then the next piece in this exhibit is sort of like an

22  equipment list?

23  **A.**   Yes.

24  **Q.**   Do you see that?  And is that same list found in the Basic

25  Data Document at C?

DAYTON - DIRECT / AXELROD

1   **A.**   It's under C, yes.

2   **Q.**   Okay.  What's the significance of having that equipment

3   list?

4   **A.**   This –– this is all the pieces of equipment that goes in a

5   St. Regis packing system.  So we've got an identical match here

6   as you go down the list.

7   **Q.**   Okay.  And I believe that that's –– that's it for Exhibit

8   79.

9        Did you look at Exhibit 73?

10  **A.**   Yes, I did.

11  **Q.**   And did you find that Exhibit 73 contained information

12  found in the Basic Data?

13  **A.**   Yes, it did.

14  **Q.**   At what page?

15  **A.**   Page 12.

16  **Q.**   And let's take a look at that.

17        **MR. AXELROD:**  Pull up 73.

18        (Document displayed.)

19  **BY MR. AXELROD:**

20  **Q.**   Okay.  And 73, the title of the document is "TiO2

21  Producer's Raw Material Tabulation."

22        Do you see that?

23  **A.**   Yes.

24  **Q.**   And then is that information found in the Basic Data

25  Document?

**DAYTON - DIRECT / AXELROD**

1  **A.**   All the way down through coal.

2  **Q.**   Okay.  So from the first one down to coal, is that all the

3  same information that's contained in Basic Data?

4  **A.**   Yes, it is.

5  **Q.**   Okay.  And what's the significance of having that

6  particular raw material requirement?

7  **A.**   This -- this will tell you a great deal about the cost of

8  operating the DuPont plant.

9  **Q.**   Okay.  How so?

10  **A.**   One can go get the prices for each one of these

11  commodities.  And if you know how many -- how much you're going

12  to use for every ton of TiO2, and you have a 60,000-ton per

13  year plant, you take this number times 60,000 times the price

14  of the material or the electricity or coal, or whatever, and

15  you know exactly what each one of them is going to cost you for

16  a whole year.  So this gives you all of the variable costs for

17  the plant, and takes you a long ways to being able to make up a

18  competitive cost sheet.

19  **Q.**   And Exhibit 74, I believe, is the same table; is that --

20  if we can look, I believe --

21  **A.**   I believe it is, also.

22  **Q.**   Okay.  And the same reference in the Basic Data Document.

23      So let's go to Exhibit 55.  Did you look at Exhibit 55?

24  **A.**   Yes, I did.

25  **Q.**   And can you find references there that were found in Basic

1    Data?

2    **A.**    Yes, I did.

3    **Q.**    At page 25?

4    **A.**    Page 25.

5    **Q.**    Let's take a look at 55.  And let's go to the first

6    reference.

7         (Document displayed.)

8    **Q.**    Okay.  So the reference in Exhibit 55, it says,

9    "Personnel."  And it says, "The projection for personnel at

10   DuPont's Kuan Yin plant was," and then a series of numbers

11   follows, right?

12   **A.**    Yes.

13   **Q.**    Is that information found in the Basic Data Document?

14   **A.**    Yes, it is.

15   **Q.**    And where is that found?

16   **A.**    It's in a table that doesn't show at the moment.

17   **Q.**    Let's --

18   **A.**    I think what they're doing is matching -- there we go.

19   Thank you.

20   **Q.**    So if you look, for example, there's a number at the top

21   there of the -- where it says, "The projection for personnel at

22   DuPont's Kuan Yin plant was," and then there's a specific

23   number.  If you look down the bottom right of the Basic Data

24   Document, is that number there?

25   **A.**    Yes, it is.

DAYTON - DIRECT / AXELROD

1  Q.   And then there's some breakout, some of the information is

2  broken out in Exhibit -- are there matches to the information,

3  you know, the way the personnel is broken out?

4  A.   Yes, there is.

5  Q.   Okay.  And do you -- let's see.  The first one talks about

6  management?

7  A.   Yeah.  The management is the sum of the last two lines.

8  Q.   Okay.  And then the next one says --

9  A.   Production is the sum of the second and third line.

10  Q.   Okay.  And then the next one is support?

11  A.   Okay.  You've got it highlighted there.  It's the fifth

12  and sixth lines.

13  Q.   And then lab?

14  A.   Yeah, the lab doesn't match up exactly with the fourth

15  line because whoever made the table made a typographical error

16  in the "total" line.  13 and 8 and 1 is not 18, okay.

17  Q.   I'm sorry, you're saying a typo in the Basic Data or --

18  A.   It's in the Basic Data.

19  Q.   And then maintenance?

20  A.   Maintenance is the top line.

21  Q.   Okay.  And safety?

22  A.   It's the remaining line.

23  Q.   Okay.  And I believe that that is it for Exhibit 55.

24  Okay.

25       And then did you look at Exhibit 56?

1    **A.**    Yes.  I think it's the same information.

2    **Q.**    Okay.  I think you're right.  But let's take -- oh, no,

3    let's take a look.  On the left is Exhibit 56, and you'll see a

4    reference in handwriting to DuPont.  And it's got some numbers,

5    and it's got the same -- some of the same numbers as the Basic

6    Data, right?

7    **A.**    That's correct.  Whoever wrote this recognized that the

8    lab personnel number was not added correctly and fixed it.

9    **Q.**    Let's go to the next one.

10       (Document displayed.)

11   **BY MR. AXELROD:**

12   **Q.**    Okay.  Did you look at Exhibit 58?

13   **A.**    Yes, I did.

14   **Q.**    And did 58 contain any references found in the Basic Data

15   Document?

16   **A.**    Yes, it did.

17   **Q.**    And at what page?

18   **A.**    177.

19        **MR. AXELROD:**  And can we pull up 58, please.

20       (Document displayed.)

21   **BY MR. AXELROD:**

22   **Q.**    And so 58 is some handwritten notes.  And the first

23   reference there identifies -- so there's some texts.  It says,

24   "Kuan Yin scaleup," and then it's got some numbers.  Do you see

25   that?

**DAYTON - DIRECT / AXELROD**

1   **A.**   Yes, I do.

2   **Q.**   And does that reflect information from the Basic Data

3   Document?

4   **A.**   Yes, it does come from the Basic Data.

5   **Q.**   Does it come from section VI A?

6   **A.**   Yes, it does.

7   **Q.**   And we talked about this figure before, right?  This is

8   the heat transfer number for the flue pump?

9   **A.**   That's correct.

10  **Q.**   So what's -- what's the scaleup?  What's the -- what's the

11  use of that number right there?

12  **A.**   What is being attempted to do is take this area for a

13  55,000-ton per year plant and scale it up for a hundred

14  thousand ton per year plant.

15  **Q.**   Okay.  And then that gives you a number?

16  **A.**   Yeah.

17  **Q.**   I see.  Are there any other references?

18  **A.**   Yes, there's one, at least.

19  **Q.**   And this is the reference to that length of pipe that we

20  talked about earlier, I think it's B3?

21  **A.**   That's correct.

22  **Q.**   And is there more of that scaleup-type analysis going on

23  there?

24  **A.**   Yes, there is.

25  **Q.**   And did you look at Exhibit 135?

1    **A.**    Yes, I did.

2    **Q.**    What -- did you find references in 135 to information

3    contained in the Basic Data Document?

4    **A.**    Yes, I did.

5    **Q.**    On what pages?

6    **A.**    140, 141, 168, 175, and 188.

7              **MR. AXELROD:**  And let's bring that up.

8         (Document displayed.)

9    **BY MR. AXELROD:**

10   **Q.**    Okay.  So on the left side we've got the Exhibit 135.  So

11   let's take a look at the first reference.  Okay.  And the top

12   of it says "Oxid Stor Bins."  Do you see that?

13   **A.**    Yes, I do.

14   **Q.**    What's that?

15   **A.**    That's the bins that are in the oxidation area for some of

16   the additives.

17   **Q.**    And it says "aluminum pellets" on Exhibit 135.  Do you see

18   that?

19   **A.**    Yes.

20   **Q.**    Okay.  And then is there a reference -- there's got a

21   particular range of PPH?

22   **A.**    Yes.

23   **Q.**    Is that information found in the Basic Data Document?

24   **A.**    It's -- yes, because -- it shows much higher, but this is

25   for a 30,000-ton calculation, and the Basic Data is for 60.  So

DAYTON - DIRECT / AXELROD

1    the number is exactly half.

2    **Q.**   So if you cut the Basic Data reference in half, you get

3    the number that's in Exhibit 135?

4    **A.**   That's correct.

5    **Q.**   Okay.  And what's the next reference?  And I should ask

6    you, what's the significance of that information?

7    **A.**   Well, one of the things that you do when you design a

8    plant, you don't design the operation for a single point.  You

9    have to have a high and a low, to be able to size the

10   equipment.  And this gives you that high and that low for this

11   particular piece of equipment.  And this is something that we

12   would never, ever publish.

13   **Q.**   Okay.  And let's go -- there's another reference in here

14   to -- there's a density with the specific figure.

15   **A.**   Yes, there is.

16   **Q.**   And is that specific density figure found in the Basic

17   Data at section C?

18   **A.**   Yes, it is.

19   **Q.**   What's the significance of that information?

20   **A.**   That tells you how strong you need to make your bin.  The

21   higher the density, the stronger you have to have the bin so

22   that it doesn't fail when you fill it up.

23   **Q.**   I see.

24            **THE COURT:**  Is this a good time to take a break?

25            **MR. AXELROD:**  Yeah, this is a good time.

1    **THE COURT:**  Ladies and gentlemen, we're going to take

2    our 15-minute break.  We're going to quit at 2:45.  Remember

3    the Court's usual admonitions.  Keep an open mind and we'll see

4    you in 15 minutes.

5        (Proceedings were heard out of the presence of the jury:)

6        **THE COURT:**  How much more time do you have with this

7    witness?

8        **MR. AXELROD:**  We're getting there, Your Honor.  I

9    don't know if I'm going to finish today.  I'll do my best, but

10   we'll see how it goes.  We're making huge progress but, you

11   know, we're not quite there yet.

12       **THE COURT:**  All right.  Well, my plan is at the end of

13   the day after we dismiss all of the jurors, except for

14   Number 7, we'll bring him out and see how he's doing.  I want

15   to ask him what time he has to pick up his child so that we'll

16   know whether we have a possibility of sitting different hours

17   on Monday, if that would solve anything.

18       So I'll question him after we release the rest of the

19   jurors for the afternoon.

20       Yes, Mr. Froelich?

21       **MR. FROELICH:**  May I make a suggestion?

22       **THE COURT:**  Sure.

23       **MR. FROELICH:**  Maybe if you talk to him and ask him to

24   talk to his family about -- you know, and then talk to him

25   tomorrow morning, he might have a little more information.

1    **THE COURT:**  That's a good idea.  But I do want to ask

2    him about how he's feeling today, kind of while it's fresh in

3    his mind, just for a couple of minutes; and then I'll ask him

4    to please think about it, talk to his family, and we'll talk to

5    him before we go into session.

6        I wanted to inform Mr. Liew's team that the Court arranged

7    a 3:30 appearance before Judge Cousins, and I'm also alerting

8    the marshals that Mr. Liew needs to be present at that, and I'm

9    letting the Government know as well.

10       And Judge Cousins has been informed of the Court's views

11   about release and what's required, and he'll go over that with

12   you.

13       All right?  See you later.  Fifteen minutes.

14       **MS. AGNOLUCCI:**  Thank you, Your Honor.

15                  (Recess taken at 1:32 p.m.)

16              (Proceedings resumed at 1:48 p.m.)

17   (Proceedings were heard out of the presence of the jury:)

18       **THE COURT:**  Please bring the jury in.

19   (Proceedings were heard in the presence of the jury:)

20       **THE COURT:**  Please be seated.

21   You may continue.

22       **MR. AXELROD:**  Thank you, Your Honor.

23   **Q.**  Mr. Dayton, before the break, we were looking at

24   Exhibit 135 and looking at references to the Basic Data

25   Document, and we talked about the bulk density.

**DAYTON - DIRECT / AXELROD**

1    If we could, Mr. Hemann, if we could bring up the next

2    reference.

3        Okay.  And this has to do with a particular use of a

4    particular material and a density.  Do you see that,

5    Mr. Dayton?

6    **A.**    Yes, I do.

7    **Q.**    And is that found -- there's a reference in Section A to

8    Basic Data?

9    **A.**    Yes, there is.

10   **Q.**    And can you explain the significance of that?

11   **A.**    It's very similar to the bulk density we looked at

12   earlier.  This would give you information on how strong you

13   need to design your bin, how much weight it needs to be able to

14   handle.

15   **Q.**    Okay.  Now, you're talking about bends.  Are those bends

16   in --

17   **A.**    These are bins, containers, vessels.

18   **Q.**    Okay.  And can we go to the next reference?

19       And you'll see in the note in the purple there's a number

20   and then it says "cone" and then there's a reference, I

21   believe, in Section D of Basic Data.  Do you see that?

22   **A.**    Yes.

23   **Q.**    And is it the same number?

24   **A.**    Yes, it is.

25   **Q.**    And what's the significance of that information?

1   **A.**   This is the angle that the cone has to be to be able to

2   get the material to flow out to the outlet.

3   **Q.**   Okay.

4   **A.**   If you had a lower angle, the material would bridge over

5   and it wouldn't go to the outlet.

6   **Q.**   And let's go to the next reference.

7        So now we're talking about oxidation bag filters; is that

8   right?

9   **A.**   That's correct.

10  **Q.**   And this references a ratio.  Do you see that?

11  **A.**   Yes, I do.

12  **Q.**   Is that ratio found in the Basic Data Document at

13  Section B?

14  **A.**   Yes, it is.

15  **Q.**   And what's the significance of that ratio?

16  **A.**   This is the -- how much gas you can have through a square

17  foot of filter.  We discussed this previously.

18  **Q.**   Okay.  And let's go to the next reference.

19        And the Exhibit 135, it says, "Flue Pond Size."  Do you

20  see that?

21  **A.**   Yes.

22  **Q.**   And then it has -- it says, "Gas in pipe," and then it's

23  "Delta T," and then it's got some numbers?

24  **A.**   Yes.

25  **Q.**   And are those numbers found in the Basic Data Document in

1  the flue pond section?

2  **A.**  Yes.  They're under "Function."

3  **Q.**  Okay.  And what's the significance of those numbers?

4  **A.**  This gives you the inlet and outlet temperatures of the

5  pond.  And, you know, again you get an overall amount of heat

6  that you have to remove once you know the mass of solids that's

7  going through it, and it will help you size the pond system.

8  **Q.**  And I believe there's one more reference.

9      Okay.  And this references Altamira and identifies a

10  particular number for a particular duty.  Do you see that?

11  **A.**  Yes, I do.

12  **Q.**  And is that information found in Basic Data?

13  **A.**  Yes, it is.

14  **Q.**  Where?

15  **A.**  It's under A.

16  **Q.**  Okay.  So the numbers -- it's in A?

17  **A.**  Yes.  They're not -- they're not in the same units.

18  **Q.**  Well, I guess there's a number in feet squared --

19  **A.**  Yes.

20  **Q.**  -- and that number is in C; right?

21  **A.**  That's correct.

22  **Q.**  And then there's a number in Exhibit 135 that's in BTUs

23  per hour.  Do you see that?

24  **A.**  Yes.

25  **Q.**  And then it's a slightly different number that's in KCAL

**DAYTON - DIRECT / AXELROD**

1    per hour?

2    **A.**   Yes.  That's a metric unit.  And those are the same amount

3    of heat.

4    **Q.**   Okay.  Just different --

5    **A.**   One is an English unit, the other is a metric unit.

6    **Q.**   I understand.

7         What's the significance of that information?

8    **A.**   It tells you, given the area of the flue pond, how much

9    heat you can remove from it.  And you could actually use this

10   to size a pond for different capacities.

11   **Q.**   And I believe that's the last reference for this chart.

12        **MR. AXELROD:**  And with that, Your Honor, the

13   Government offers Exhibit 918, which is this summary chart,

14   into evidence.  This is just the same information that was

15   displayed.

16        **THE COURT:**  Any objection?

17        **MR. GASNER:**  No objection.

18        **MR. FROELICH:**  None, Your Honor.

19        **THE COURT:**  All right.  It's admitted.

20        (Trial Exhibit 918 received in evidence)

21        **MR. AXELROD:**  Maybe we'll put this up here

22   (indicating).

23   **Q.**   And I wanted to ask you, Mr. Dayton, we've now been

24   through a number of references in the Basic Data Document, and

25   are all the pieces of information in the Basic Data Document of

DAYTON - DIRECT / AXELROD

1    equal importance?

2    **A.**    No, they're not.

3    **Q.**    Okay.  Could you explain?

4    **A.**    You can have a whole range of information.  You can have

5    something -- and we just looked at some bulk densities.  The

6    bulk densities you probably could look up in a book.  You have

7    information that came from patents that's in there.  You have

8    information that came from the DuPont trade secrets.

9         And think about the discussion we've had about the best

10   practices we've had from some of our sites.  We've looked at

11   several examples where we took things from Johnsonville or

12   Antioch or Edgemoor or DeLisle.  And the experience on

13   materials of construction of what works best in each of the

14   pieces, those are not public.

15        So we have a range of information that's in there.  I

16   think the important thing is, this is all the information in

17   one spot that you need.  It's both the stuff that's public, the

18   things that are from patents, and the trade secrets all in one

19   document so that you're able to do a design.

20   **Q.**    Could some of the information that's in the Basic Data

21   Document be figured out by a chemical engineer just based on

22   public information?

23   **A.**    Yes, some of it.

24   **Q.**    Okay.  And how about the rest of it?

25   **A.**    A lot of the information, particularly that that is based

1    on the experience of the operation, an engineer would not be

2    able to do independently.  He may come up with a different

3    solution.  He may think some other alloy or different pump

4    model works, or what have you.  And we've seen that with the

5    competition; that they put facilities together that either

6    don't run or run very poorly, and they have to go through that

7    same learning curve that DuPont did.

8    Q.    Now, Kuan Yin was a greenfield facility; right?

9    A.    Yes.

10   Q.    So what does that mean?

11   A.    Greenfield is basically you think of a field covered with

12   grass and you've got nothing, and you go out and you build an

13   entire plant.  So you build everything.  You've got to put up

14   the roads.  You have to put in the fences, the administration

15   buildings and, of course, all the process equipment.

16   Q.    And when DuPont builds a new plant or you talked about

17   adding lines on some of the facilities you worked at, does it

18   start from scratch every time?

19   A.    No, absolutely not.

20   Q.    What does it start with?

21   A.    We take all the experience that we've developed since we

22   started this process, we started operating in 1948, all the

23   experience that we've developed over this time period and

24   utilize that in our Basic Data Document.

25          We don't -- if we were going to start from scratch and not

1    utilize our experience, we'd have very poor project results.

2    **Q.**   So when it came to Kuan Yin, was DuPont confident that

3    Kuan Yin would work to DuPont standards when the plant opened?

4    **A.**   Yes.

5    **Q.**   Why?

6    **A.**   Again, we're starting based on all of our experience.

7    We're utilizing the best information from every site we could

8    get.  We had a really good project team and, you know, the

9    design was very sound on that plant.

10   **Q.**   I want to move on from the Basic Data Document and talk

11   about some other documents with you.

12              **MR. AXELROD:**  And, Your Honor, what I'd like to do,

13   with the Court's permission, is to display Exhibit 7, which is

14   one of the flow sheets, and have Mr. Dayton come down and talk

15   through it.

16              **THE COURT:**  All right.

17                     (Pause in proceedings.)

18   **BY MR. AXELROD:**

19   **Q.**   And, Mr. Dayton, do you recognize that document?

20   **A.**   Yes, I do.

21   **Q.**   What is it?

22   **A.**   It's a system flow sheet for the Edgemoor oxidation area.

23   **Q.**   Okay.  Could you describe -- first of all, flow sheets for

24   DuPont, are they often referred to as pink sheets?

25   **A.**   Back in the day when everything was manual copies, we were

**DAYTON - DIRECT / AXELROD**

1   only allowed to reproduce these on pink paper.  So that if

2   somebody left them out on their desk, for example, at night

3   when they went home and we would go through and do an audit, it

4   would just leap out and realize that the thing is sitting

5   there; and it would get confiscated, and the guy would be in

6   his boss' office the next morning getting talked to very

7   strongly.

8   **Q.**   Okay.  And this particular flow sheet, what facility is it

9   from?

10  **A.**   It's from Edgemoor, Delaware.

11  **Q.**   And what's the security classification for that document?

12  **A.**   This is confidential special control.

13  **Q.**   Okay.  And we talked about that.  That's the highest

14  designation?

15  **A.**   That's the highest level there is, yes.

16       **THE COURT:**  Again, please wait for the question to be

17  finished.

18       **THE WITNESS:**  I'm sorry, sir.

19       **THE COURT:**  Thank you.

20  **BY MR. AXELROD:**

21  **Q.**   I want to ask you to describe -- to explain the document.

22  It looks like there's two parts.  On the top there's sort of it

23  looks like a spreadsheet almost with a series of columns and

24  numbers; right?

25  **A.**   Yes.

1    Q.    Do you see that?

2          And then below it there's a diagram?

3    A.    Yes.

4    Q.    So could you start with the diagram and describe to the

5    jury what we're looking at?

6    A.    Okay.  What we've got here -- and I hope you can all hear

7    me because I have to kind of turn away from the microphone --

8    we have a representation of all the pieces of equipment that's

9    in the oxidation area at Edgemoor, Line 2.

10         So the pure TiCl from the purification area comes in right

11   here (indicating).

12         MR. FROELICH:  Excuse me, Your Honor.  I'm a little

13   bit worried about the record just by saying, "It comes in right

14   here."

15         THE COURT:  Yes, that's exactly right.  We need to

16   know exactly.  If we can describe in word pictures.

17         MR. AXELROD:  I will.  Thank you.

18         THE COURT:  All right.

19   BY MR. AXELROD:

20   Q.    Mr. Dayton, as you're talking through this, we need to

21   make sure that we capture a record of what you're looking at.

22   A.    Okay.

23   Q.    So if you could describe in particularity where you're

24   looking; or if you don't know, I'll ask some follow-up.  It's

25   important that all of that's clear.

 1              **THE COURT:**  And also you may not -- since this is an

 2     exhibit, you can't mark on that.

 3              **MR. AXELROD:**  Right.  No.

 4              **THE WITNESS:**  Right.  I have the cap on, sir.

 5              **THE COURT:**  Oh, okay.  I was worried about that.

 6              **THE WITNESS:**  I was kind of using this as a pointer

 7     because I didn't see the pointer.

 8              **MR. AXELROD:**  There is a pointer.

 9              **THE WITNESS:**  Is there?  Oh, it's over here.  Even

10     better.  Thank you.

11              **THE COURT:**  All right.

12     **BY MR. AXELROD:**

13     **Q.**   Okay.  So you were starting in the upper left corner of

14     the diagram there.

15     **A.**   That's correct.

16     **Q.**   Okay.

17     **A.**   So the pure TiCl comes into the building, and it gets

18     vaporized in a piece of equipment right here (indicating).

19     **Q.**   And that's in the upper left?

20     **A.**   And this is the upper left corner.

21     **Q.**   Okay.

22     **A.**   And, so, what we see is we see all the pieces associated

23     with this piece of equipment.  It shows all the pipelines.  It

24     shows all the sizes of the pipelines.  It shows the instruments

25     that are associated with this piece of equipment to the point

1    you can tell which type of instrument it is.  You can tell what

2    kind of a flow meter you have.  You can tell where you have

3    control valves.

4          I know this is awfully small.  I'm sorry about that.

5          So you know everything to be able to almost design this

6    particular area.

7                MR. GASNER:  Objection, Your Honor.  Expert testimony.

8                THE COURT:  Overruled.

9                THE WITNESS:  So then we come out of this vessel

10   (indicating), and we go into another vessel where we've got

11   additional reaction going on.

12         And, again --

13   BY MR. AXELROD:

14   Q.   And that's in the center there?

15   A.   Yeah.  That's moving over.  We're kind of going a little

16   bit toward the right-hand side of the drawing.

17   Q.   And what's the name of that?

18   A.   This is called the G vessel.

19         Then the reaction goes on in there, and then it goes down

20   to the reactor vessel.

21   Q.   Okay.  And is that the oxidation reactor?

22   A.   This is the oxidation reactor that we've talked about.

23   Q.   And that's in the bottom right part of the center?

24   A.   Yes.

25   Q.   Okay.

**DAYTON - DIRECT / AXELROD**

1   **A.**   And also going into the oxidation -- remember we said we

2   were going to put oxygen into this step when we went through

3   our little block drawing earlier in the day.

4   **Q.**   Right.

5   **A.**   The oxygen comes in over here (indicating) again into a

6   vessel at the lower left-hand corner of the drawing.  It gets

7   heated up, okay, because we need this to be very, very hot for

8   our flame in here.  And it goes over and into the reactor

9   vessel itself as well.

10   **Q.**   So the information that's contained on that particular

11   drawing, it's more than of a general nature?

12   **A.**   Absolutely.  It's very detailed, to the point that we're

13   talking, as I mentioned, we have the diameters of the pipes.

14   We have all the instruments showing.  We have all of the

15   release systems showing.  We have how this system connects to

16   the other parts of the process.

17        As we go right over here (indicating), right above the

18   oxidation reactor, there are two lines here that shows where

19   this system connects to two other parts of the process.  And

20   one of them is where the chlorine -- remember I had mentioned

21   earlier the chlorine gets recycled back to the chlorinator.

22   That's one of the lines.  Another line here is used during our

23   startup operation.

24        And that's not revealed publicly anywhere and you will not

25   find that in any patent.

DAYTON - DIRECT / AXELROD

1   Q.    Okay.

2   A.    So then we have our flue pond here (indicating), which we

3   talked about, the flue pond, just a bit today.

4       And then we go into our collection system.  And, again,

5   we're seeing all the sizes, all the instruments, all the

6   purges.

7       There's many of our utility systems which, again, are not

8   public in patents are shown on this drawing so that we have all

9   of our connections for nitrogen, most of our connections for

10  water.  And those kinds of streams are shown exactly where they

11  tie into the process.

12      And then we talked about making -- mixing it with water.

13  That's over here (indicating) in the lower right-hand portion.

14      And then there's some scrubbing systems that's associated

15  with this particular area that's over in the extreme far right.

16  Those we have not talked about at all; and, again, they would

17  not be out in the public.

18  Q.    So let me ask you about the information in the upper part

19  of the drawing.

20          MR. HEMANN:  Mr. Axelrod, if we can get the computer

21  turned on, then I can highlight it.

22          MR. AXELROD:  Oh, great.

23          THE WITNESS:  The relationship --

24          MR. AXELROD:  If we could just wait.

25          THE COURT:  Just a moment.

1        **MR. AXELROD:**  Mr. Dayton, if you can just hold on for

2   one second, we're going to try to coordinate our -- oh, great.

3        Okay.  So, Mr. Hemann, if you could blow up the top half.

4   And, actually, first, this will be easier for the jury to see,

5   if you could blow up the bottom half so that they could see the

6   kind of sizes that Mr. Dayton was just talking about and

7   information.

8   **Q.**   Mr. Dayton, can you see the screen over there?

9   **A.**   No, I cannot.

10  **Q.**   Okay.

11  **A.**   Do you mind if I walk over and look real quickly?

12       **THE COURT:**  Well, no, you can't.

13       **THE WITNESS:**  I cannot?

14  **BY MR. AXELROD:**

15  **Q.**   Let's go to the top part.

16  **A.**   Okay.

17  **Q.**   Thank you.

18       And Mr. Hemann will blow up the top half.

19  **A.**   The relationship between the top part and the bottom part

20  is that there are numbers in a little circle on each one of

21  these pipelines, the flows going into various places.  And

22  across the very top of this is 1, 2, 3, okay, numbers across

23  the top.  Those numbers across the top relate to the various

24  numbers down in the body of this.  So that, for example, if I

25  was coming out of this G vessel, okay, this is number 6 at this

**DAYTON - DIRECT / AXELROD**

1  very point (indicating), and that matches up to number 6 up in

2  the table.

3  **Q.**  I see.

4  **A.**  So that's how we match up and find out where things are on

5  the print.

6  **Q.**  And the table, so there's a series of columns, each with

7  its own number; right?

8  **A.**  Each with its own number, exactly.

9  **Q.**  And each one of those numbers corresponds to a line number

10  on the drawing?

11  **A.**  That's correct.

12  **Q.**  Okay.  And then there's a whole bunch of data up there as

13  well?

14  **A.**  Yes.  Yes, there is.  And if we start at the top of this,

15  there's a little, what they call, process material or line

16  description, and that kind of gives you the title of what each

17  stream is.

18      And then you have physical state.  This would be gas,

19  liquid, solid.

20      Okay.  The flow rate, and there's actually two lines

21  there.  You can have your average flow rate and your maximum

22  flow rate, okay, that the equipment is designed for.  You can

23  have in pounds per hour.  The next one is in gallons per minute

24  or CFM.  Okay.  And that's cubic feet per minute.

25      So they don't have -- if you've got something that's a

**DAYTON - DIRECT / AXELROD**

1  volumetric flow rate, it would be in the second group of

2  things; and if it's in a weight flow rate, it would be in that

3  first group.

4       And then you have operating temperature and degrees

5  Centigrade, operating pressure in PSI.

6       And then the rest of this is a list of chemicals, and this

7  is -- each of these, if there is that chemical present in that

8  stream, they would have the weight in pounds per hour of that

9  chemical.

10 **Q.** What's the significance of that?

11 **A.** That gives us the composition of that stream.

12 **Q.** Okay.

13 **A.** So if you have a gas stream and you've got eight chemicals

14 in there, they have different weights, and we're able to

15 determine what's the density of that stream, what's the rest of

16 the composition of that stream based on how many different

17 chemicals are in it.

18 **Q.** And is that relevant to sizing equipment?

19 **A.** It's sizing equipment, sizing pumps, sizing compressors.

20 So we use that to be able to come up with our flows.  And,

21 also, it helps us as we go through this thing and try to make

22 sure everything adds up correctly.

23 **Q.** Okay.

24 **A.** Because you put something in at one spot, it has to go

25 somewhere.

DAYTON - DIRECT / AXELROD

1   **Q.**   Okay.

2   **A.**   So you have to make sure this all adds up and you've not

3   made a math error as you've gone through.

4   **Q.**   And that process, that chart on the top, does that have a

5   name in the engineering world?

6   **A.**   We would call that a flow tabulation.

7   **Q.**   Okay.  And the information that's in it, does it correlate

8   to that particular drawing in that particular oxidation area?

9   **A.**   Yes, it's specific to this oxidation area.

10  **Q.**   And it's populated -- each one of these lines is populated

11  by specific flow rates and temperatures, and things of that

12  nature; right?

13  **A.**   That's correct.

14  **Q.**   Is that significant to the process?

15  **A.**   It is.  The oxidation areas are not all of the same

16  capacity.  They don't all run at the same pressure.  Each one

17  is designed to do certain things.  And, you know, this

18  particular case, this particular oxidation area was designed to

19  make a specific product, which we don't make anymore, but we've

20  actually modified it to make other products.

21  **Q.**   Now, I want to ask you to stay up there for a moment, and

22  we're going to pull up Exhibit 70.

23      And Exhibit 70, if you could blow that up, Mr. Hemann.

24      It references -- let me get -- this might be easier for

25  you, Mr. Dayton.

**DAYTON - DIRECT / AXELROD**

1  **A.**  Oh, thank you.  I was wondering how I was going to do it.

2  **Q.**  So I'm handing you Exhibit 70, and in Exhibit 70 -- and

3  you've seen this document before?

4  **A.**  Yes, I have.

5  **Q.**  Okay.  And it references, it says -- it references -- it

6  says:  (reading)

7         "Since the amount of aluminum is not shown in your

8      flow sheet," and this is an email from Mr. Liew to

9      Mr. Maegerle, it says, "I checked this with the reference

10     sheet I got from Spitler.  The values used there are..."

11     And there's two lines.  You see one says, "AlCl3 generator

12  inlet," and then it then has a series of numbers?

13  **A.**  Yes, I see that.

14  **Q.**  Have you been able to identify those specific numbers on

15  that specific drawing?

16  **A.**  Yes, I did.

17  **Q.**  Okay.  And could you show -- you don't have to say the

18  specific numbers, but can you show where they are?

19  **A.**  Okay.  The first number is right there in item 3.

20  **Q.**  So that's in the third column.  Okay.

21  **A.**  The second number is in item 5.

22  **Q.**  Okay.

23  **A.**  And the third number is in item 4.

24  **Q.**  And there's another reference in Exhibit 70 to -- I think

25  you just did the inlet numbers; right?

**DAYTON - DIRECT / AXELROD**

1  **A.**   That was just the first line, yes.

2  **Q.**   Okay.  Then there's another one for the outlet?

3  **A.**   There's another one for the outlet, yes, sir.

4  **Q.**   And could you show the jury -- were you able to match

5  those numbers up to that exhibit?

6  **A.**   Yes, I was.

7  **Q.**   And can you show the jury where those are?

8  **A.**   Certainly.

9       These are all in item 6.  This is the compliance stream.

10  As I mentioned, if you have six or eight different chemicals in

11  a stream, it all shows up in one column on that table.

12  **Q.**   I see.

13  **A.**   It's all one stream, so all of these numbers are under

14  item 6 in this table right here (indicating).

15  **Q.**   Okay.  Thank you.

16       I am going to ask you to stay up there for a moment, and

17  I'm going to put up a different exhibit, with the Court's

18  permission.  This is Exhibit 1.

19            **THE COURT:**  Yes.  Yes, you may.

20            **MR. AXELROD:**  Thank you.

21  **Q.**   Actually, before we leave Exhibit 7, I wanted to ask you

22  if you could look in the bottom right corner of that document.

23       Can you tell, is that a final drawing?

24  **A.**   I believe it is.  What had happened, when we had manual

25  drawings, the engineer had to physically sign the block that it

**DAYTON - DIRECT / AXELROD**

1   was complete.

2       This is -- this was done on a computer.  And many times we

3   had complete drawings, the engineers did not have the

4   capability in the early days to go on the CAD system and put

5   their initials in.  And they -- they -- because of that,

6   sometimes drawings got issued without the initials typed into

7   'em.

8   **Q.**   Okay.  Now I'm going to bring up Exhibit 1.  Let me just

9   put this up and ask, do you recognize that document?

10  **A.**   Yes, I do.

11  **Q.**   What is it?

12  **A.**   It's an incomplete flow sheet of the Edgemoor reaction

13  area.

14  **Q.**   Okay.  And is it the same reaction area that we were just

15  looking at?

16  **A.**   No.  We were looking at oxidation on the other -- this is

17  where the chlorinator is.

18  **Q.**   This is the chlorinator?

19  **A.**   Yes.

20  **Q.**   And what's the -- could you describe, again, I see on the

21  top there's a block.  It appears to be empty, right?

22  **A.**   Yes, it is.

23  **Q.**   And then below that, in the bottom half of the drawing,

24  there are a series of lines.  Could you describe the

25  significance of that -- the drawing on the bottom half.

**DAYTON - DIRECT / AXELROD**

1    **A.**    Okay.  This particular drawing shows all of the major flow

2    streams in the reaction area.  So, for example, as we're at the

3    left edge of this, of this area, we have our coke and our ore

4    that we said we feed into the chlorinator.  So we have our bins

5    here in our feed system.  And then as we move across we have

6    our chlorinator, and then we go across into the condensing

7    system that takes the product from the chlorinator and cools it

8    down.

9        So this shows all the vessels, the tanks, the pumps.

10   Unlike the oxidation drawing that we looked at, it does not

11   show the instruments, it does not show many of the utility

12   streams.  And it does not show the pipe sizes in any great

13   detail.

14   **Q.**    There also appear to be some thick lines on there?

15   **A.**    Someone's used a Magic Marker or something on this

16   drawing.

17   **Q.**    Okay.  And are there numbers next to those lines,

18   handwritten numbers?

19   **A.**    Oh, yes, yes.

20   **Q.**    And do you know, do they correspond to anything in

21   particular?

22   **A.**    Uhm, from my experience, I would say this is from an

23   Aspen Plus, which is a software package to model chemical

24   plants.

25           **MR. GASNER:**  Objection, Your Honor.

DAYTON - DIRECT / AXELROD

1          **THE COURT:**  Sustained.

2          **MR. AXELROD:**  Thank you.

3    **BY MR. AXELROD:**

4    **Q.**    Are you familiar, through your work, with different

5    modeling, for example, associated with chemical processes?

6    **A.**    Yes, I am.

7    **Q.**    And is one of the ones that you're familiar with

8    Aspen Plus?

9    **A.**    Yes, it is.

10   **Q.**    And is Aspen Plus a program that you used during your time

11   working at DuPont?

12   **A.**    Yes, I did.

13   **Q.**    And can you describe that experience in general?

14   **A.**    We took that program and used it to model various sections

15   of the process.  And based on the output from that program, I

16   turned that into a design for a area that we built at the

17   New Johnsonville plant.  It's the last one I did.

18   **Q.**    Okay.  And could you just describe, at a very high level,

19   how Aspen Plus works.  What's, sort of, the concept?

20   **A.**    Aspen is a simulation program that you can put in tanks,

21   pumps, heat exchangers, various chemical operations, and it

22   simulates how they're going to work.  And so it will give you

23   the flow going in, the temperature going in.  Then you go

24   through whatever that particular unit of operation is and then

25   it gives you the outputs so you can actually model and size

**DAYTON - DIRECT / AXELROD**

1  various pieces of equipment.

2  **Q.**   And Aspen Plus, that's a -- that's a publicly available --

3  **A.**   Oh, yeah, anyone can buy it.

4  **Q.**   -- program?

5  **A.**   Yeah.

6  **Q.**   But I gather when you use it you can then modify it or

7  input information that's unique to the user?

8  **A.**   Absolutely.

9  **Q.**   And is that how you used it at DuPont?

10  **A.**   Yes, I did.

11  **Q.**   Okay.  And when you used it that way at DuPont, would you

12  correlate the lines with the program?

13  **A.**   Yes.  You have to give each line a designation.  If we

14  were looking one, two, three, you can't use something that

15  simple with a complicated computer program.  They have their

16  own system.

17  **Q.**   Okay.

18  **A.**   And that's one of the things that we have to do when we

19  set it up, we have to give each line a code.

20  **Q.**   Okay.  So going back to Exhibit 1 there, did the line

21  identifications that you were discussing relate, based on your

22  experience, to the Aspen Plus system?

23         **MR. GASNER:**  Objection, Your Honor.

24         **THE COURT:**  Sustained.

25         **MR. GASNER:**  And move to strike the earlier answer.

DAYTON - DIRECT / AXELROD

1           **THE COURT:**  The jury will disregard the earlier

2    answer.  The last answer given by the witness.

3    **BY MR. AXELROD:**

4    **Q.**   The -- in talking about this plan, and, you know, you

5    indicated that it didn't have quite -- it didn't have as much

6    information as the oxidation area plan, what's -- what's the

7    significance of this plan, sort of, in its current state?  Is

8    there still information of significance contained on it?

9    **A.**   There is --

10          **MR. GASNER:**  Object to the expert testimony.

11          **THE COURT:**  Sustained.

12   **BY MR. AXELROD:**

13   **Q.**   Mr. Dayton, why don't you go back up there.  And thank you

14   for looking at that drawing.

15        I wanted to show you Exhibit 38.

16          **MR. AXELROD:**  May I approach, Your Honor?

17          **THE COURT:**  Yes, you may.

18   **BY MR. AXELROD:**

19   **Q.**   And I'm handing you Exhibit 38.  And do you recognize that

20   document?

21   **A.**   Yes, I do.

22   **Q.**   Okay.  And this is in evidence.  This is -- it's an email

23   with a series of photographs?

24   **A.**   Yes, it is.

25   **Q.**   Okay.  And I want to ask you, I'd like to --

1           **MR. AXELROD:**   Mr. Hemann, if you could bring up page

2     2.

3           (Photograph displayed.)

4           **MR. AXELROD:**   And, Mr. Hemann, if you could blow up

5     that picture.

6     **BY MR. AXELROD:**

7     **Q.**   Mr. Dayton, do you recognize that photograph?

8     **A.**   Yes, I do.

9     **Q.**   Okay.  And what is it?

10    **A.**   These are oxidation flue bend elbows, consistent with what

11    we used at Edgemoor during the initial startup.

12    **Q.**   Okay.  And you've reviewed all the photographs in this

13    packet?

14    **A.**   Yes, I have.

15    **Q.**   And what's the significance of that photograph, of those U

16    bends?

17          **MR. GASNER:**   Objection.

18          **THE COURT:**   Overruled.

19          **THE WITNESS:**   The elbows are an internal DuPont

20    design.  They're not something that you would get out in -- by

21    a public vendor.  And specifically designed to hold up in the

22    very severe service in our flue pond.

23    **BY MR. AXELROD:**

24    **Q.**   And this -- you recognize this is from Edgemoor?

25    **A.**   Yes.

DAYTON - DIRECT / AXELROD

1    **Q.**   And you recognize it how?

2    **A.**   I worked at Edgemoor for nine years.  And one of my early

3    assignments was to run this area.

4    **Q.**   And what's -- what's the procedure for DuPont employees,

5    are they allowed to take pictures on the plant?

6    **A.**   You may take pictures, but you must go to the plant

7    manager and have him review them to take them off the site.

8    **Q.**   Okay.  And are you allowed to use them for other

9    non-DuPont purposes?

10   **A.**   Absolutely not.

11   **Q.**   And does this picture contain information that, you know,

12   you couldn't find elsewhere?

13            **MR. GASNER:**  Objection.  Expert testimony.

14            **THE COURT:**  Sustained.

15   **BY MR. AXELROD:**

16   **Q.**   You had talked earlier about the -- this U bend design.

17   Is that a design that was employed in various DuPont

18   facilities?

19   **A.**   Yes, it was.

20   **Q.**   Okay.  I want to go to a picture, 3818, which is a little

21   bit further down.

22        (Photograph displayed.)

23            **MR. AXELROD:**  Thank you, Mr. Hemann.

24   **BY MR. AXELROD:**

25   **Q.**   Mr. Dayton, do you recognize what's depicted in that

DAYTON - DIRECT / AXELROD

1   photograph?

2   **A.**   Yes.  This is the Edgemoor oxidation area.  The picture is

3   taken from the south.

4   **Q.**   Okay.  And looking at the picture, is the -- where is the

5   oxidation area?  Could you describe that for the jury.

6   **A.**   What we have in this picture, the concrete impoundment in

7   the foreground is the flue pond.  This is during the

8   construction of the facility.  It's not complete at this point.

9        And you have your two heaters.  There's -- the one on the

10  right is for heating up the titanium tetrachloride.  The one on

11  the left is for heating oxygen.  And you can see several bins

12  and vessels in the inside of the building.  It's kind of

13  shadowed.

14  **Q.**   And that structure in the middle of the picture, is that

15  where the oxidation reactor would be housed?

16  **A.**   Yes.

17  **Q.**   And is that something that would be visible from above?

18  **A.**   No.  It's completely enclosed.

19  **Q.**   Okay.  And is that the case with the DuPont plants in

20  general?

21  **A.**   Uhm, all of our oxidation areas have roofs on them.  You

22  can't see anything from the top.  A couple of them, the walls

23  only go down to the second floor, particularly where we have no

24  freezing issues, such as Mexico.  So the first floor is open on

25  the sides but covered on top.

**DAYTON - DIRECT / AXELROD**

1  Q.    Okay.  And in this picture, in 3818, in the center it

2  looks like there's like a concrete structure with a hole on

3  the -- in the middle?

4  A.    Yes.

5  Q.    What's that?  What are we looking at?

6  A.    That is actually the flue pond.  And the hole is where the

7  discharge from the oxidation reactor goes into the pond.

8  Q.    Okay.

9  A.    The piping is not in place yet.

10 Q.    Okay.  And then at the end of the piping would be those U

11 bends that we were looking at --

12 A.    Yes.

13 Q.    -- earlier?

14 A.    That would be part of it, yes.

15         THE COURT:  Let him finish his question, please.

16         THE WITNESS:  I'm sorry.

17 BY MR. AXELROD:

18 Q.    What's the significance of this picture from --

19         MR. GASNER:  Objection.

20         THE COURT:  I'll sustain the objection as to the form.

21         MR. AXELROD:  Okay.

22         THE COURT:  I think you need to be more specific and

23 relate it to his activities at DuPont.

24         MR. AXELROD:  Understood.

25         THE COURT:  Rather than in general.

1          **MR. AXELROD:**  Thank you, Your Honor.

2     **BY MR. AXELROD:**

3     **Q.**   With respect to your experience at DuPont, and in

4     particular from a design perspective, what's the significance

5     of this photograph?

6     **A.**   This photograph actually shows pieces of equipment that's

7     not open to the public.  We would not show anyone.  And there's

8     a number of pieces here that's pretty proprietary.  You

9     actually -- as I look at it, I see some things, perhaps, that's

10    a little hard for others, but there's actually some of the

11    reactor parts are shown inside the print.

12    **Q.**   Okay.  So having that access from a design perspective,

13    would that be useful?

14    **A.**   Yes, it would be.

15    **Q.**   How so?

16    **A.**   Again, when you start doing this you bring someone who's

17    got some skill in the art, they could use this to be able to

18    design some other facilities.

19    **Q.**   Okay.  And if we could go back to the picture of the U

20    bends, on page 2, 3802, same question about from a design

21    perspective, based on your experience at DuPont, what would be

22    the significance of this photograph?

23    **A.**   Again, like the other photograph, it reveals part of our

24    design, and would allow someone else to be able to design bends

25    of their own.

DAYTON - DIRECT / AXELROD

1    **Q.**   I'd now like to go to 3813.

2        (Document displayed.)

3    **Q.**   And do you recognize that item?

4    **A.**   It's the Edgemoor oxidation reactor.

5    **Q.**   And how do you know that?

6    **A.**   Again, I worked at the plant for nine years.  I've run

7    this piece of equipment.

8    **Q.**   From a -- what's the significance of that photograph from

9    a design perspective?

10   **A.**   This photograph shows details of our reactor, which is

11   not -- we would not even show anybody, even on a tour of the

12   plant.  You can actually see into some of the nozzles and see

13   how some pieces/parts are made inside.

14   **Q.**   Okay.  Would that be useful for designing?

15   **A.**   That would be useful for someone designing an oxidation

16   reactor.

17   **Q.**   And if we could go to 3810.

18       (Document displayed.)

19   **Q.**   And do you recognize that photograph?

20   **A.**   Uhm, that one appears to be the Antioch oxidation reactor.

21   **Q.**   Okay.  Would that be -- would that be, from a design

22   perspective, a useful photograph?

23   **A.**   Uhm, much less than the previous picture.  It -- you can

24   see some instruments and pieces, but you don't get to see

25   inside any of the nozzles or anything like that.

 1          **MR. AXELROD:**  Your Honor, may I approach with Exhibit

 2  164?

 3          **THE COURT:**  Yes, you may.

 4  **BY MR. AXELROD:**

 5  **Q.**   And, Mr. Dayton, I'm handing you what's been marked

 6  Exhibit 164.  This is an exhibit that's in evidence.  Do you

 7  recognize it?

 8  **A.**   Yes, I do.

 9  **Q.**   Okay.  And what is it?

10  **A.**   The drawings attached to this are drawings of components

11  for the flue pond for Pangang.

12          **MR. AXELROD:**  And if we could go, let me see, a few

13  pages into that.  I think there's some drawings of U bends.  I

14  apologize.

15          **MR. HEMANN:**  Mr. Axelrod, is that ...

16          **MR. AXELROD:**  Could you go a little further along,

17  Mr. Hemann?  I'm sorry.

18      (Document displayed.)

19          **MR. AXELROD:**  Yes.  Okay.

20  **BY MR. AXELROD:**

21  **Q.**   If we look at page 9, now, a moment ago -- and there's

22  other picture -- or other drawings in Exhibit 164.  You looked

23  at the U bend photo in Exhibit 38.  Does this plan appear to be

24  based on that?

25          **MR. GASNER:**  Objection.  Expert testimony.

1          **THE COURT:**  Sustained.

2    **BY MR. AXELROD:**

3    **Q.**   Does this plan have a structure that's consistent with the

4    one in the U bends that were at Edgemoor?

5          **MR. GASNER:**  Same objection.

6          **THE COURT:**  Overruled.

7          **THE WITNESS:**  The drawing appears to be identical to

8    the photographs of the Edgemoor flue bends.

9    **BY MR. AXELROD:**

10   **Q.**   Why do you say that?

11   **A.**   It has the same arrangement for nozzles.  It has the same

12   arrangement for the fins.  It has the same transition between

13   circular to square around the elbows.

14   **Q.**   Now, I want to switch gears with you a little bit and go

15   back to ...

16      (Photograph displayed.)

17   **Q.**   Okay.  And now we have the photograph displayed next to

18   that drawing.  And can you describe what you were discussing,

19   in general terms, with respect to the pictures?

20   **A.**   If -- uhm, if you look at the drawing, you will see that

21   there are what appears to be fins or reinforcing plates that

22   start about a foot back from the two flanges.  And the flanges

23   are where the pipes bolt together.  And they go all the way

24   around the bend.

25      If you look at the picture, that's very similar.  These

1  plates are very close together, as we are in the straight

2  section, and then they space out to further apart as you go

3  around the bend.  And if you look at the photograph, you see

4  exactly the same kinds of spacing.

5      Both of these start out with a round flange, and both of

6  these, as you look at the back part of the elbow you can see

7  the square side.

8  **Q.**  Okay.  Okay.

9      Let me switch gears with you.  And at the beginning of the

10  day, many hours ago, you had talked about some of the positions

11  you had held at DuPont.  And I believe you said you were

12  involved in some acquisition due diligence or investigation.

13  Do you recall that?

14  **A.**  Yes.  I was involved with two different acquisitions.

15  **Q.**  Okay.  And could you describe your experience?  What was

16  the first acquisition that you were involved?

17  **A.**  The first acquisition of what was then Tioxide, which had

18  a number of plants around the world, and the work that I did

19  was the plants in Europe.  So I visited facilities in Italy,

20  Spain, in France, and England.

21  **Q.**  Okay.  So for the Tioxide potential -- DuPont did not

22  acquire Tioxide, right?

23  **A.**  No.

24  **Q.**  But there was the prospect of acquiring Tioxide?

25  **A.**  Yes.  We had an agreement to purchase them.

**PROCEEDINGS**

1   **Q.**   And Tioxide was a competitor?

2   **A.**   Yes, they were.

3   **Q.**   And also doing chloride route TiO2?

4   **A.**   They have one plant that does chloride route, and the rest

5   of their plants use the sulfate process.

6   **Q.**   And when you were involved in the -- what was your role in

7   the acquisition process?

8   **A.**   My job was to go to these various plant sites and review

9   their site for the condition of the equipment in the rest of

10   the facility.

11        **THE COURT:**  Mr. Axelrod, at a convenient point, I

12   think we're going to break.

13        **MR. AXELROD:**  This is a convenient point, Your Honor.

14        **THE COURT:**  You may step down, sir.  We're going to

15   adjourn for the day.

16        And, ladies and gentlemen, I am going to again inform you

17   of your proper conduct, which the law requires me to do each

18   day.  So let me remind you of your proper conduct.

19        First, keep an open mind throughout the trial and do not

20   decide what the verdict should be until you and your fellow

21   jurors have completed your deliberations at the end of the

22   case.

23        Second, because you must decide this case based only on

24   the evidence received in the case and on my instructions as to

25   the law that applies, you must not be exposed to any other

1    information about the case or to the issues it involves during

2    the course of your jury duty.

3         Thus, until the end of the case or unless I tell you

4    otherwise, do not communicate with anyone in any way and do not

5    let anyone else communicate with you in any way about the

6    merits of the case or anything to do with it.  This includes

7    discussing the case in person, in writing, by phone, Smartphone

8    or electronic means, via email, text messaging or in or on any

9    Internet chat room, blog, website including such social

10   networking media like Facebook, MySpace, LinkedIn, YouTube, and

11   Twitter, or other feature.

12        Decline to communicate with your fellow jurors until I

13   give you the case for deliberation.  And it applies to

14   communicating with everyone else, including your family

15   members, your employer, the media or press, and the people

16   involved in the trial.  Although, you may notify your family

17   and your employer that you've been seated as a juror in this

18   case and are continuing your service.  But if you're asked or

19   approached in any way about your jury service or anything about

20   this case you must respond that you have been ordered not to

21   discuss the matter and to report the contact to the Court.

22        Because you will receive all the evidence and legal

23   instruction you may properly consider to return a verdict, do

24   not read, watch, or listen to any news or media accounts or

25   commentary about the case or anything to do with it.  Do not do

**PROCEEDINGS**

1   any research such as consulting dictionaries, searching the

2   Internet, or using other reference materials.  And do not make

3   any investigation or in any other way try to learn about the

4   case on your own.

5       The law requires these restrictions to ensure the parties

6   have a fair trial based on the same evidence that each party

7   has had an opportunity to address.

8       A juror who violates these restrictions jeopardizes the

9   fairness of these proceedings, and a mistrial would result that

10  would require the entire trial process to start over.  If any

11  juror is exposed to any outside information please notify the

12  Court immediately.

13      So we are adjourned until tomorrow morning.  We are going

14  to follow the regular 8:00 to 1:30 schedule tomorrow, and

15  toward the end of the day we'll talk more about schedule.  So

16  you're excused until tomorrow morning, with the Court's thank

17  you.

18      Could Juror Number 7 remain for a moment, please.

19      Thank you.  Everyone else are excused.

20      **(Proceedings were heard out of presence of the jury:)**

21          **THE COURT:**  All right.  Welcome again, Mr. Xavier.

22      I wanted to check in with you to see, in light of what we

23  were discussing earlier, and having had a few hours of

24  testimony, is anything that's going on with your family, did

25  that -- do you feel that in any way distracted you from

1    concentrating on the testimony as it was proceeding?

2         **JUROR NO. 7:**  I called my wife earlier, and I could be

3    at 9:30 here.

4         **THE COURT:**  Okay.  I appreciate that.  And I'll get

5    there in a minute.

6         What I was asking you is -- maybe you implicitly answered

7    it.  Without getting too deeply into your mind-set I just

8    wanted to know, we all want to know whether the issues that are

9    going on, you know, with the medical situation in your family,

10   was that of such a distraction that in some way it interfered

11   with your ability to follow what was going on today?

12        **JUROR NO. 7:**  Yes.

13        **THE COURT:**  Can you explain a little bit more, please.

14        **JUROR NO. 7:**  Because my wife had -- had little bit of

15   early stage of maybe cancer two years ago and she had -- and

16   doctor said no, it's a little numb.  And she had that kind of

17   feeling that with my sister-in-law.  She and her sister-in-law,

18   they have some kind of feeling now, and she feels how -- my

19   wife feels how my -- her sister-in-law's -- I mean how bad it

20   is.  And she tried to comfort her.  And she comes home late,

21   and I have to be with the baby.

22        **THE COURT:**  All right.  So is what you're saying that

23   your wife kind of feels like she might have some of the same

24   symptoms as your sister-in-law?

25        **JUROR NO. 7:**  No.  Emotional feelings.  And she wants

**PROCEEDINGS**

1    to calm her down and stay with her and comfort her.

2          **THE COURT:**  And how is that affecting your ability to

3    concentrate on what's going on here?

4          **JUROR NO. 7:**  Because she comes home late.

5          **THE COURT:**  No, no.  I'm asking about your mind-set.

6    How do you feel in the sense of does it distract you from

7    following what's going on because you're thinking about your

8    family situation?

9          **JUROR NO. 7:**  No.

10         **THE COURT:**  So you're able to follow what was going on

11   today?

12         **JUROR NO. 7:**  Yes.

13         **THE COURT:**  And you feel you're able to continue,

14   notwithstanding these events that are going on in your life?

15         **JUROR NO. 7:**  No.  I'm okay.

16         **THE COURT:**  You're okay?

17         **JUROR NO. 7:**  Yes.

18         **THE COURT:**  So you feel like you can continue on the

19   jury?

20         **JUROR NO. 7:**  Yes.

21         **THE COURT:**  Let me ask you, one question I didn't ask

22   you is, let's say on Monday -- you're saying Monday you could

23   be here at 9:30, correct?

24         **JUROR NO. 7:**  Yes, Your Honor.

25         **THE COURT:**  All right.  Let's say we start at 9:30,

**PROCEEDINGS**

1   and we go later.  Do you have issues with picking up your

2   child?

3               JUROR NO. 7:  I have to be there before 4:30.

4           THE COURT:  Before 4:30?

5           JUROR NO. 7:  Yes, sir.

6           THE COURT:  So if we went until 3:30, let's say -- and

7   I don't want you to discuss it with the rest of the jury

8   because I have to talk to counsel about this.  Let's say we

9   went from 9:30 to 3:30.  Would that give you enough time to

10  pick up your child.

11              JUROR NO. 7:  Yes, Your Honor.

12          THE COURT:  So let me suggest the following.  This was

13  actually suggested by all of us.  Talk to your family tonight,

14  not about what's going on in the case because you can't do

15  that, but just to get a sense of how everybody is doing and how

16  you feel about continuing, and whether you think there will be

17  interruptions again where we have to modify the schedule, and

18  just -- I understand that you won't know until Monday what the

19  appointments are, but just kind of give us an update on how

20  things are going with your family and how you're feeling,

21  tomorrow morning, before we start okay.

22              JUROR NO. 7:  Yes, Your Honor.

23          THE COURT:  So talk to your family about the impact

24  this is having on you and your ability to keep a relatively

25  regular schedule for the rest of the trial.  Okay?

**PROCEEDINGS**

1           **JUROR NO. 7:**  Yes, Your Honor.

2           **THE COURT:**  And would you mind giving us an update

3    tomorrow morning?

4           **JUROR NO. 7:**  Yes, Your Honor.

5           **THE COURT:**  Thank you so much.  You're excused.  I

6    really appreciate your candid responses to the Court.  Have a

7    wonderful evening.

8           **JUROR NO. 7:**  Thank you.

9        (Juror No. 7 exits courtroom.)

10          **THE COURT:**  In light of his answers, we'll kind of

11   keep going and, as Mr. Froelich suggests, get an update

12   tomorrow and see how he's feeling.

13       I took from the way he finally answered, because we were

14   sort of kind of not communicating, that he's doing okay and

15   he's able to follow.  And with that we'll continue.

16       And I intend to propose to the jury tomorrow that we sit,

17   perhaps, from 9:30 to 3:30.  I'll simply say that an issue

18   arose, unforeseen, that requires us to amend the schedule.  So

19   I don't put the juror on the spot.  And if they say no, we'll

20   just use whatever time we have.  And if they say yes, we'll go

21   from 9:30 to 3:30 on Mondays.  Is that okay with the

22   government?

23          **MR. AXELROD:**  That is, Your Honor.

24          **THE COURT:**  Is that okay with the defense?

25   Mr. Froelich?

1        **MR. FROELICH:**  Yes, Your Honor.

2        **MR. GASNER:**  Yes, Your Honor.

3        **THE COURT:**  With respect to Mr. Liew's status, the

4    hearing has been moved up to 3:15.  And the other thing I

5    wanted to mention to you, to the extent that this is going to

6    take -- it may take some time to comply with the requirements

7    that I have suggested to Judge Cousins, I -- I was informed by

8    the marshals, for whatever it's worth, that they have now,

9    quote-unquote, worked out all the issues.  To the extent

10   there's a delay, that doesn't change the Court's mind as to

11   releasing Mr. Liew, but at least gives the Court a bit of

12   comfort that if there's a delay that he will have the access

13   that he's entitled to.  And if that's not the case, let us know

14   and we'll move things up.  But Judge Cousins is aware of the

15   urgency of this both in terms of imposing the appropriate

16   conditions of release as well as the due process issues.  And I

17   know he's going to cooperate.

18       **MR. GASNER:**  Thank you, Your Honor.

19       **THE COURT:**  If there's any -- if that doesn't happen,

20   let the Court know tomorrow morning.

21       Anything further before we adjourn?

22       **MR. HEMANN:**  I'd like to -- we have agreement on the

23   verdict form.  I believe that Ms. Lovett is or has or is going

24   to file it.  And the parties are in concurrence on it.

25       **THE COURT:**  The Court will put that on its own

PROCEEDINGS

1    stationery, is typically the case.

2        Anything further?

3            **MR. GASNER:** Nothing, Your Honor.

4            **THE COURT:** Let us know if there's anything with

5    respect to the conditions of release or the access issues.

6        Thank you very much, Counsel.

7            **MR. AXELROD:** Thank you.

8                (Proceedings adjourned at 2:48 p.m.)

9                        ---oOo---

10            **CERTIFICATE OF REPORTERS**

11        I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   DATE:  Wednesday, January 22, 2014

15

16

17

18   _____

19       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              U.S. Court Reporter

20

21

22   _____

23       Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              U.S. Court Reporter

24

25